UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------x

UNITED STATES OF AMERICA,

         -against-

ARTHUR NIGRO,                    S5 09 Cr. 1239 (PKC)
FOTIOS GEAS, and
TY GEAS,

          Defendants.

-------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF TY GEAS' CROSS-MOTION *IN LIMINE* AND IN OPPOSITION TO THE GOVERNMENT'S MOTIONS *IN LIMINE*

ATTORNEYS FOR TY GEAS

Bobbi C. Sternheim, Esq.
156 Fifth Avenue-Suite 600
New York, NY 10010
212-243-1100

Lee Ginsberg, Esq.
30 Vesey Street- Suite 100
New York, NY 10007
212-608-0808

Zoe Dolan, Esq.
30 Vesey Street- Suite 100
New York, NY 10003
347-301-5180

## TABLE OF CONTENTS

Page

Introduction...............................................................................................3

Background...............................................................................................3

Point I:   A Bill of Particulars, Disclosure and Hearing Are Required..................................9

Point II:   Admission of Proffered "Other Acts" Evidence Should Be Denied....................14

Point III:  Evidence of Prior Prison Terms Is Unduly Prejudicial........................................20

Point IV:  A Bruton Ruling Is Required Concerning Fotios Geas' Statement.....................20

Point V:   A Hearing Is Required Concerning Admissibility of Victim Statements.............21

Point VI:  The Proposed Expert Testimony Should Not Be Permitted....................................23

Point VII:  There Is No Basis for an Anonymous Jury................................................................23

Point VIII: Request to Join in Submissions and to Supplement...........................................31

Conclusion...............................................................................................32

## INTRODUCTION

Defendant Ty Geas submits this memorandum in law (1) in support of his cross-motion *in limine* for further information from the government and a hearing, (2) in opposition to the government's motions *in limine* with respect to proposed evidence, (3) in opposition to the government's motion for an anonymous jury, and (4) to join in co-defendants' motions, as applicable, and to supplement this submission, if necessary.

## BACKGROUND

### Case Posture & Charges

One night in November of 2003 in Springfield, Massachusetts, Frankie Roche shot and killed Adolfo Bruno. Roche was prosecuted for Bruno's murder in Massachusetts state court, and that prosecution would eventually evolve into the case now before this Court. During the months prior to Bruno's death, Roche had stayed in Ty Geas's ("Ty") apartment for a brief period of time before living with two young men – Billy Johnston and Brandon Croteau – who provided housing for Roche at the time of Bruno's murder. Indeed, shortly before killing Bruno, Roche had gotten into a fight at Emo's Bar in Springfield and smashed the place up with a baseball bat, with Croteau and another cohort, Michael DeCaro, in attendance. And, as law enforcement discovered, Bruno had a financial interest in Emo's.

Roche's case proceeded toward trial in state court until he was federally indicted for the murder in the United States District Court for the District of Massachusetts. Roche evidently began cooperating against codefendant Fotios Geas ("Freddy"), Ty's brother, who was federally indicted in 2008 in the District of Massachusetts for Bruno's murder.

3

Meanwhile, the instant case was taking shape.  At some point, Roche apparently also began cooperating against Anthony Arillotta, who was indicted in the instant case before this Court before beginning his own cooperation with the government.

Soon after Arillotta's apparent cooperation, Gary Westerman's body was discovered. Charges were then brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO") in this Court against Freddy and Ty for the murder of Bruno and the murder of Westerman.  In addition to these two murders, Freddy and Ty face charges of conspiracy to murder and attempted murder of Frank Dadabo, conspiracy to murder Louis Santos, the newly added charge of conspiracy to murder Guiseppe Manzi, and extortion charges relating to Massachusetts strip clubs, a New York strip club and vending machine businesses in Springfield.

As described in the government's motions *in limine*, both Roche and Arillotta are anticipated to testify at trial.

**Factual Background**

Based on our review of discovery, investigations, and meetings with the government to discuss aspects of the case relevant to this motion, the following is a summary of alleged facts likely to be adduced through testimony at trial.  The allegations discussed in this motion are set forth for the purposes of argument only.  No statement may be construed as an admission by Ty or a concession that any allegation is true.

**Bruno**

Bruno was the alleged capo of the Springfield faction of the Genovese Crime Family. Prior to Bruno's murder, Emiliano Fusco, a codefendant in the instant case, received a

4

revised PSR in another case, *United States v. Anthony Delevo*, 00 Cr. 30036. As a preliminary matter, Delevo was a former alleged capo and Bruno's predecessor. The PSR Fusco received stated that, based on information that Bruno had provided to Federal Bureau of Investigation ("FBI") Special Agent Clifford Hedges, Fusco was a made member in the Genovese Family.

Fusco met with Carlotta and codefendant Felix Tranches to discuss Bruno's apparent cooperation. The PSR was provided to lead codefendant Arthur Nitro, who then approved Bruno's murder. Arillotta allegedly looped Freddy and Ty into the plot, and various options for carrying it out were discussed.

Meanwhile, John Bologna, a Gambino Crime Family member on loan to the Genovese who stood to benefit financially from Bruno's death, had come into the picture. Bologna has apparently been cooperating with the government since at least 1997. As further discussed below, Bologna lied to his FBI handler about the circumstances surrounding Bruno's death, among other things. By letter dated December 27, 2010, the government advised the defense that it does not currently intend to call Bologna to testify at trial but will produce his 3500 material in due course.

Back in Springfield around the time of Bruno's death, the incident at Emo's Bar occurred. After Roche got in a fight at the bar and then smashed it up with a bat, it was decided that Roche would be included in the plot against Bruno. Fusco obtained a .45 caliber firearm for Roche to use in the murder.

