UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
                              :
UNITED STATES OF AMERICA,     :
                              :
          - v.-               :    S5 09 Cr. 1239 (PKC)
                              :
ARTHUR NIGRO,                 :
     a/k/a "Artie,"           :
     a/k/a "the Short Guy,"   :
     a/k/a "the Little Guy,"  :
FOTIOS GEAS,                  :
     a/k/a "Freddy," and      :
TY GEAS,                      :
                              :
          Defendants.         :
                              :
------------------------------x


**GOVERNMENT'S REPLY BRIEF REGARDING MOTIONS IN LIMINE**



                         PREET BHARARA
                         United States Attorney for the
                         Southern District of New York
                         Attorney for the United States
                              of America




MARK LANPHER
ELIE HONIG
DANIEL S. GOLDMAN
Assistant United States Attorneys

     - Of Counsel -

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------x
                             :
UNITED STATES OF AMERICA,    :
                             :
        - v.-                :    S5 09 Cr. 1239 (PKC)
                             :
ARTHUR NIGRO,                :
    a/k/a "Artie,"           :
    a/k/a "the Short Guy,"   :
    a/k/a "the Little Guy,"  :
FOTIOS GEAS,                 :
    a/k/a "Freddy," and      :
TY GEAS,                     :
                             :
            Defendants.      :
                             :
-----------------------------x
```

### GOVERNMENT'S REPLY BRIEF REGARDING MOTIONS IN LIMINE

The Government respectfully submits this brief in further support of its motions in limine and to reply to the arguments raised in the defendants' January 14, 2011 submissions.

### I.   The Proffered Other Act Evidence Is Not Unduly Prejudicial.

The defendants barely respond to the legal analysis provided in the Government's initial papers as to the proffered "other acts" evidence.  As to certain proffered acts, such as the prior conspiracies to murder Gary Westerman, Fotios Geas's involvement in a 1996 truck robbery with Westerman, the defendants make no response and apparently do not dispute their admissibility.[1]  As to the other acts, while certain specific responses are provided, for the most part the defendants simply state in conclusory

_____

[1]     Further, the conspiracy to murder Guiseppe Manzi – about which the defendants have long been on detailed notice – has now been added as a substantive racketeering act.

fashion that the proffered evidence is irrelevant or is overly prejudicial.  In so doing, the defendants misconstrue the purpose for which the proffered evidence will be offered.  The purpose of this evidence is not, as Ty Geas contends, "to paint Ty Geas [or Fotios Geas or Arthur Nigro] as a habitually violent individual so that the jury will convict him of the charged crimes based on non-charged crimes."  (Ty Geas Motion, 19).

First, as explained at length in the Government's initial moving papers, much of the proffered the evidence goes not to "non-charged" crimes but rather goes directly to the RICO conspiracy charged in Count One, which specifically charges underlying objects including murder, robbery, narcotics trafficking, loansharking, gambling and other crimes.  See Indictment ¶ 14.  Moreover, even if certain of the proffered conduct falls outside the Indictment, the Second Circuit has repeatedly held that the Government may prove the existence and nature of the racketeering enterprise, as well as the pattern of racketeering activity, by offering evidence of crimes committed by persons associated with the enterprise that are not specifically charged in the indictment.  See United States v. Diaz, 176 F.3d 52, 79 (2d Cir.), cert. denied, 528 U.S. 875 (1999); United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997), cert. denied, 524 U.S. 905 (1998).

Second, as again explained at length in the Government's moving papers, all of the proffered evidence is directly relevant

to proving how the defendants became involved in the RICO conspiracy, how their relationships grew with their co-conspirators, and how they built reputations that served them well once members of the RICO conspiracy.  See, e.g., United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990) (evidence of other bad acts admissible to "inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help[] explain to the jury how the illegal relationship between [participants in the crime] developed") (citation and internal quotation marks omitted); United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) ("evidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense"); United States v. Lasanta, 978 F.2d 1300, 1307 (2d Cir. 1992) (evidence of other crimes is admissible "to delineate the background details of a conspiracy -- to 'inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed.'").  For example, it is largely through their well-earned reputation for violence that Fotios and Ty Geas sought to, and did, extort people.  It is largely for the same reason that Anthony Arillotta brought them into the plot to murder Bruno, the

conspiracy to murder Frank Dadabo, and the conspiracy to murder Louis Santos.

Ty Geas and Fotios Geas are not simply "a roving band of thieves." (Ty Geas Motion, 19). They are a pair of individuals who, through their careers of crime, drew the attention, respect, trust and friendship of members of the Genovese Organized Crime Family. As time went on, they committed more and more crimes in furtherance of the RICO enterprise, and evidence of all of the proffered crimes (including crimes committed prior to the charged period of the RICO conspiracy) help the jury to understand how they came to join the enterprise and, indeed, how they committed the charged crimes.

