UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

UNITED STATES                                                    09 Cr. 1239 (PKC)

v.

ARTHUR NIGRO, ET AL (TY GEAS).
----------------------------------------------------------X


**DEFENDANT TY GEAS'S REPLY TO MOTIONS IN LIMINE**

ATTORNEYS FOR TY GEAS

Bobbi C. Sternheim, Esq.
156 Fifth Avenue – Suite 600
New York, NY 10010
212-243-1100

Lee Ginsberg, Esq.
30 Vesey Street – Suite 100
New York, NY 10007
212-608-0808

Zoe Dolan, Esq.
30 Vesey Street – Suite 100
New York, NY 10007
347-301-5180

This submission comprises defendant Ty Geas's Reply to the pending motions in limine.  As described in our moving papers and further set forth below, the discovery disclosed to date reveals a cornucopia of potential *Brady*, *Giglio* and Rule 16 material tending to undermine the government's case-in-chief.  A pretrial *Mastrangelo* hearing is necessary based on this material and the arguments set forth in the government's reply papers, and because the statements the government seeks to admit intertwine with the foundation required by Rule 804(b)(6).  In addition, the government should be compelled to disclose further information and discovery.

I.      Potential *Brady* Inconsistencies And *Giglio* Material Abound.

The discovery in this case is rife with potential *Brady* inconsistencies and *Giglio* material.  Our initial submission at pages 10-11 contains a summary of areas of discovery that pertain to the instant motions.  To detail this material for the purposes of this Reply, it divides into three categories: information contradicting the government's theory of the case (i.e., *Brady* material), information tending to yield information undermining aspects of a government witness's testimony or background (i.e., *Giglio* material), or information relating to "background" evidence of the racketeering enterprise that is material to preparing the defense (i.e., Rule 16 material).  Specifically, the discovery yields the following:

A.  Information From The Discovery

    i.      Bruno

        a.  Information indicating Bruno was killed by someone other than the defendants currently indicted in this case:

            1.  Jay Ceravolo killed Bruno.

1

2.  Leone Daniele killed Bruno and apparently claimed responsibility.

3.  Gary Westerman killed Bruno.

4.  Ralph Santaniello killed Bruno.

5.  FBI SA Cliff Hedges relayed information to Bruno suggesting that Chris Berte or Carmine Manzi threatened Bruno's life.

6.  Bruno was killed by a Gambino Crime Family crew or Renaldi Ruggiero, and John Bologna brought in "zips" to kill Bruno.

7.  Mario Imbesi thought Bruno was killed by any individual associated with, or a member of, an organized crime family other than the Genovese Crime Family.

8.  AUSA Todd Newhouse advised ADA Carmen Picknally that Bruno had provided a poker machine to Dennis Collasacco and never received payment in return for the machine, and Collasacco or Mitchell Weissman had stated Bruno would be killed prior to Bruno's death.

9.  Anthony Arillotta made payments to Albert Scibelli in connection with criminal activity but stopped paying after Bruno was made a captain.

b.  Information indicating Bruno had adversarial relationships with individuals other than the defendants:

1.  Bruno's death occurred in connection with a romantic affair, retaliation, or money owed to Bruno by Frank Depergola.

2. Bruno and Michael DeCaro had a conversation about Frankie Roche prior to Bruno's death, and Bruno made a threat against Roche.

3. Bruno's death was connected to his relationship with Anthony Delevo, and Bruno collected money in such a way as to "humiliate" Delevo.

4. Bruno had a relationship with an individual in connection with a usurious loan or legal or illegal business deal that became strained.

5. Bruno and James Fiore had a conflict and there was "bad blood" between them.

c. Information indicating that individuals other than the Defendants were extorted by Bruno or owed him money:

1. Bruno sought or received extortionate payments from Richard Furnelli, James Santaneillo and the owner establishments such as the Civic Pub, Chessman Lounge, Sorrento Pizza and Castaway Lounge.

2. Individual(s) by the last name of Sarno made illegal payments to Felix Tranghese or Bruno.

3. Albert Facchiano owed money to Bruno or Bruno extorted money from Facchiano.

4. Charles Steinberg owed money to Bruno or Bruno extorted money from Steinberg.

3

5.   Bruno had a "campaign" to extort or illegally obtain monies
from businesses in the Springfield, Massachusetts area.

6.   Bruno was involved in usurious debt collection from an
individual by the last name of Manzi.

d.   Information that individuals other than the Defendants gave alternative
versions to the government's theory or lied to law enforcement during
investigation of Bruno's murder:

1.   Bologna lied to law enforcement about his criminal activity
while cooperating with the government, failing to tell his
original handler about collecting money and providing
inaccurate statements about Bruno's murder.