Roche involved Croteau, and together they cased the Mt. Carmel Society, a social club in Springfield that Bruno frequented. After that, Roche ambushed Bruno in a parking

lot at Mt. Carmel and shot him. At some point, Roche paid Johnston and Croteau to stay quiet about the murder. Roche thereafter hooked up with an individual named Mario Imbesi, a consort of Bologna's, to commit street crimes. Subsequently, Roche made his way to Florida, where he stayed with Anthony DeSanto, a contact of Imbesi's. Roche soon returned north and met a woman who is now his wife. He was arrested following a shoot-out with the FBI in Florida.

### Westerman

Westerman was hanging around in Springfield committing crimes for years. Not long before his death, he married Arillotta's sister-in-law, Sandra Berardi. Their relationship angered Arillotta because Sandra was decades Westerman's junior. In addition, Westerman, a cokehead and drug-dealing thief, gave Sandra lots of drugs and there are rumors of various ménage-a-trois sexual activities. Irritated by these developments, Arillotta was going to kill Westerman approximately nine to twelve months before the murder, however, things calmed down.

According to the government, the Geases asked Arillotta to help kill Westerman because they believed that Westerman cooperated against Freddy in connection with a 1996 case. That case involved a truck hijacking in which Westerman and Freddy participated. Freddy took a plea. Arillotta signed on and looped in Fusco.

### Santos

Discovery reviewed to date indicates that Roche was allegedly involved in a plot to kill Santos in the summer of 2003, prior to the deaths of Bruno and Roche. Allegedly,

however, the Santos plot was "put off" in place of a contract with Roche on Guiseppe Manzi's life.

### The Manzis

The Manzis are a family in Springfield. The government had informed us that evidence regarding the Manzis would be offered as Rule 404(b) or background evidence. As of yesterday, January 20th, a late-breaking superseding indictment added a new charge of conspiracy to murder Guiseppe Manzi. While reserving the right to challenge the propriety or scope of admissibility pertaining to any such evidence at trial, the discovery reveals the following allegations that involve the Manzis.

Vinnie Canavan, an enforcer for the Manzis, was assaulted at his house by two men whom Canavan suspected to be Manzi's crewmembers. After discussing the matter with Roche, Canavan caucused with Roche, Arillotta, the Geases, Johnston, Croteau and another person who has not been indicted in any incarnation of this case.

One night after this meeting, the group became involved in a display of gunfire against the Manzis at a Springfield nightspot known as the Civic Pub. Arillotta's house was later shot up. After these events, Arillotta instructed Roche to use an AK-47 in public "to set an example," and Roche's contract on Manzi's life was renewed to include the two men who were suspected to have assaulted Canavan.

The alleged plot against the Manzis came to naught.

### Extortion

7

As mentioned above, Ty faces extortion charges relating to Massachusetts strip clubs, a New York strip club and vending machine businesses in Springfield. Ty, Freddy and Arillotta previously went to trial together in Massachusetts state court for charges relating to vending machines in Springfield. The principle witness was Emo Gonzalez, who had run Emo's Bar before a series of events that resulted in his extradition from Canada to face drug charges in Massachusetts. All three – Ty, Freddy and Arillotta – were found not guilty.

**Additional Testimony the Government Seeks to Admit**

In its motions *in limine*, the government seeks to admit testimony or evidence regarding various bad acts and uncharged crimes over the course of two decades:

- Robberies Arillotta and Freddy allegedly committed together and with others beginning in the early 1990's, and robberies of drug dealers that Freddy and Ty allegedly committed together in the 1990's and 2000's. Government's Motions *In Limine* ("Gov't MIL") at 6-7.
- A 1996 truck theft by Freddy and Westerman. *Id.* at 8.
- Prior conspiracies to murder Westerman allegedly involving Freddy, Arillotta or Michael DeCaro. *Id.* at 9-10.
- A conspiracy to murder Guiseppe Manzi, allegedly involving Freddy, Ty, and Roche, and alleged related acts. *Id.* at 10-13.
- Robberies allegedly discussed among Freddy, Ty and Roche. *Id.* at 7.
- An assault on Jeff Solely in October 2003 allegedly involving Freddy and Roche and a payment to Roche by Ty. *Id.* at 13-14.
- A beating of Anthony DeFranco in Bronx allegedly involving codefendant Arthur Nigro. *Id.* at 14.
- An assault on July 11, 2004 involving Freddy and alleged associate Angelo Malafronte. *Id.* at 14.
- An alleged beating of codefendant Felix Tranghese by Freddy, allegedly approved by Nigro. *Id.* at 14-15.
- Alleged extortions involving Springfield businesses Red Rose, Café Manhattan, and Hot Club, loansharks/bookmakers including Robert Desimone, Louis Naioleari and Ryan Fattini, and Club Blue in Hartford: Club Blue, and, as to Nigro only, assorted individuals and business owners in Florida. *Id.* at 15-16.
- Marijuana and cocaine in which Freddy and Ty were allegedly involved. *Id.* at 16.
- Narcotics trafficking in which Arillotta, Fusco and Santos were allegedly involved. *Id.* at 16.

In addition, the government seeks to introduce statements Freddy allegedly made to Roche confessing to Westerman's murder as an admission or co-conspirator statement. *Id.* at 30-34. The government also seeks to admit statements of Bruno relating to Fusco. *Id.* at 37-38. Further material the government seeks to admit encompasses statements by Westerman regarding Freddy, Ty and organized crime, including statements about (1) Arillotta, Freddy and Ty allegedly making moves and seeking to retire Bruno; (2) an alleged robbery of Manzi's cousin by the Geases; (3) the Geases' alleged involvement in an August 29, 2003 shooting of the Civic Pub in Springfield; and (4) alleged retaliation by the Geases in connection with a shooting of Arillotta's house. *Id.* at 38-39.