Alternatively, the defendants repeatedly claim, again in conclusory fashion, that they need more information or a bill of particulars before responding. That is simply not the case. First, the Government has provided extensive details about the charged crimes and the other-acts evidence through the Indictment itself; through discovery (which includes many documents that are technically not Rule 16 materials but that the Government nonetheless has produced to provide full disclosure, including the full grand jury testimony of cooperating witness Frank Roche); and through the detailed disclosures contained in the Government's original moving papers (see Gov. Motion at 5-16). The defendants fail to explain why they are entitled to even more detail than they have already been provided; in fact, as

4

technical matter, the defendants are entitled to far less detail than the Government has provided.  Further, as the Government has already set forth, these are crimes that the Government will seek to prove almost entirely through its cooperating witnesses, as they tell the natural story of their relationships with the defendants.  The Government does not intend to divert or delay the trial to call witnesses as to anything that could even arguably be called ancillary.  Moreover, the Government has agreed to begin production of 3500 material at least one month before trial – well before the defendants are statutorily entitled to it – and has already produced much of the 3500 material for a number of the Government's key witnesses (including Frank Roche) as part of Rule 16 discovery.  In the 3500 material, the defendants will receive in the coming weeks even more notice as to precisely what the Government's witnesses can be expected to say.  Nothing more is required.[2]

Finally, to the extent there is any doubt as to the admissibility of a particular act proffered by the Government, the Court can of course take up the issue during the course of

---

[2]     On this score, Ty Geas argues somewhat in passing that immediate disclosure of 3500 materials and a hearing is necessary to determine the admissibility of the Government's proffered evidence.   (Ty Geas Motion at 12).   That is simply not correct.  The fact that the discovery produced to date illuminates certain inconsistencies among Government witnesses or highlights evidence inconsistent with the Government's theory of the case hardly means that immediate disclosure of 3500 material or a hearing is required.   To the contrary, such disclosures are entirely normal, and the schedule agreed to by the Government for 3500 material is, if anything, generous to the defendants.

trial, after seeing how the evidence is being presented.  In addition, the Court can issue limiting instructions as necessary to ensure that any "other act" evidence is considered by the jury only for its proper purpose.

## II. Evidence Regarding the Defendants' Prior Prison Terms is not Unduly Prejudicial.

As explained in the Government's original motion papers, evidence of the defendants' prior prison terms is entirely admissible and necessary to explain the defendants' relationships with their co-conspirators, including two of the Government's primary witnesses, Anthony Arillotta and Frank Roche.

The defendants claim that the parties can reach a mutually agreeable stipulation concerning the relationships between alleged co-conspirators without reference to prior convictions and incarceration.  (Ty Geas Motion, at 20; Fotios Geas Motion, at 8).  In particular, Ty Geas apparently makes this claim because he argues that "Ty's close relationship of confidence and trust with Arillotta" will not be disputed.  (Ty Geas Motion, at 14).  While the Government has reached a general agreement with defense counsel that the parties will agree to various stipulations in order to streamline the trial (such as stipulations as to the admissibility of phone and other business records), and will continue to work with defense counsel on other possible areas for stipulation, this is not an area in which one can reasonably expect a mutually agreeable stipulation.  Indeed, it is hard to conceive of a possible stipulation (agreeable to

6

the defendants) that would explain adequately the kind of trust that formed between the defendants and their co-conspirators while serving jail time together and while committing crimes together.  It is a kind trust that gave the defendants and their co-conspirators the confidence to commit murder together.

A mere stipulation that the Government's witnesses were close with the defendants only tells a small portion of the story; the fact is, the witnesses met the defendants, developed mutual trust, and planned to commit future crimes together, while in prison.  The type of trust born and bred in prison is a very particular kind of trust which enabled the witnesses and the defendants to trust one another sufficiently to commit criminal acts after their release from prison, and to confide in one another about past crimes.  A stipulation that the defendants have a close relationship of trust with Government witnesses inadequately paints this picture for the jury, which the Government is permitted to do by law in order to prove its case.  See Old Chief v. United States, 519 U.S. 172, 188 (1997) ("[T]he prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault.").  Where, as here, the manner in which the Geas brothers became close with Anthony Arillotta and Frank Roche, and the RICO enterprise itself, is so

inextricably tied to the prison terms they served together, a stipulation along these lines is untenable and likely unworkable.

Moreover, the admission of such testimony will not unduly prejudice the defendants - particularly as the Government's own witnesses (whom the defendants apparently acknowledge were their close and trusted associates) will themselves be testifying to their own prior prison terms.[3]

## III. Motion to Admit Statements by Fotios Geas Regarding the Murder of Gary Westerman

The defendants next oppose admission of evidence that, while Fotios Geas was incarcerated with Frank Roche in 2005, Geas told Roche that he (Fotios Geas), Ty Geas, and Anthony Arillotta had murdered Westerman.  Geas also informed Roche of certain details about the murder, some of which became the subject of ongoing

---

[3]    Fotios Geas also suggests that certain recorded prison recordings of Fotios Geas to his brother Ty from April 2010, excerpts of which the Government intends to offer at trial, are irrelevant because he disagrees that they tend to incriminate him. (Fotios Geas Motion, 8-9).  In these recordings, among other things, the Geases discussed news reports of Arillotta's cooperation and the FBI's digging behind the home of Joe Iellamo in Agawam, Massachusetts (where Westerman's remains were found). As they spoke, through both their words and their tone, the Geases revealed their concern.  The Government intends to argue at trial that the jurors will be able to infer that the Geases were concerned about these news reports because they knew precisely what they had done at Joe Iellamo's house – killed and buried Westerman.  We have reproduced the recording Fotios Geas claimed not to have received, and will discuss further with defense counsel any objections they have to these recordings.  If the defendants plan on persisting in any objection, the Government will provide copies of transcripts of these recordings to the Court in advance, to permit the Court to consider their admissibility without any undue delay to the trial.