2.   Victor Bruno ("Victor") lied to the police about whether Al
Bruno visited Brandon Croteau the day before Al Bruno's
death.

e.   Information related to individuals other than the Defendants who were
or are suspected to be involved in Bruno's murder:

1.   Croteau asked Billy Johnston in or about November 2003 to
provide a fake alibi on Croteau's behalf, in connection with the
investigation of Bruno's murder.

2.   Johnston admitted a statement he had made to law enforcement
in connection with an investigation in to Bruno's death was a
lie.

4

3.   Springfield attorney Dan Kelly provided a document to Roche containing information regarding individuals involved or allegedly involved in Bruno's murder – that is, DeCaro, Croteau, Johnston, Imbesi, Emo Gonzalez, Ty Geas or Fotios Geas – and the defense has received information that Kelly is currently being investigated by federal law enforcement.

4.   Jeffery Murphy invoked his Fifth Amendment privilege during testimony before the grand jury investigating Bruno's death, and subsequently Murphy committed suicide.

ii.   Roche

a.   Information related to Bruno's murder, indicating that:

1.   Roche threatened DeCaro, and off-duty policeman Leonardo Matos witnessed an altercation between them.

2.   Bruno made a threat against Roche.

b.   Information related to uncharged criminal activity in which Roche was involved:

1.   Roche proposed robbing Bologna's social club.

2.   Imbesi interacted with Anthony DeSanto in connection with criminal activity involving Roche.

3.   Roche committed crimes other than those charged in the indictment for the Gambino crime family or the Genovese crime family.

    c.  Information relating to statements by others about Roche:

        1.  Bologna stated that information provided by Roche relating to Bruno's murder was incorrect.

        2.  Imbesi asked DeSanto to not disclose that Imbesi and DeSanto had talked on the phone regarding material on the Internet about Roche.

        3.  Imbesi made false statements to law enforcement about how well he knew Roche.

iii.    Westerman – Information indicating that:

    a.  Gary Westerman killed Bruno.

    b.  Westerman robbed Emiliano Gonzalez (who dealt drugs and ran Emo's Bar, which Roche smashed up).

    c.  Steven Skea discussed a gun with law enforcement in connection with the investigation of Gary Westerman's murder.

    d.  Croteau had a relationship with Westerman such that law enforcement questioned Croteau about Westerman.

    e.  Westerman provided information about organized crime activity, including information about Arillotta, the shooting at Civic Pub and the shooting at Arillotta's house.

    f.  DeCaro was at Westerman's condo with Westerman's wife when police arrived to investigate Westerman's disappearance, and DeCaro was wearing Westerman's clothes.

iv.  Bologna – Information indicating that:

    a.  Bologna lied to law enforcement about his criminal activity while he was cooperating, that is, he failed to tell his original handler about collecting money and provided inaccurate statements about Bruno's murder.

    b.  Bologna was willing to help the FBI based in whole or in part on revenge.

    c.  Bologna was a member of the Gambino Crime Family, and law enforcement obtained intelligence that Bruno was killed by the Gambinos.

    d.  There was a shooting at Bologna's social club in Port Chester, New York, suspected to be in retaliation for Bruno's murder.

v.  Arillotta – Information indicating that:

    a.  Arillotta made payments to Scibelli in connection with illegal activity but stopped paying after Bruno's was made a captain.

    b.  Gonzalez made a statement about information concerning Arillotta's past.

    c.  Arillotta made a statement to Gonzalez about Croteau, who was investigated in connection with Bruno's murder and invoked his Fifth Amendment right to silence before the grand jury investigating Bruno's death.

    d.  Arillotta was involved in "stage fights" in or about 2003.

7

vi.   The Manzis – Information indicating that:

    a.   Arillotta was involved in criminal activity with Joseph Manzi.

    b.   Gonzalez and an individual by the last name of Manzi had a criminal relationship.

    c.   Bruno was involved in usurious debt collection from an individual by the last name of Manzi.

    d.   Bruno had a criminal relationship with Carmine Manzi.