## POINT I

### A BILL OF PARTICULARS, DISCLOSURE AND HEARING ARE REQUIRED

It is necessary for the defense to receive particulars regarding undated acts the government seeks to introduce. Rule 7 of the Federal Rules of Criminal Procedures provides that "[t]he court may direct the government to file a bill of particulars." A bill is appropriate to identify charges, prevent surprise and establish the contours of a future double jeopardy claim. *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988). Applying these principles in the context of the racketeering statute requires the Court's care. *Id.* Thus, scrupulousness requires the government to provide a bill of particulars in a RICO case involving uncharged acts allegedly in furtherance of the racketeering charges. *See id, generally*.

The government has taken the position that the proposed evidence falls within the ambit of the charged racketeering enterprise. *See* Gov't MIL at 18-22, 30, 42-43. The charged enterprise in this case covers nearly ten years and the government seeks to

9

introduce various uncharged acts extending twenty years into the past. Accordingly, to the extent that any aspect of the alleged enterprise remains unspecified, a bill of particulars is in order. Without such particulars, the defense is unable to challenge the relevancy or propriety of the potential testimony the government mentions.

## Further Discovery Is Necessary

Immediate disclosure of material in the government's possession pertaining to Arillotta and Roche and a hearing are necessary to address the issues in the government's motions in limine. To understand why, we turn to the discovery in this case, which reveals information that undermines or contradicts testimony the government will elicit from Carlotta and Roche.

## Information from the Discovery

The voluminous discovery provided to date comprises a spate of discrepancies among cooperator information and investigative leads. As a preliminary matter, the discovery material divides into six categories: (1) Bruno, (2) Roche, (3) Westerman, (4) Bologna, (5) Arillotta, and (6) The Manzis. The material relating to Bruno subdivides into another six categories, specifically, information indicating that: (i) Bruno was killed by someone amongst several individuals other than the Defendants; (ii) Bruno had adversarial relationships with individuals other than the Defendants; (iii) individuals other than the Defendants were extorted by Bruno or owed him money; (iv) individuals other than the Defendants lied to law enforcement during investigation of Bruno's murder; and (v) there were or are individuals suspected or alleged to be involved in Bruno's murder other than the Defendants.

As to Roche, there are three areas of information, that is: (i) threats in connection with Bruno's murder, (ii) uncharged criminal activity in which Roche was involved, and (iii) statements by others about Roche, including Bologna's statement that information Roche provided to law enforcement was incorrect. The information revealed to date about Westerman, Bologna, Arillotta falls within the realm of their past criminal activities or aspects of their involvement with law enforcement or individuals in connection with the instant case. Information relative to the Manzis likewise revolves around their involvement with individuals or events in this case.

Our review of discovery provided to date is ongoing. We anticipate that further review will reveal additional information that would supplement this summary.

**Legal Framework**

Due process obliges the government to disclose material evidence that is favorable to an accused upon request. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Such evidence includes information that is useful to impeach witness credibility. *Giglio v. United States*, 405 U.S. 150 (1972). Reversible error arises where the government fails to disclose such material and there is little or no other evidence implicating the accused other than testimony by a government witness to whom the material relates. *See,* e.g., *id.*, and *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001) (reversible error where undisclosed observations of crime scene by eyewitness undermined observations of two eyewitnesses who testified for prosecution and there was no other evidence of defendant's guilt). Similarly problematic is the nondisclosure of evidence that may provide a basis for attacking "the probative value of crucial physical evidence and the circumstances in which it was found [or] the

thoroughness and even the good faith of the investigation..." *Kyles v. Whitley*, 514 U.S. 419,

444 (1995). Finally, "[an] individual prosecutor has a duty to learn of any favorable

evidence know to the others acting on the government's behalf in the case, including the

police." *Id.* at 437.

## Further Disclosure and a Hearing are Necessary

The government's motions *in limine* thrust the credibility of Arillotta and Roche into

issue at this time. It is impossible to respond without disclosure of any statement Arillotta

or Roche has made to law enforcement. The discovery yields (1) contradictions among

their testimony and statements to law enforcement as to Bruno's murder; (2) concerns

arising from Bologna's lies to the FBI about information that goes to the core of the case

and the accuracy of information provided Roche; and (3) issues relating to the nature of

Arillotta's relationship with the Manzis.

Accordingly, disclosure of material relating to Arillotta or Roche and a hearing are

required to determine the scope and admissibility of the proffered testimony.

## A Representation from the Government is Necessary

By letter to the government dated December 23, 2010, the defense set forth seventy

(70) areas of disclosure pursuant to *Brady* and its progeny. The government responded on

January 12, 2011, and we are currently reviewing the material the government provided.

Pending our review, we reiterate our requests for material relating to Roche's criminal

activities or past (request no. 17, 26, 27, 28, 41), Arillotta's criminal activities or past

(request no. 7, 47, 52, 64, 65, 66) or information about criminal activity involving the Manzis (request no. 7, 13, 21, 38, 39).

It is logical to believe law enforcement possesses voluminous material responsive to these demands that the defense may have yet to receive. Arillotta appeared on the radar of federal law enforcement as early as 1995. Guiseppe Manzi was subject to a Fall 1998 gaming investigation by the Massachusetts State Police as early as 1998, and the FBI was aware of a connection between Delevo and Manzi as early as 2000. With respect to the case more generally, Bruno had been the subject of federal wiretaps beginning in 1976. Westerman, in the words of Trooper Liam Jones of the Massachusetts State Police Detective Unit, "was a subject known to the State Police Detective Unit from prior arrests and prior criminal investigations" which began in May 1996 at the latest. Bologna is even more familiar to law enforcement. The FBI opened him as a source as early as March 25, 1997.