references during the time that Roche and Geas were in prison together in 2005 and 2006.

As the Government set forth in its original motion, evidence of Fotios Geas's statement to Roche is plainly admissible against Fotios Geas as a non-hearsay admission by a party, pursuant to Fed. R. Evid. 801(d)(2)(A). Fotios Geas makes no response to this straightforward point of law, and appears to concede that the statement is admissible against him.

The statement is also admissible against Ty Geas because it was a co-conspirator statement made in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E); 804(b)(2). Ty Geas responds, first, that the statement was not made in furtherance of the conspiracy to murder Westerman because it was made two years after Westerman's death. (Ty Geas Motion at 20). That is, of course, a straw man: the Government never argued that the statement was made in furtherance of the already-committed Westerman murder, but rather in furtherance of the then-ongoing (and now-charged) RICO conspiracy. The Second Circuit has taken an expansive view of the "in furtherance" requirement of Rule 801(d)(2)(E), particularly in RICO cases. See, e.g., United States v. Russo, 302 F.3d 37 (2d Cir. 2002) (holding that statements about individuals' status within the RICO conspiracy were "in furtherance" of the conspiracy). Statements between co-conspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current

status of the conspiracy," further the conspiracy.  <u>United States</u> v. <u>Simmons</u>, 923 F.2d 934, 945 (2d Cir. 1991).  <u>See</u> Gov. Motion at 32-33 (citing additional cases regarding breadth of co-conspirator statements exception).  Indeed, as the Government discussed in detail in its moving papers, Fotios Geas's statement to Roche served to inform Roche (a fellow RICO co-conspirator) about significant conduct of other conspirators; to inform Roche about potential exposure to future arrest (and potential cooperation) by their co-conspirators; to foster cohesiveness and trust between Geas and Roche as well as other co-conspirators; and to forewarn Roche about the potential dangers of cooperating. (Gov. Motion at 33-34).  Ty Geas offers no response to this caselaw or factual analysis other than to argue in conclusory terms, and completely without factual or legal support, that the statements were not made in furtherance of the RICO conspiracy.

Ty Geas relatedly asserts that Fotios Geas's statement to Roche should be "Brutonized" to eliminate or redact Ty Geas's name.  (Ty Geas Motion at 20-21).  First, redaction is unnecessary because, as discussed above, the statements are admissible in full against Ty Geas as co-conspirator statements pursuant to Fed. R. Evid. 801(d)(2)(A).  Further, as discussed in the Government's moving papers, <u>Bruton</u> has no application here because there was nothing "testimonial" about Fotios Geas's statement to Roche.  (Gov. Motion at 34-35).  Ty Geas offers no response to this point.  Redaction will be necessary only if this

Court rules that the statement is admissible against Fotios Geas as a party-admission (which is undisputed) but <u>not</u> against Ty Geas as a co-conspirator statement.

## IV.  The Statements of Adolfo Bruno and Gary Westerman to Law Enforcement Are Admissible

The Government respectfully submits this portion of its brief in response not only to the defendants' written submissions regarding the admissibility of statements made by the two murder victims, Adolfo Bruno and Gary Westerman, to law enforcement, but also to respond to the oral comments made at the January 25, 2011 conference.

The defendants' submissions on this score have muddied the water on what is, in reality, a straightforward issue.  The statements that Bruno and Westerman made to law enforcement are plainly admissible, at least for the fact that they were made, as they are relevant to an element of the crimes charged and they provided some of the primary motive for the defendants' decisions to murder Bruno and Westerman.  In addition, the evidence expected to be elicited at trial will make clear that, under Rule 804(b)(6) and <u>Mastrangelo</u>, the statements these victims made to law enforcement are admissible for their truth.  Because the defendants have suggested a need for a pre-trial hearing before testimony or evidence about these statements is admitted in any form, the Government here provides a more fulsome explanation of precisely what it intends to offer, and how it intends to do so,

which refutes any suggestion that a pre-trial hearing would be necessary or appropriate.

1.   **Facts**

    A.   **Evidence Expected to be Elicited Regarding Bruno's Statement to Law Enforcement**

The defendants are charged with murdering and aiding and abetting the murder of Adolfo Bruno to obstruct justice, in violation of Title 18, United States Code, Section 1512(a)(1), both in Racketeering Act One of Count Two and in freestanding Count Three.

The evidence at trial will show that the plot to murder Bruno began in earnest after it became known among the defendants and others that Bruno had spoken with FBI agent Cliff Hedges and confirmed that Emilio Fusco was a made member of the Genovese Organized Crime Family.  Tthree separate Government cooperating witnesses (Anthony Arillotta, Felix Tranghese, and Frank Roche) are expected to testify that they saw a copy of a document stating that Bruno had spoken to the FBI and had confirmed that Fusco was made.  This document, the evidence will show, was a single page out of a revised Pre-Sentence Investigation Report ("PSR") issued on September 9, 2003, to Fusco (who was then pending sentence for a racketeering conviction in the District of Massachusetts).