II.   A *Mastrangelo* Hearing Is Necessary.

The government's argument that the victim statements are admissible turns on the illusion that it is possible to lay the foundation for their admissibility before the jury without undue prejudice to the defendants. Rule 804(b)(6) provides that "A statement offered against a party that has engaged or acquiesced in wrongdoing *that was intended to, and did*, procure the unavailability of the declarant as a witness" is not excludable as hearsay. Fed. Rule Evid. R. 804(b)(6) (emphasis supplied). The inquiry under Rule 804(b)(6) is whether a nexus between intent and causation exists. *See Giles v. California*, 554 U.S. 353 (2008) (incorporating 804(b)(6) rationale into common law forfeiture analysis and upholding admission of victim statements establishing defendant's threat and concordant intent). Even prior to the promulgation of Rule 804(b)(6), the Second Circuit recognized the importance of inquiring into the circumstances surrounding the statement sought to be admitted prior to testimony about it before the jury. *United States v. Mastrangelo*, 693 F.2d 269, 272-73 (2d Cir. 1982).

The core of the problem here is that the substance of the victim statements intertwines with the foundation the government seeks to lay. Indeed, in the government's

analysis, evidence that the defendants murdered Bruno and Westerman to prevent their cooperation establishes the *Mastrangelo* foundation.  Government's Reply ("Gov't Reply") at 22-23.  The problem gets hairier as the government argues that the defendants need not have known what Bruno and Westerman said to law enforcement.  Even if such an approach withstood the intent and causation requirements of Rule 804(b)(6), it still falls afoul of the Rule: the government's proposed openings presuppose the defendants' intent before it has been established.

The breadth of *Brady* and *Giglio* issues compounds the problem.  As set forth above, there is a spate of inconsistencies that tends to undermine the intent and causation that the government's approach assumes.  Testimony laying a foundation for the statements under these circumstances is therefore embedded with prejudice.  Because there are so many versions of the events and reasons to disbelieve the cooperators, scrupulousness requires a determination of admissibility before the cat even stirs in the bag at trial.

In any event, uncertainties remain.  While the government – at the urging of the court, and in order to defend its position – has set forth more detail in its reply, it is still not clear if the totality of the statements made to law enforcement by Bruno and Westerman have been placed before the court.  Nor is it clear whether there is sufficient evidence of the defendants' knowledge of the cooperation of these individuals.

The government glosses over the problem that would be created if the statements were admitted only for the fact that they were made and not necessarily for the truth of the statements.  If, as the government seems to assume, the statements are admissible beyond all cavil simply because they were made, a Rule 403 issue portends a mistrial.

Assuming *arguendo* the statements are not true, and they are admitted solely because they were made, no explanatory or curative instruction may prevent the undue prejudice that results.  Further, if the government only wants to demonstrate that the victims made statements to law enforcement about the defendants and that is why they were killed, then a stipulation admitting that the witnesses made statements to law enforcement about the defendants would serve the purpose.

In light of these considerations, a pre-trial hearing is necessary to determine whether the statements are admissible at all.  *Mastrangelo* illustrates why.  In that case, a key witness against the defendant was shot and killed by two unknown individuals just prior to testifying against the defendant.  Judge Weinstein granted a mistrial and Mastrangelo moved to dismiss on double jeopardy grounds.  On interlocutory appeal following denial, the Second Circuit affirmed, discussing the procedural difficulty facing Judge Weinstein at the time the witness was killed.  *United States v. Mastrangelo*, 662 F. 2d 946 (2d Cir. 1981), *cert. denied* 456 U.S. 973 (1982).

The second trial was held before Judge McLaughlin, who, giving deference to Judge Weinstein's apparent determination that the defendant had, in some manner, been responsible for the unavailability of the witness, permitted prior statements of the unavailable witness to be admitted into evidence over the objection of defense counsel. On appeal following conviction, the Circuit addressed the issue of the admissibility of the statements of the unavailable witness and held that the trial court should have conducted an "evidentiary hearing in the absence of a jury" before a finding of a waiver could be made.  *Mastrangelo,* 693 F.2d 269.  This standard remains the benchmark in a forfeiture inquiry.  *See Perkins v. Herbert*, 596 F.3d 161, 166-67 (2d Cir. 2010) (noting New York

law requires clear and convincing evidence of defendant's responsibility for witness absence whereas *Mastrangelo* standard is "preponderance of evidence").

The government's argument that dealing with the *Mastrangelo* issue during trial is the most efficient way to proceed fails to withstand scrutiny.  As an initial matter, even if the court were to hold a hearing, as we continue to urge, there is <u>no</u> delay caused to the court or any party.  A pretrial hearing is <u>more</u> efficient than delaying the proceedings to deal with the issue once the jury is seated.  Furthermore, the defendants will be prejudiced beyond any possible curative instruction once testimony about circumstances surrounding the statement comes out and the court makes a midtrial decision that the statements are not admissible or even admissible for a limited purpose.