In light of these considerations, the defense asks the government to represent whether the material it has turned over to date constitutes the universe of material responsive to our December 23rd requests, in particular with respect to the requests highlighted above.

For the reasons set forth above and in co-defendants' submission, as applicable, the relief sought by the defense should be granted.

## POINT II

### ADMISSION OF PROFFERED "OTHER ACTS" EVIDENCE SHOULD BE DENIED

The government seeks to admit evidence of several crimes allegedly committed by Ty Geas and co-defendants that are not charged in the Indictment.  In particular, the government seeks to introduce evidence of Ty's alleged involvement in: (1) a prison beating; (2) robberies; (3) conspiracy to murder Guiseppe Manzi;[1] (4) additional acts of violence; (5) additional extortions; and (6) narcotics trafficking. The government's proffer of uncharged crimes should be rejected.  The probative worth of the evidence sought is substantially outweighed by the undue prejudice to be suffered by Ty Geas if admitted.

To assist the Court in its sensitive gatekeeping function and necessary balancing of competing interest pursuant to Rules 401, 403, and 404(b), the defense wishes to make clear that the following will not be contested at the upcoming trial.

- The existence of the enterprise, the Genovese Crime Family;
- The Genovese Crime Family's involvement in racketeering activity
- The Genovese Crime Family's effect on interstate commerce
- Ty's close relationship of confidence and trust with Arillotta

As such, the defense objects to admission of any of the other uncharged crimes evidence regarding Ty Geas for purposes of establishing that which will not be contested.

### Legal Framework

The defense is well aware of this Court's familiarity with the standards applicable to the issues.  Nevertheless, it is necessary to underscore a few principals.  Although the

---

[1] On the eve of this submission, the government filed a superseding indictment adding a new charge: conspiracy to murder Guiseppe Manzi, which had been included in the government's motion *in limine* as an uncharged act.  We will not state our specific objection to its introduction under an "other crimes" basis.  We do, however, object to the inclusion of this charge at this late date and will amplify our objection at the January 25th conference.

Second Circuit's "inclusory" approach affords broad latitude to the District Court regarding the admission of uncharged crimes evidence under Rule 404(b), this approach "does not obviate the need to identify the fact or issue on which the evidence is relevant." *United States v. Figueroa*, 618 F.2d 923,949, n.2 (2d Cir. 1980).  There must be a clear connection between the prior act evidence and a disputed issue at trial.  *See United States v. Mohel*, 604 F.2d 748 (2d Cir. 1979).

The Second Circuit has adopted an "inclusive" approach to Rule 404(b). *United States v. Stevens*, 83 F.3d 60, 68 (2d Cir. 1998).  Accordingly, evidence of other acts may be admitted for "any purpose except to show criminal propensity, unless the trial judge concludes that its probative value is substantially outweighed by its potential for unfair prejudice." *United States v. Germosen*, 139 F.3d 120, 127 (2d Cir. 1998) (internal citation and quotation marks omitted). Rule 404(b)'s list of permissible purposes for the admission of other act evidence is "non- exhaustive." *United States v. Levy*, 731 F.2d 997, 1002 (2d Cir. 1984).  Nonetheless, before other act evidence may be admitted under Rule 404(b), the court must consider whether it is offered for a proper purpose, whether it is relevant to a disputed issue, and whether its probative value is substantially outweighed by its possible prejudicial effect. *See United States v. Edwards*, 342 F.3d 168, 176 (2d Cir. 2003). Furthermore, if such evidence is admitted, the court must administer an appropriate limiting instruction if one is requested. *See id.; United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992).

The government has proffered the evidence of other uncharged crimes in a number of ways: pursuant to Rule 404(b), as direct evidence of the charged offenses, and as

evidence that is inextricably intertwined with evidence of the charged offenses. The government's position and cases cited in support does not obviate the need for sensitive balancing pursuant to Rule 403. *United States v. Carniglia*, 256 F.R.D. 104 (E.D.N.Y. 2009, Weinstein, J.). Several of the government's proposed bases for the admission of other acts evidence under Rule 404(b) are overbroad and rely impermissibly on a theory of criminal propensity.

The court may exclude relevant evidence, whether admitted under Rule 404(b) or otherwise, for several enumerated reasons. Rule 403 specifically provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *See United States v. Massino*, 546 F.3d 123 (2d Cir. 2008, *cert. denied*, 129 S. Ct. 1928 (2009). The "conscientious assessment" of the evidence under Rule 403 includes a determination of "whether there exists any alternative evidence with same of greater probative value, but with a lesser threat of unfairly prejudicing the defendant, as the proffered evidence." *United States v. Carneglia* 256 F.R.D. 104, 112 (E.D.N.Y. 2009).

As the Supreme Court observed, "[t]he term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). Evidence is commonly considered prejudicial if it tends "unfairly to excite emotions against the defendant." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). "Evidence that tends to prove a

16

character trait of a defendant is admissible if it is offered for another, proper purpose." *United States v. Salameh*, 152 F.3d 88, 123 (2d Cir. 1998). However, evidence of uncharged acts is unfairly prejudicial if its probative value is substantially outweighed by its tendency to imply "bad character" that the jury might take "as raising the odds that [the defendant] did the later bad act now charged (or, worse, as calling for preventive conviction even if he should happen to be innocent momentarily)." *Old Chief*, 519 U.S. at 180.