Arillotta and Tranghese are both expected to testify that, shortly after Fusco received this PSR, Fusco met with them to show them the PSR and to discuss what should be done.  Tranghese

12

ultimately took this page to New York to meet with Arthur Nigro and others.  Nigro then gave Tranghese, and later Arillotta, the order to kill Bruno.  The evidence will further show that Fotios and Ty Geas were brought into the murder plan and were told the reasons why Bruno was to be killed.

Accordingly, the Government intends to (1) elicit testimony from its cooperating witnesses about the Fusco PSR and the central role that this document played in the murder plot; (2) introduce the relevant page of the PSR through its cooperating witnesses (who will testify that the document was passed around and discussed among the co-conspirators as a primary reason for Bruno's murder) and the United States Probation Officer who prepared the document; and (3) elicit testimony from Special Agent Cliff Hedges to explain the conversation he had with Bruno that was later summarized in the PSR.

### B.    Evidence Expected to be Elicited Regarding Westerman's Statements to Law Enforcement

Defendants Fotios and Ty Geas are charged with murdering and aiding and abetting the murder of Gary Westerman to obstruct justice in Racketeering Act Two of Count Two.

The evidence will show that one of the primary motives for the murder of Westerman was the Geas brothers' belief that he had previously cooperated, and was still cooperating, with law enforcement.  In particular, Arillotta is expected to testify that Fotios and Ty Geas had long believed (correctly) that Westerman was a Government informant.  Fotios and Ty Geas

13

discussed with Arillotta on many occasions their belief that Westerman had cooperated with law enforcement against Fotios Geas in connection with a 1996 truck robbery case for which they were arrested together.  Indeed, as explained in its initial motions in limine, in 1996, Arillotta, Fotios Geas, and Louis Santos had attempted to kill Westerman for that very reason.  Later, in 2003, Arillotta and the Geas brothers again discussed on many occasions their belief and concern that Westerman was cooperating with law enforcement, and the fact that it could pose a danger to them.  According to Arillotta, they had a number of reasons for being suspicious – not only had the Geases heard from numerous other individuals that Westerman was an informant, but they had on several occasions thought they had seen Westerman with or near law enforcement officers, suggesting that he had been meeting with them.  Given that Westerman was aware of significant criminal activity committed by the Geases and Arillotta with and in furtherance of the Genovese Organized Crime Family, this posed a considerable risk.

Arillotta is expected to testify that on November 4, 2003, he, Fotios Geas and Ty Geas formulated a plan to kill Westerman largely for this very reason – their suspicion that he was a Government informant.  Arillotta's account of the murder will be corroborated by physical crime scene evidence and the testimony

14

of Frank Roche (to whom Fotios Geas spoke about the murder after the fact),[4] among other things.

At some point after Arillotta has testified, the Government expects to call two law enforcement witnesses – Peter Higgins and Liam Jones of the Massachusetts State Police – to confirm that Westerman had, in fact, been cooperating with law enforcement, including against the Geas brothers, precisely as Arillotta and the Geases had believed.  In particular, the officers would testify that Westerman had provided information against Fotios Geas in 1996, including information that led directly to his re-arrest for truck hijacking.  They would also testify that, in early 2003, after being released from prison, Westerman re-established his relationship with the Massachusetts State Police as an informant, and began providing information about the Geases, Arillotta, and others, on a number of occasions.

As described more specifically in the Government's initial motion in limine, Officer Jones would testify that on multiple occasions in 2003, Westerman told law enforcement that Arillotta, Fotios Geas, and Ty Geas were "making moves," and seeking authorization from members of organized crime in New York to "retire" Al Bruno.  In addition, on September 2, 2003, Westerman met with Officer Jones and told him about events that had taken place in the prior three days involving the Geases and Guiseppe

_____
[4]      Roche also will testify that both Geas brothers, particularly Fotios Geas, regularly referred to Westerman as a "rat" during the summer and fall of 2003.

Manzi.  Specifically, Westerman told Officer Jones that Ty and
Fotios Geas had an ongoing dispute with Manzi and that Ty and
Fotios Geas had robbed Manzi's cousin out of approximately
$50,000.  Westerman went on to explain that the dispute had
escalated in the prior week, and told the officer details
regarding Ty and Fotios Geas's involvement in the August 29, 2003
shooting at the Civic Pub in Springfield.  He also explained to
Officer Jones that the following day, an individual had shot
Arillotta's home 21 times, and that Arillotta and Ty Geas were
actively seeking to retaliate against the person who they
believed had committed the shooting.

## 2.  Discussion

The defendants confuse the issue posed by <u>Mastrangelo</u> and
Fed. R. Evid. 804(b)(6).  The question is <u>not</u> whether the
victims' statements to law enforcement are admissible at trial at
all; the statements clearly are admissible non-hearsay because,
regardless of the truth of the matters asserted, the statements
prove that the victims spoke with law enforcement (which goes
directly to a required element of the charged witness tampering
offenses) and that the defendants had a motive for killing the
victims (i.e., as retribution for, and to prevent their future,
cooperation).  The question posed by <u>Mastrangelo</u> and Fed. R.