Finally, we urge the court to consider the danger of statements elicited before the jury and then later ruled to be inadmissible.  Even were the parties to walk on eggshells during opening statements, the issues here remains alive to cause delay at trial.  A hearing is necessary at this time.

III.    *Brady*/*Giglio* Requests

The government declines to represent whether it has provided the universe of material responsive the requests set forth in our December 24, 2010 letter seeking 70 items for disclosure (the "December 24th Letter").  Accordingly, it is necessary to move to compel production of the remaining areas of inquiry which follow.

A.  "Bouncing" Of Lead AUSA Newhouse

Preliminarily, it appears that this prosecution went awry during a prior phase in the U.S. District Court of Massachusetts to the degree that the issue surfaced in the press:

> Prosecutors . . . told [United States District of Massachusetts] [J]udge Michael A. Ponsor they needed more time to ramp up for trial after ***the lead prosecutor was***

> ***bounced from the case***.  Assistant U.S. Attorney Todd E. Newhouse was very
> recently taken off the two-year-old case, according to replacement Paul H. Smyth.
> ***Often stating during pretrial hearings that he "didn't want to try the case twice"
> if a guilty verdict was [sic] flipped on appeal***, the veteran organized crime
> prosecutor won't get to try it even once. "He's out," said Smyth, head of the
> Springfield U.S. Attorney's office.[1]

Newhouse's statements are a red flag signaling an actualized or anticipated error,
known to the government, that has the potential to result in a reversal.  Newhouse's
removal from the case and the sealing of the record – a highly unusual series of events –
underscore the seriousness of this issue, which needs to be addressed.

In the December 24th Letter, we requested "[a]ny and all documents relating to the
protective order in *United States v. Fotios Geas*, 08 Cr. 30029 (MAP), and the
circumstances underlying same, including but not limited to the relationship, if any,
between AUSA Newhouse's withdrawal and the protective order or circumstances
relating to exculpatory material."  It is our understanding that the government provided
an *ex parte* submission to the Court in this regard.

In light of the discrepancies among the discovery and reportage set forth above,
the defense moves for immediate disclosure.  And we request that the *ex parte*
submission be identified as a Court Exhibit and referenced on the Docket.

B.  Other Requests

1.  All documents and recordings reflecting any allegation or belief that Daniele
    killed Bruno, and all investigative materials relating to same.

---

[1] See "Federal judge grants one-month delay for Adolfo "Al" Bruno murder trial," available at
http://www.masslive.com/news/index.ssf/2010/02/federal_judge_grants_one-month.html (last visited
February 5, 2011 (emphasis supplied).

2. All documents and recordings concerning the relationship between DeCaro and Bruno, including but not limited to investigative materials with respect to any conversation between DeCaro and Bruno about Roche.

3. All documents and recordings regarding Roche's relationship with Bologna, including but not limited to investigative materials pertaining to Roche's proposal or plan to rob Bologna's social club.

4. All documents and recordings concerning investigations into Imbesi's connection with Roche or criminal activity as it relates to any charge in this case, including but not limited to Imbesi's interactions with DeSanto.

5. All documents and recordings relating to Bruno's relationship with Delevo, including but not limited to information tending to indicate that Bruno's death was in any way connected with this relationship, or information regarding money collection from Delevo, including but not limited to money collection conducted to "humiliate" Delevo.

6. All documents and recordings reflecting investigative materials pertaining to any individual who actually or allegedly owed Bruno money or was believed to owe Bruno money, including but not limited to individuals who provide or ever provided information to law enforcement relating to any such money.

7. All documents and recordings reflecting investigative materials pertaining to Anthony Arillotta's involvement in criminal or other activity in connection with Joseph Manzi or any individual associated with Joseph Manzi.

8. All documents and recordings regarding criminal activity allegedly or actually involving Bruno, including but not limited to extortionate payments sought from

13

or paid by Furnelli, Santaniello or the owner any establishment such as the Civic Pub, Chessman Lounge, Sorrento Pizza or Castaway Lounge or any other such establishment.

9.  All documents and recordings reflecting information that Bruno was or may have been killed by anyone other than the individuals charged in the current indictment, including but not limited to investigative materials relating to Siano's statement to law enforcement that Bruno was killed by Jay Ceravolo.