In conducting the required Rule 403 balancing, the court should "evaluate the degrees of probative value and unfair prejudice not only for the item in question but for any actually available substitutes as well." *Id.* at 182. It is within the court's discretion to exclude proposed evidence if alternative evidence has "substantially the same or greater" probative value but a lower risk of prejudice. *Id.* at 182-83.  This is because "what counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives." *Id.* at 184; *see also United States v. McCallum*, 584 F.3d 471, 477 (2d Cir. 2009) ("'[T]he availability of other, less prejudicial, evidence on the same point ordinarily reduces the probative value of a given item of extrinsic evidence.'") (quoting Weinstein, Federal Evidence § 404.21 (Joseph M. McLaughlin ed., Mathew Bender & Co. 2009)).

A party's concession is "pertinent to the court's discretion to exclude evidence on the point conceded" under Rule 403. *Id.* at 184.  Where a party does not contest a point, evidence supporting that point offered by the opposing party is less probative, and its admission implicates the Rule 403 consideration of "waste of time." *Id.* As stated earlier, Ty will not be contesting the existence of the enterprise, namely the Genovese crime family;

nor will he contest the Genovese family's involvement in racketeering activity or its effect on interstate commerce. In addition, he will not be contesting his close relationship of trust with Arillotta.

Rule 402 applies to this situation whether the proffered evidence is offered under Rule 404(b) or as direct evidence of the crimes charged. The Second Circuit has held that Rule 404(b) bad acts must be relevant to an "actual" issue and an offer to stipulate an issued removes it from the case. *Mohel*, 604 F.2d at 751. Furthermore, even in the absence of a formal offer to stipulate, defendants may remove an issue from consideration as long as the decision not to dispute the issue is made with sufficient clarity that the trial court will be justified in (1) in sustaining objection to any subsequent cross-examination of jury argument that seeks to raise the issue, and (2) in charging the jury that if they find all the other elements established beyond a reasonable doubt, the can resolve the issue against the defendant because it is not disputed. *Figueroa*, 618 F.3dat 934.

With respect to all of the evidence proffered by the prosecution, the defense objects pursuant to Rule 403 of the Federal Rules of Criminal Procedure (evidence) on the grounds that the probative value of the evidence is substantially out weighed by the unfair prejudice to Ty; the evidence is not cumulative, not related to matters are truly in issue, will unduly mislead or confuse the jury, constitute a waste of time. Furthermore, introduction of the evidence will violate Ty's right to a fair trial within the meaning of the Fifth Amendment to the United States Constitution. Offering evidence of so many uncharged crimes chiefly serves as an unfair attempt to improperly demonstrate Ty's capability for violence and criminality. It is an effort to buttress the crimes charged by establishing Ty's character as a

18

violent killer and degenerate criminal. That is precisely what legal precedents and rules of evidence forbid.

## Specific Objections

Evidence concerning a prison beating inflicted by Ty is remote in time to the crimes charged and unrelated to enterprise activity.  Evidence of that crime does nothing to prove the conspiracies or homicides and the evidence is highly prejudicial. The government's proffer of irrelevant violent criminality highlights its need to paint Ty Geas as a habitually violent individual so that the jury will convict him of the charged crimes based on non-charged crimes. This prosecutorial approach should not be permitted.

We do not contest the close relationship of trust between Ty and Arillotta and between Ty and his brother.  The government can put relationship before the jury without prejudicing the defendants by introducing evidence of incarceration.

With respect to allegations of uncharged robberies, extortions, and narcotics activity, the prejudice to be suffered substantially outweighs the probative value of the proof.  Notably, the government virtually concedes that such evidence bears no relationship or connection to the enterprise charged.  Rather, by introducing criminality separate from the charged conduct, the government seeks to paints Ty and his brother Fotios as a roving band of thieves, further suggesting propensity.

The government's proffer of unspecified "additional acts of violence by the defendants," undated and non-specific acts of extortion, and additional allegations of narcotics trafficking provide less than reasonable notice of the government's intent within

the meaning of Rule 404(b).  It is unfair and unreasonable for the government to require the defense to peruse thousands of pages of discovery, hundreds of hours of recorded conversations, lengthy 3500 material and the like, to speculate over which crimes they mean to introduce or when and how such alleged activity occurred.

For the reasons stated, the Court should preclude introduction of the proffered other acts evidence.

## POINT III

### EVIDENCE OF PRIOR PRISON TERMS IS UNDULY PREJUDICIAL

As discussed in Point II, *supra*, introduction of evidence regarding prison terms of Ty and his co-defendants is highly prejudicial and should be precluded through stipulation. The parties can reach a mutually agreeable stipulation concerning relationship between alleged co-conspirators without reference to prior convictions and incarceration.

## POINT IV

### A BRUTON RULING IS REQUIRED CONCERNING FOTIOS GEAS' STATEMENT

The government seeks to admit statements by Fotios Geas regarding the Westerman murder that implicate his brother, Ty.   This hearsay statement should not be admitted. It was not made in furtherance of the conspiracy  to murder Westerman, having been made some two years after his death.  Nor should it be admitted against Ty as an alleged admission by co-conspirator made in furtherance of the RICO conspiracy.  Introduction of this statement violates the precepts of *Bruton v. United States*, 391. U.S. 123 (1968) and the Confrontation Clause. *See White v. Illinois, 502 U.S. 346, 352-53 (1992);  Crawford v. Washington,* 541 U.S. 36 (2004).