Evid. 804(b)(6) is merely whether those statements are <u>also</u>
admissible for their substantive truth.  Here, the court can most
efficiently and most fairly determine whether the Government

satisfies the <u>Mastrangelo</u> threshold based on the trial testimony of the Government's witnesses, without requiring a separate pre-trial hearing.

###    A.    The Victims' Statements to Law Enforcement are Admissible as Non-Hearsay

The victims' statements to law enforcement are admissible, first, as non-hearsay, and completely without reference to <u>Mastrangelo</u> or Rule 804(b)(6).  Regardless of the truth of the matters asserted, the statements Bruno and Westerman made to law enforcement are admissible for two independent, non-hearsay purposes.

First, the statements prove the very fact that the victims, Bruno and Westerman, had provided information to law enforcement. One of the statutory elements of the witness tampering offense charged in Racketeering Acts One and Two and Count Three of the Indictment is that the defendants believed that their victims were cooperating with law enforcement.  <u>See</u> 18 U.S.C. § 1512(a)(1) (prohibiting murder to "prevent the communication by any person to a law enforcement officer or judge of the United States"); Sand, <u>Modern Federal Jury Instructions</u>, Instr. 46-32 ("It is only necessary that the defendant you are considering or a co-conspirator of that defendant believed that a witness might testify in court or give information to federal officials regarding a federal offense and to have prevented that testimony or communication.").  Here, numerous Government witnesses will testify that the defendants believed that the victims were

17

cooperating with law enforcement.  Proof that the defendants had in fact made statements to law enforcement – again, regardless of the truth of those statements – strongly corroborates the witnesses' expected testimony that the defendants believed that the victims had cooperated.

Second, the victims' statements to law enforcement are admissible to prove the defendants' motive to commit the charged murders – again, without regard to the statements' admissibility for the truth of the matters asserted.

With regard to Bruno's statements to law enforcement, it seems beyond serious debate that his statements – as described in Fusco's PSR, which was then handed around and led to the order to kill him – will be admissible.  The fact that those statements were made and included in the PSR is direct evidence of the murder; multiple cooperating witnesses will testify that the actual page from the PSR was scrutinized and passed around among the co-conspirators, and was a primary impetus for the murder. The PSR's admissibility for these purposes thus has nothing to do with whether, in fact, Bruno had spoken to Special Agent Cliff Hedges or whether what he told Agent Hedges about Fusco's status in the Genovese Organized Crime Family was true.

The analysis is no more complicated with regard to Westerman's statements to law enforcement.  Again, Arillotta will testify that he, Fotios Geas, and Ty Geas believed and discussed the fact that Westerman had cooperated with law enforcement in

18

1996, and had again begun to cooperate in 2003.  Evidence that
Westerman did in fact make statements to law enforcement about
various crimes committed by Arillotta, Fotios Geas, and Ty Geas
during those time periods is thus admissible at a minimum to
prove the basic fact that Westerman was cooperating with law
enforcement, precisely as the defendants and Arillotta believed.

**B.    No Pretrial Hearing Is Necessary To Establish That The
       Victims' Statements To Law Enforcement Are Admissible
       for their Truth Under <u>Mastrangelo</u> And Rule 804(b)(6).**

The analysis of whether the proffered statements are
admissible under Rule 804(b)(6) for the additional purpose of
proving the truth of what Bruno and Westerman told law
enforcement is distinct.  The Government acknowledges that, under
<u>Mastrangelo</u> and Rule 804(b)(6), the victims' statements to law
enforcement are admissible for their substantive truth – above
and beyond the non-hearsay purposes discussed above – only if the
Government can make the requisite showing, by a preponderance of
the evidence, that (a) the "party against whom the out-of-court
statement is offered[ ] was involved in, or responsible for,
procuring the unavailability of the declarant through knowledge,
complicity, planning or in any other way," and (b) that party
"acted with the intent of procuring the declarant's
unavailability as an actual or potential witness," <u>Dhinsa</u>, 243
F.3d at 653-54 (internal quotation marks omitted).

As discussed above, the Government expects to amply make
such a showing through the testimony of its trial witnesses who

will testify that the defendants killed Bruno and Westerman
because the defendants believed that the victims cooperated with
law enforcement.  To be clear, the Government intends to call
those witnesses who will provide the necessary Mastrangelo
foundation, including at least Arillotta, before it offers
testimony from law enforcement agents about the substance of the
victims' statements.  The Government will thus order its
witnesses in a manner to ensure that the Court will have an
opportunity to evaluate the required Mastrangelo threshold, and
to rule on the Mastrangelo issue, before the introduction of the
evidence of the statements at issue.  In particular, in the case
of Westerman, the Government expects to call Arillotta before the
Government offers the testimony of Massachusetts State Police
Officers Peter Higgins and Liam Jones to elicit the substance of
what Westerman told them.  Should the Government make the
required showing during trial, Officers Higgins and Jones should
be permitted to testify to what Westerman told them not only to
establish the fact that Westerman was providing law enforcement
with information about Fotios and Ty Geas, but also to establish
the truth of what Westerman said.  Should the Government fail to
make the required threshold showing, then the Government bears
the risk that Westerman's statements will be admitted only to
establish the fact that Westerman was cooperating, and not for
their truth.