10. All documents and recordings concerning information reflecting intelligence or rumors contrary to the government's current theory of Bruno's murder, including but not limited to any indication that Bruno's death occurred in connection with a romantic affair, retaliation by a gang or any individual, or money owed to Bruno by Depergola or any other individual or group.

11. All documents and recordings reflecting information that Westerman killed Bruno, including but not limited to any investigative materials regarding same.

12. All documents and recordings reflecting information that Santaniello killed Bruno, including but not limited to any investigative materials regarding same.

13. All documents and recordings concerning any information tending to indicate that Bruno's life was threatened by anyone other than the Defendants, including but not limited to information FBI SA Cliff Hedges relayed to Bruno suggesting that Berte or Manzi in any way threatened Bruno's life.

14. All documents and recordings reflecting information that Westerman robbed Gonzalez, including but not limited to any investigative materials regarding same.

15. All documents and recordings relating to the statements that (a) Bruno was killed by a Gambino Crime Family crew or Renaldi Ruggiero, (b) Bologna brought in "zips" to kill Bruno, (c) any "beef" between Bruno and Ruggiero and (d) any statement to the allegations reflected in (a)-(c); and (4) any investigative materials regarding (1)-(3).

16. All documents and recordings regarding information concerning the relationship between Roche and DeCaro, including but not limited to any information regarding any altercation between Roche and DeCaro or any instance when Roche threatened DeCaro, including all documents and recordings relating to Matos in connection with any such altercation or instance.

17. All documents and recordings reflecting information regarding Bruno obtained by law enforcement or the government in connection with Petropoulos's cooperation, including but not limited to information relating to AUSA Smyth's letter to ADA Picknally acknowledging the value of Petropolis's cooperation in connection with a reduced sentence recommendation.

18. All documents and recordings concerning any relationship between Gonzalez and any individual by the last name of Manzi, including but not limited to any investigative materials regarding same.

19. All documents and recordings reflecting information as to Croteau's relationship with Westerman, including but not limited to any investigative materials regarding same.

20. All documents and recordings concerning Croteau's request in or about November 2003 to Johnston to provide a fake alibi on Croteau's behalf, including but not limited to any investigative materials regarding same.

21. All documents and recordings reflecting information that Bruno made a threat against Roche, either implicitly or explicitly, whether in Roche's presence or otherwise.

22. All documents and recordings concerning information that Victor Bruno lied to the police about whether Al Bruno visited Croteau the day before Al Bruno's death.

23. All documents and recordings concerning investigative materials in connection with any statement by Bologna that may tend to contradict or undermine the government's theory of the case at trial, including but not limited to any statement that any information provided by Roche was incorrect.

24. All documents and recordings concerning investigative materials relating to Imbesi's request to DeSanto to conceal or not disclose to law enforcement or any other individual or group that Imbesi and DeSanto had talked on the phone regarding any article on the internet about Roche.

25. All documents and recordings relating to false statements Imbesi made to law enforcement about whether or how well he knew Roche, or about Imbesi's relationship with Roche.

26. All documents and recordings reflecting any statement Bologna made to Imbesi regarding Bruno or Bruno's death.

27. All documents and recordings reflecting any statement to law enforcement by any individual that Imbesi thought Bruno was killed by any individual associated with, or a member of, any organized Crime Family other than the Genovese Crime Family.

28. All documents and recordings regarding any statement by Johnston that Johnston later admitted or indicated was a lie.

29. All documents and recordings regarding attorney Dan Kelly, including but not limited to any document containing information Kelly may have provided to Roche regarding DeCaro, Croteau, Johnston, Imbesi, Emo Gonzalez, Ty Geas or Fotios Geas.

30. All documents and recordings reflecting information regarding illegal payments made to Tranghese or Bruno, whether directly or indirectly, by any individual by the last name of Sarno.

31. All documents and recordings concerning any gun discussed with law enforcement by Skea in connection with the investigation of Gary Westerman's murder.

32. All documents and recordings regarding any involvement Bruno had or may have had with any usurious debt collection, including but not limited to any debt owed to or by any individual by the last name of Manzi.

33. All documents and recordings reflecting information about Bruno's relationship with Carmine Manzi.

34. All documents and recordings reflecting information regarding any crime Roche committed for the Gambino Crime Family or the Genovese Crime Family other than those crimes charged in the indictment.

35. All documents and recordings reflecting information tending to indicate or suggest that Bruno's relationship with another person in connection with illegal activity became strained, including but not limited to any instance involving a usurious loan or legal or illegal business deal.