As a co-defendant confession, the statement by Fotios triggers Ty's rights afforded by *Bruton*, which held that at a joint trial, a defendant's confrontation rights are violated by the admission of a co-defendant's statement that implicates the defendant , especially where the opportunity to confront the declarant is not guaranteed.  Should the Court permit introduction of Fotios' statement, all references to Ty must be redacted in a way that shields him from being implicated and prejudiced by the hearsay statement.

POINT V

## A HEARING IS REQUIRED CONCERNING ADMISSIBILITY OF VICTIM STATEMENTS

The government seeks to introduce statements made by two deceased individuals, Adolfo Bruno and Gary Westerman, named as victims in the indictment, to law enforcement officials. (*See* Section IV. p.37 Gov't MIL). Both Bruno and Westerman are alleged to have been murdered by the defendants Fotios and Ty Geas. The government alleges that, at various times, Bruno and Westerman were co-operating with law enforcement officials by providing information regarding past and potentially future criminal activity concerning the Geas brothers.  Further, the government points to various documents turned over in pre-trial discovery as supporting the claim that Bruno and Westerman had been co-operating.

Ty Geas recognizes, as he must, Federal Rule of Evidence 804(b)(6), which codified prior case law permitting otherwise inadmissible hearsay statements when "a party ... has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declaring as a witness."  The case law that pre-dates and post-dates this rule carefully sets out, however, the circumstances that must be found by the trial court before such statements will be admitted.  Most critically, the Court must hold a

21

hearing at which the government must prove defendant's responsibility for the witness's absence by a preponderance of the evidence. *United States v. Mast Angelo*, 693 F.2d 269, 273 (2d Cir. 1982), *cert. denied*, 467 U.S. 1204 (1984); *United States v. Augier*, 975 F.2d 45, 47 (2d Cir. 1992); *United States v. Potamitis*, 739 F.2d 784, 789 (2d Cir. 1984) *cert. denied*, 469 U.S. 918 (1984).

In order for counsel to adequately prepare for opening statements and trial, we must know, in advance of the start of the trial whether the court will admit such statements. Therefore, the hearing to determine admissibility must take place pre-trial.

Further, it follows from the government's argument and the evidentiary rule they rely upon that the following determinations must be made after such a hearing is held to determine if the proffered statements are admissible at trial: (a) that both Bruno and Westerman were cooperating with law enforcement authorities; (b) the nature of the statements made to law enforcement authorities that the government will claim the defendants sought to prevent from being used against them; and, (c) that the defendants were aware that Bruno and Westerman were cooperating and were providing statements that would, in some manner, implicate the defendants at some future proceeding.

Each one of these requirements is necessary because unless the government can prove the fact of cooperation, the nature of the cooperation and the knowledge of the defendants, the intent of Rule 804 (b)(6) would not be satisfied. Further, the government must prove the nexus between the proposed testimony and the alleged murders or other criminal acts in the indictment. *See Giles v. California*, 554 U.S. 353, 359 (2008) (common law forfeiture applies "only when the defendant engaged in conduct designed to prevent the witness from testifying.")

## POINT VI

### <u>THE PROPOSED EXPERT TESTIMONY SHOULD NOT BE PERMITTED</u>

The government seeks to introduce expert testimony regarding the structure and operation of the Mafia. In this day and age of prolific media, it is a stretch to assume that the inner workings of the Mafia are beyond the awareness and comprehension of the average juror. Permitting an "expert" witness to testify about the Mafia, which the government has repeatedly analogized as simply a "criminal corporation," permits an unwarranted "expert" opinion, the sole purpose of which is to establish the alleged enterprise- The Genovese Crime Family of La Cosa Nostra -which is not contested; to buttress questionable cooperator testimony; and to fan the flames of prejudice already smoldering in this case.

We urge the Court to exercise its discretion and exclude the expert testimony sought.

## POINT VII
### <u>THERE IS NO BASIS FOR AN ANONYMOUS JURY</u>

The government moves for an anonymous jury based on the claim that the defendants "committed (murders) with and for the Mafia", corrupted the judicial process by one of the murders (the 2003 murder of Bruno) and, because of anticipated publicity during the course of the trial that the government fears will expose jurors to intimidation by defendants' friends or enemies or harassment by the public (*See* Gov't MIL. Section VI. p. 51).

The defendant is constitutionally entitled to a trial by an impartial jury. The

mere fact that the charges against a defendant are serious does not, standing alone, require

an anonymous jury. *See United States v. Millan-Colon*, 834 F. Supp. 78, 83 (heroin

distribution conspiracy); *United States v. Mora*, 1995 WL 519987 (E.D.N.Y. 1995) (narcotics

conspiracy); *United States v. Melendez*, 743 F. Supp. 134 (E.D.N.Y. 1990) (violent

racketeering charges); *United States v. Coonan*, 664 F. Supp. 861 (S.D.N.Y. 1987) (violent

racketeering charges).

In this case, the seriousness of the crimes charged does not warrant the use of an

anonymous jury. Trials involving murders, by their very nature, are inherently serious and

usually involve the most heinous crimes. However, the chilling effect of an anonymous jury

strikes at the heart of impartially. The quest for an impartial jury carries with it the right to

take reasonable steps designed to ensure that the jury is impartial. *Ham v. South Carolina,*

409 U.S. 524, 92 S. Ct. 744 (1973). Experience has demonstrated that the most effective

means of ridding the jury box of unfit jurors is the exercise of peremptory challenges. As a

consequence, it is critical for defense counsel to have sufficient information to conduct an

intelligent inquiry.

Many authorities believe that jury selection is the most significant part of any trial

because during this complex process, we choose those that will decide the controversy.