The defendants argue that the Government should be required to make the Mastrangelo threshold showing at a pre-trial hearing, and not during the trial itself.  In evaluating the defendant's request for a pre-trial hearing versus the Government's proposal to meet the Mastrangelo threshold by calling its trial witnesses in a manner to enable the Court to rule during trial but before admission of the victims' statements, several points seem beyond dispute.  First, the Government's proposal is more efficient and will save the parties and the Court resources by eliminating the need for an extensive pre-trial hearing.  Second, the defendants will have precisely the same opportunity to fully cross-examine the Government's foundational witnesses (including Arillotta) during trial as they would during a pre-trial hearing.  Third, holding a pre-trial hearing would give the defense the significant tactical advantage of providing the defense with a preview of key Government witnesses, and an opportunity to do a pre-trial round of cross-examination of those witnesses.[5]

In contrast, the only proffered justification for the defendants' proposed pre-trial hearing approach is the claim that a pre-trial hearing is necessary to prepare for opening statements.  (Ty Geas Motion at 22).  That explanation does not

---

[5]     To the extent the Court wishes to question Government witnesses more thoroughly on the foundational issues relevant to Mastrangelo, the Court may do so outside the presence of the jury during trial.  The Government, however, does not believe that will even be necessary, as the foundational requirements of Mastrangelo will naturally be met as part of Arillotta's testimony, and others if necessary.

withstand scrutiny.  The defendants completely fail to explain how their opening statements will be at all impacted by a Mastrangelo ruling.  In other words, the defendants fail to explain how their opening statements would be at all different if the victims' statements are admitted solely for non-hearsay purposes (on one hand) or if the statements are also admitted for their truth (on the other).  If the Court were to postpone a Mastrangelo ruling until after the Government has laid what it perceives to be the necessary foundation during the trial, the parties would still be able to state in their opening statements that "You will learn that Westerman had provided information to law enforcement" and/or "You will learn that the defendants had a motive to kill Westerman because he had told law enforcement that Geas had committed a truck robbery" – both admissible non-hearsay purposes.  But the parties would not be able to state, "You will learn that Fotios Geas in fact robbed trucks because Westerman said so to law enforcement" – which would be an admission of Westerman's statements for the truth, subject to Mastrangelo analysis.  The defendants fail to explain why such a limitation on opening statements would be in any way harmful to them – if anything, such a limitation would seem to benefit the defendants – nor how or why the defendants would even refer to the victims' statements to law enforcement at all in opening statements.

The Government's approach involves neither bootstrapping nor circularity, as the defendants have argued.  The Mastrangelo

threshold inquiry – whether the defendants were complicit in the murders of the victims, and whether the defendants acted with intent to procure the victims' unavailability, see Dhinsa, 243 F.3d at 653-54 – is analytically distinct from the subject of a Mastrangelo finding by the Court (i.e., the victims' statements). The Government will establish through its trial witnesses, including at least Arillotta, that the defendants in fact participated in the murders of Bruno and Westerman, and did so to prevent both victims from continuing to cooperate with law enforcement.  Those facts alone will establish the Mastrangelo foundation.  Once such a foundation is established, then the actual statements by the victims to law enforcement can be admitted for their truth.  Thus, the Government need not rely on the victims' statements in any way in order to make the required Mastrangelo threshold showing, and there is no analytical intermingling or overlap.

In addition, it is worth noting that the defendants misconstrue in critical ways what the Government will be required to establish for a Mastrangelo inquiry.  Contrary to the arguments of defense counsel (see Fotios Geas Motion, at 15), whether or not there was an active federal investigation pending at the time of the statements is wholly irrelevant to the inquiry under Mastrangelo and Rule 804(b)(6).  That proposition was squarely rejected by the Second Circuit in Dhinsa, which stated that the forfeiture principle applies even to "situations where

23

there was no ongoing proceeding in which the declarant was
scheduled to testify.  The application of <u>Mastrangelo</u> under these
circumstances is both logical and fair since a contrary rule
would serve as a prod to the unscrupulous to accelerate the
timetable and murder suspected snitches sooner rather than
later." <u>Dhinsa</u>, 243 F.3d at 652 (internal quotation marks and
citations omitted).

    Nor is there any concern, as Fotios Geas suggests, that
because Westerman's statements may not have been based on first-
hand knowledge, admitting them would result in an additional
hearsay problem.  (Fotios Geas Motion, at 15).  The point of the
<u>Mastrangelo</u> rule is that the defendants forfeited any hearsay
argument by their involvement in murdering Westerman.  We do not
know the source of Westerman's information about the defendants
precisely because Fotios and Ty Geas murdered him.  They should
not get an evidentiary windfall for having done so.  Again, it is
"well established, as a matter of 'simple equity' and 'common
sense,' that the right to confrontation is forfeited if the
defendant has 'wrongfully procured the witnesses' silence through
threats, actual violence or murder,'" <u>United States</u> v. <u>Stewart</u>,
485 F.3d 666, 670 (2d Cir. 2007) (quoting <u>Dhinsa</u>, 243 F.3d at
651).