36. All documents and recordings regarding any relationship or interaction between Bruno and Facchiano, including but not limited to all documents and recordings concerning information about monies allegedly or actually owed to Bruno by Facchiano and monies allegedly or actually extorted from Facchiano by Bruno.

37. All documents and recordings regarding any relationship or interaction between Bruno and Steinberg, including but not limited to all documents and recordings concerning information about monies allegedly or actually owed to Bruno by Steinberg and monies allegedly or actually extorted from Steinberg by Bruno.

38. All documents and recordings regarding any relationship or interactions between Bruno and Ruggiero, including but not limited to all documents and recordings concerning information about Ruggiero's potential or actual involvement as to monies discussed in ¶¶ 36-37, or concerning any interaction between Bruno and Ruggiero in connection with any actual or potential business deal.

39. All documents and recordings reflecting information concerning "stage fights" in which Arillotta and any individual suspected to be associated with Arillotta were involved or suspected to be involved in or about 2003.

40. All documents and recordings reflecting information regarding Bologna's willingness to help the FBI based in whole or in part on revenge.

41. All documents and recordings reflecting information about Bologna's membership in the Gambino Crime Family.

42. All documents and recordings reflecting information regarding any payment Arillotta allegedly or actually made to Scibelli, including any such payment in the months leading up to Bruno's death.

43. All documents and recordings concerning any alleged or actual shooting of Bologna's social club in Port Chester, New York.

44. All documents and recordings reflecting information about Bologna's misrepresentation to law enforcement, or his failure to tell the truth, or any lie he made to law enforcement, about any of his criminal activity at any time, including but not limited to Bologna failing to tell his original handler about collecting money or providing any inaccurate statement about Bruno's murder.

45. All documents and recordings reflecting information in the possession of law enforcement or the government concerning any information provided by Bologna regarding any "fight," disagreement or conflict involving Bruno and any suspected or actual member of any organized crime organization.

46. All documents and recordings reflecting information regarding Bruno's "campaign" to extort or illegally obtain monies from any business in the Springfield, Massachusetts area, including any information relating to Scibelli in connection with such activity.

19

47. All documents and recordings reflecting information concerning any disagreement or conflict between Bruno and Fiore, including but not limited to any information regarding "bad blood" between Bruno and Fiore.

48. All documents and recordings reflecting information about any statement made by Bologna relating to Ty Geas that tends to be inconsistent with the government's current theory of the case.

49. Whether Roche made any identification, including but not limited to any identification of Ty, and, if so, any and all details regarding any such identification.

50. All documents and recordings reflecting information about a power struggle between Arthur Nigro and any other actual, alleged or suspected organized crime member, including but not limited to any individual known as "Leo."

51. All documents and recordings reflecting information about any statement Gonzales made to law enforcement or any state of federal prosecutor regarding Arillotta, including but not limited to any such statement concerning Arillotta's past.

52. All documents and recordings reflecting information regarding any statement Arillotta made to Gonzalez regarding any individual currently charged with, or at any time suspected to be involved in, the crimes in the indictment, including but not limited to any such statement regarding Croteau.

53. All documents and recordings reflecting any information provided by Westerman about organized crime activity, including but not limited to information about Arillotta, Freddy or Ty, or the Civic Pub or Arillotta's house.

54. All documents and recordings reflecting information about Murphy's suicide, including any information relating to the relationship, if any, between Murphy's suicide and his invocation of the Fifth Amendment during his Grand Jury testimony.

55. All documents and recordings relating to a relationship between DeCaro and Westerman or Sandra Berardi, including but not limited to intelligence relating to DeCaro's relationship with Berardi at the time of Westerman's death, specifically, information as to why DeCaro was found in Westerman's condominium with Berardi shortly after Westerman's death wearing Westerman's clothes.

Because material responsive to these requests tends to undermine the government's case-in-chief, impeach a witness or is otherwise material to the preparation of the defense, it falls under *Brady*, *Gigilio* or Rule 16.  And in light of the number of investigative leads in this regard, a definitive response from the government is in order.

IV.    Conclusion

For the foregoing reasons, including those set forth in our cross-moving papers and discussed at the January 25th pretrial conference, the government's motions should be denied, and the cross-motions by the defense should be granted, in their entirety.

Dated: February 9, 2011
        New York, New York

/s/_____
Bobbi C. Sternheim

/s/_____

Lee Ginsberg
/s/_____
Zoe Dolan

*Attorneys for defendant Ty Geas*

21