This important aspect points out the importance of counsel's ability to have sufficient

information to effectively examine the jurors and intelligently make decisions on their

suitability. Thus, this essential means of maintaining impartiality through knowledgeable

selection should be preserved at all costs.

The name of a prospective juror, where he or she lives, and specifics about

employment are major factors used in judging his or her suitability to sit as a juror. In

order to effectively confront the forces of prejudice and bias that afflict so many jurors that are called into service, it is imperative that the parties have available the standard information normally disclosed in the selection process. In other words, what must be taken into account, when discussing anonymous juries, is the alarming increase in prejudice that poses a constant threat to the integrity of jury verdicts. The government has requested that the names, addresses and places of employment of the prospective jurors not be revealed to either the parties or their attorneys. Anonymity itself generates prejudice and creates fear in the prospective jurors. Resistance to anonymous juries is based upon the recognition that the prejudices that afflict jurors in our society cannot effectively be confronted without the aid of the critical information which the government wants withheld from defense counsel such as the jurors' names, place of employment and addresses.

To exercise the power of the peremptory challenge intelligently requires that counsel have access to relevant information concerning each prospective juror, which is foreclosed when a juror's identity is kept secret. The withholding of this vital information imposes a terrible handicap on the defense and renders the peremptory challenge almost worthless. Moreover, the exercise of a peremptory challenge is often without logic and is usually based on feelings and instincts. Ours is a human system, and there are signs and symptoms that a lawyer can see in jurors that cannot be articulated.  Many of those signs and symptoms can stem from the place where they live, where they work and nature of their employment. In his dissent in *J.E.B. v. Alabama a ex rel. T.B.,* 511 U.S. 127, 162, 144 s. Ct. 1419, 1438 (1994), Justice Scalia declared  "and make no mistake about it: there really is no substitute for the peremptory" challenge.

When the black cloak of anonymity is thrown over a jury, it has a devastating effect on the jurors themselves. It is fundamental that when jurors are advised that their names and addresses are being kept secret, they inevitably conclude that these precautionary steps are taken to protect them from the defendants.  In a word, the requirement of anonymity confirms the jurors' worst fears and makes their prejudice against the defendants all the more plausible. No intelligent person could possibly believe that such drastic procedures are invoked to guard the jury from the government.

Moreover, well-intended attempts, taken by some courts to blunt the obvious ill effects of anonymity, such as explaining to the jurors that their identities are concealed and the reason for escorts is to avoid interference from the press, are ineffective and disbelieved by jurors. Indeed jurors become terrified by the process. In an actual case where an anonymous jury was used, several jurors explained that they regarded anonymity as a shield against bribe attempts by, or on behalf of the defendants -- even though the court in that case had portrayed anonymity as "a shield against a curious media." *United States v. Castellano,* Ind. No. SSS 84 CR. 63 (E.D.N.Y.) (VLB).

Further, there is nothing about the charges in this case that distinguishes them from the multitude of other violent crimes that are routinely tried without anonymous juries. *See United States v. Coonan, supra*, 664 F. Supp. 861 (S.D.N.Y. 1987); *United States v. Mora,* 1995 WL 519987 (E.D.N.Y.) (case involving violent narcotics conspiracy did not justify completely anonymous jury); *United States v. Melendez*, 743 F. Supp. 134 (E.D.N.Y. 1990) (same); *United States v. Millan-Colon*, 834 F. Supp. 78, 83 (S.D.N.Y. 1993) (narcotics conspiracy where witness intimidation alleged).  On any given day in this courthouse and courthouses around the country, jurors whose identifies have been disclosed to the parties,

sit and pass judgment on defendants who have been charged with serious acts of violence and who face life imprisonment or a death sentence if convicted.  The rules governing jury selection do not contain an automatic exception for cases involving acts of violence or even the possible imposition of the death penalty, nor should they.  Defendants charged with committing violent crimes and facing lengthy prison sentences or the death penalty for murder are entitled to at least the same rights as defendants in "white collar" cases. Accordingly, it is respectfully submitted that neither the violent nature of the crimes charged nor any potential sentence, standing alone, provide an adequate basis for use of an anonymous jury in this case.

The Second Circuit has required that trial courts not approve an anonymous jury unless the trial judge can take reasonable precautions to "minimize the effect that such a decision might have on the jurors' opinions of the defendants." *United States v. Thomas,* 757 F.2d 1359, 1365 (2d Cir. 1985), *cert, denied,* 447 U.S. 819, 106 S. Ct. 66 (1985). Following the standards set by the Second Circuit, Judge Leonard B. Sand held that allegations of organized crime were insufficient to warrant the use of an anonymous jury. *See United States v. Rotondo,* Ind. No. 84 Cr. 479 (S.D.N.Y.) (LBS). There, the government offered sworn affidavits that many of the defendants had "violent and deadly pasts," reciting the gruesome details of three murders. Yet, Judge Sand declined to grant the government's application.

Moreover, in *United States v. Santoro*, Ind. No. 85 Cr. 100 (E.D.N.Y.) (JMM), Judge McLaughlin denied the request for an anonymous jury even though the government represented that a key government witness would testify regarding efforts to tamper with jurors in previous cases involving some of the same "organized crime" defendants.

Similarly, in *United States v. Rastelli*, Ind. No. 85 Cr. 354 (E.D.N.Y.) (CPS), the trial of the alleged boss of the Bonanno crime family, Judge Sifton denied the government's motion for an anonymous jury and, after a six month trial, the case went to verdict without a incident.