    Finally, defense counsel suggested at the January 25, 2011
conference that Westerman's statements should not be admitted
unless there is evidence that the defendants knew <u>precisely</u> what

had been said by Westerman to law enforcement (as there will be with regard to the Bruno statements).  But that is simply not correct.  First, under no circumstances must the Government show that the defendants knew the exact substance of the information provide by Westerman to law enforcement; rather, all that is required to meet the <u>Mastrangelo</u> inquiry is that the defendants believed that Westerman was cooperating and therefore they acted with the intent to remove him as a possible witness.  To the extent the defendants attempt to apply this argument to the non-hearsay purposes for the victims' statements outlined above, which, of course, is a more lenient standard than <u>Mastrangelo</u>, that argument also fails.  The fact of the victims' cooperation is strong circumstantial evidence of the defendants' belief that he was cooperating – which is an element of crimes charged for each murder – and, accordingly, the defendants' motive to kill him.  It is therefore irrelevant to the admissibility of the statements for non-hearsay purposes whether the defendants knew about the precise information - or, for that matter, <u>any</u> of the information – provided by the victims to law enforcement.

Because the proposed method of evaluating the <u>Mastrangelo</u> inquiry through trial testimony saves resources, causes no unnecessary delay, and does not prejudice the defendants in any way, the Government respectfully requests that the Court evaluate during the course of trial whether the victims' statements come in solely for non-hearsay purposes or, also, for their truth.

## V. The Government Agrees Not to Call an Expert Regarding Organized Crime

The Government hereby withdraws its motion to offer expert testimony regarding Organized Crime.  The Government continues to believe that its arguments in support of such testimony are well founded and that such testimony would be entirely admissible at trial.  However, in light of the defendants' representations that they will not contest the existence of the Genovese Organized Crime Family, and assuming those representations are borne out at trial, the Government will agree not to call such a witness.

## VI. An Anonymous Jury is Appropriate, and No Questionnaire is Needed.

The defendants respond to the Government's motion for an anonymous jury primarily by either ignoring the settled law on the topic or by arguing that the law should not be as it is. With respect to the first established legal factor – the seriousness of the charges – Fotios Geas makes no argument.  Ty Geas argues that "the mere fact that the charges against a defendant are serious does not, standing alone, require an anonymous jury."  (Ty Geas Motion at 23-24).  The Government does not claim that this factor "standing alone" requires an anonymous jury, but rather that it is one of the three established, relevant legal factors, which weighs strongly in favor of anonymity here.  Ty Geas cites four cases in which anonymous juries have not been used – all over twenty years old, and none involving murder charges.  (Ty Geas Motion at 24).  Ty Geas

conspicuously fails to cite any case involving allegations of multiple murders of witnesses in which an anonymous jury motion has been rejected.  Ty Geas ultimately declares without citation to authority that "[i]n this case, the seriousness of the crimes charged does not warrant the use of an anonymous jury."  (Ty Geas Memo at 24).  Ty Geas fails to follow this conclusory and unsupported assertion with any explanation as to how the multiple murder charges in the case here are not serious, or do not weigh in favor of jury anonymity.

The second established legal factor is the potential threat of corruption to the judicial process.  (See Gov. Motion at 50-51, citing cases).  Fotios Geas does not address this point.  Ty Geas argues that "there is no specific allegations that the government points to that supports the assumption that a juror selected for this trial would be subjected to [jury tampering]." (Ty Geas Motion at 28).  While it is true that a case involving prior instances of jury tampering would present the most obvious case for anonymity, the Second Circuit has made clear that a court should consider any type of obstructive conduct in assessing an anonymity motion.  See United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995) (evaluating "defendant's willingness to tamper with the judicial process"); United States v. Vario, 943 F.2d 236, 239 (2d Cir. 1991) ("An obstruction of justice charge, particularly one involving jury tampering, has always been a crucial factor in our decisions regarding anonymous

27

jury."). Here, the defendants are charged with killing two different individuals because they believed those individuals had become cooperating witnesses. Thus, these defendants possess not only the "willingness to tamper with the judicial process," see Aulicino, but also, even more disturbingly, the demonstrated ability to do so.

With respect to the third factor, the expectation of media coverage, Fotios Geas makes no response, while Ty Geas argues that the Government's point that the trial will likely engender media coverage is "pure speculation, which does not justify its request for an anonymous jury." (Ty Geas Motion at 30). As set forth in the Government's original motion, this case has already generated significant media coverage even during the pre-trial stages, with several dozen articles being published by outlets including the New York Post, the Boston Globe, and other publications and websites. There is little commonsense reason to expect the media attention to wane; if anything, coverage is likely to intensify as trial begins and as more evidence of the defendants' crimes becomes publicly available. This factor too weighs in favor of jury anonymity.