These decisions, rejecting the government's application for anonymous juries, rendered by well-reputed judges in both the Eastern and Southern Districts of New York, should be considered by the Court in dealing with this prosecutorial device. It has been learned from some cases in which anonymous jury applications were denied, that the government's fears were exaggerated, misplaced and unfounded. Moreover, in cases where anonymous juries have been employed, more compelling evidence was adduced by the government as to why that extraordinary relief had to be employed. That kind of forceful evidence that provoked the granting of such relief in those other cases is simply not present here.

There is no specific allegations that the government points to that supports the assumption that a juror selected for this trial would be subjected to the type of intimidation or fear suggested by the government. The allegations against some of the defendants have been public knowledge for a long time and, the fact that additional defendants were recently added to the indictment does not change the equation. Further, given the allegations against the defendants and the prior cases brought both in federal and state court in Massachusetts against the defendants, the names of the likely witnesses against them come as no surprise. To put it bluntly, if the defendants intended to affect the trial process by intimidating the witnesses, they had ample time to do so.

**No Prior Attempts to Interfere with the Judicial Process**

The government asserts that the allegations contained in the indictment, *i.e.*, defendant's alleged participation in a violent racketeering enterprise and alleged murder of one or more cooperating individuals, militates in favor of an anonymous jury because these alleged acts demonstrate a threat to the judicial process and the lives and safety of the jurors.

The government's argument is misplaced.  Although proven instances of witness tampering are certainly relevant to the issue of whether a defendant is likely to subvert the proper administration of justice, the proper inquiry is whether there is any evidence that a defendant has or would tamper with a *jury.  Cf., United States v. Tutino*, 883 F.2d 1125 at 1132-1133 (2d Cir. 1989) (history of actual jury tampering by defendant justified use of anonymous jury); *see also, United States v. Coonan, supra*, 664 F. Supp. at 862 (absent evidence of actual jury tampering, use of anonymous jury was unwarranted); *United States v. Millan-Colon, supra*, 834 F. Supp. at 85 (same).  Further, the allegations of witness tampering upon which the Government relies are the very crimes charged in the indictment; allegations denied by the defendants, who are seeking a fair trial in this case. The Government has taken the position that anytime a defendant is charged with acts of violence against an alleged witness, an anonymous jury is appropriate.  That bootstrapping proposition is clearly not the law of this Circuit and cannot be adopted by this Court.

Again, the government cannot point to a single incident where it is alleged that either defendant tried to improperly hurt, threaten or influence a juror, despite a history of contacts with the criminal justice system.  The absence of any specific or articulable effort

by or on behalf of the defendants, to influence a juror suggests an anonymous jury is unnecessary here. *See United States v. Coonan, supra*, 664 F. Supp. at 862; *United States v. Melendez, supra*, 743 F. Supp. at 137; *United States v. Millan-Colon*, 834 F. Supp. at 83-85.

The government's concern that extensive media attention might ensue upon trial is pure speculation, which does not justify its request for an anonymous jury. *United States v. Melendez, supra*, 743 F. Supp. at 138; *United States v. Corran*, 1998 WL 36329 (S.D.N.Y. 4/11/88); *United States v. Gambino*, 818 F. Supp. 536, 540 (E.D.N.Y. 1993); *United States v. Millan-Colon, supra*, 834 F. Supp. at 85. Because New York is considered the media capital of the world, it is common for there to be extensive media coverage of most of the interesting and novel cases brought in this district. Despite such coverage however, the government rarely seeks the use of an anonymous jury. If anything, the defendants have far more to be concerned about should a sitting juror somehow read or hear about this case through a media source.

If the Court does share the government's concern about the effect of media coverage on the prospective jurors, the appropriate remedy is to keep the jurors' personal information and names secret from the press and the general public while disclosing the names to the parties. Such a procedure has been adopted in several federal capital cases.[1]

Finally, defendant Fotios Geas was scheduled for trial in the District of Massachusetts on charges of murder in aid of racketeering. That indictment included a preamble regarding Fotios's association with the Genovese crime family, as well as other language that parallels the introductory paragraphs in the instant indictment. (*See* Exhibit Indictment No. 08-30029 (MAP), *United States v. Fotios Geas, Jr.*). Just before trial was to commence that Indictment was dismissed on motion of the government in light of the

Southern District of New York indictment before this court. In addition, although there are additional charges of murder, attempted murder and other counts in the present indictment, the government had moved to admit essentially all of the conduct now charged in the New York case, as either background or 404(b) evidence in the Massachusetts case. No application for an anonymous jury was made in the Massachusetts case. Therefore, it is clear the Department of Justice, through the United States Attorney's office in Massachusetts, did not feel the need to move for an anonymous jury in that district in a trial that was to take place in the very district where most of the criminal conduct occurred, and in which the same conduct was to be proved or offered and, in which at least Fotios Geas would have been a participant.

Therefore, we oppose the application for an anonymous jury. In the alternative, if the court grants the application, there would be a heightened need for detailed information about the prospective jurors. For that reason, we propose that a questionnaire be utilized to assist in the jury selection process. Counsel can prepare such a questionnaire in short order.

**POINT VIII**

**<u>REQUEST FOR PERMISSION TO JOIN IN SUBMISSIONS AND TO SUPPLEMENT</u>**

Ty Geas joins in and adopts by reference the motions and responses of co-defendants to the extent they are applicable and reserves the right to supplement this submission based on future disclosures.

## CONCLUSION

For the reasons stated, the Court should direct the government to provide a bill of

particulars, conduct the requested hearings, and deny the government's motions *in limine*

in their entirety.

Dated: New York, New York
      January 21, 2011

Respectfully submitted,
ATTORNEYS FOR TY GEAS

_____
Bobbi C. Sternheim

_____
Lee Ginsberg

_____
Zoe Dolan