The defendants lastly argue that, should this Court order an anonymous jury, then the Court should utilize extensive, written jury questionnaires to ascertain information about each juror. (Ty Geas Motion at 31). However, the defendants fail to explain adequately why a potential juror's name is properly relevant to

28

the jury selection process, and why the absence of the juror's name requires even more information than the Court can obtain through in-court voir dire; indeed, as the Court alluded to at the January 25, 2011 conference, there is no legitimate nexus between the two.  Fotios Geas argues that a juror's name "discloses, to a greater or lesser degree, ethnicity." (Fotios Geas Motion at 13).  This is, of course, a completely impermissible and unconstitutional basis for the exercise of juror strikes either by the Government or by the defense.  As the Supreme Court has held, "parties are constitutionally prohibited from exercising peremptory challenges to jurors based on race, ethnicity, or sex." Rivera v. Illinois, 129 S. Ct. 1446, 1447 (2009) (discussing Batson v. Kentucky, 476 U.S. 79 (1986) and its progeny).  Fotios Geas also claims, somewhat inexplicably, that a juror's name "leads one to question educational biases."  (Fotios Geas Motion at 13).  It is unclear what this means, but, in any event, the parties surely will have full information about each potential juror's educational background, with or without questionnaires.  The fact that a juror does not reveal his or her name does not eliminate the fact that the parties will be able to see and hear the potential juror in court, will know essentially all relevant biographical details for each juror short of that juror's name, and will have the benefit of the Court's thorough examination about each juror's ability to consider the evidence and to be impartial.

All three relevant factors are satisfied here.  Jury anonymity is appropriate and necessary to protect and safeguard the jury and the judicial process.  And a juror questionnaire is cumbersome and unnecessary in this case.

## VII. The Government Is In Compliance With its <u>Brady</u> and <u>Giglio</u> Obligations.

Ty Geas claims that further disclosure is necessary from the Government and demands representations from the Government that it has produced all materials requested by him to date, all of which he claims is potential <u>Brady</u> or <u>Giglio</u> material.

The Government is of course well aware of its obligations under <u>Brady</u>, <u>Giglio</u>, and their progeny.  On December 24, 2010, the Government received a letter from Ty Geas requesting additional disclosure regarding 70 itemized categories of materials.  Many of these itemized requests were based on <u>Brady</u> materials that had already been provided by the Government, and were simply to confirm that the defendants had already been provided with all materials concerning a given subject matter.  However, the Government respectfully submits that many of the itemized requests called for material that was not <u>Brady</u> or were, at least, far overbroad.  For example, in one request provided without any time limitation, Ty Geas requests "all documents and recordings regarding criminal activity allegedly or actually involving Bruno..."  In another such request, Ty Geas sought "all documents and recordings reflecting investigative materials

30

pertaining to any individual who actually or allegedly owed Bruno money or was believed to owe Bruno money...”

Nevertheless, the Government responded first on December 28, 2010; and then provided additional materials to all defendants on January 6, January 12, and January 27, 2011.  The vast majority of this material was either summarized in prior Government disclosures already or would not constitute Brady or Giglio. However, the Government has produced, and will continue to do so, such material in an abundance of caution and to ensure that the defendants have possession of any materials that could assist in their case (some of which will be provided in the Government's coming, early production of 3500 material).  In addition, the Government has spoken (and will continue to speak) to defense counsel about their requests, to discuss categories of responsive information of which it is aware.

As in any case, the Government continues to search to ensure that no stone is unturned and to ensure that any exculpatory material is provided.  Accordingly, it may well be that as trial approaches, the Government will obtain additional materials responsive to the defendants' requests (which it will of course turn over).  The Government will provide any such information as soon as it is obtained, and continue to ensure its own compliance with its disclosure obligations.

31

## Conclusion

For all of the forgoing reasons, the Government's motions <u>in limine</u> should be granted.


Dated:      New York, New York
            February 1, 2011


                         Respectfully submitted,

                         PREET BHARARA
                         United States Attorney


                    By: _____/s/_____
                         Mark Lanpher
                         Elie Honig
                         Daniel Goldman
                         Assistant United States Attorneys
                         Tel: (212) 637-2399/2474/2289
                         Fax: (212) 637-0086

<u>CERTIFICATE OF SERVICE</u>

Mark Lanpher deposes and says that he is employed in the Office of the United States Attorney for the Southern District of New York.

That on February 1, 2011, he caused to be served a copy of the foregoing Government's Motions In Limine by ECF and e-mail on:

**Murray Richman**
Law Offices of Murray Richman
2027 Williamsbridge Road, 3rd Floor
Bronx , NY 10461
(718) 892-8588
Fax: (718) 518-0674
Email: mrichman_mr@msn.com

**Frederick H. Cohn**
Attorney At Law
61 Broadway, Suite 1601
New York, NY 10006
(212)768-1110
Fax: 212 (267)-3024
Email: fcohn@frederickhcohn.com

**Bobbi Sternheim**
156 Fifth Avenue – Suite 823
New York, NY 10010
212-243-1100
Cell: 917-306-6666
Fax: 888-587-4737
Email: bcsternheim@mac.com

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. Section 1746.

_____/s/_____
Mark Lanpher


Executed on:   February 1, 2011
               New York, New York