UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x

UNITED STATES OF AMERICA,                  :

   -against-                               :        S4 09 Cr. 1239 (PKC)

EMILIO FUSCO,                              :

                Defendant.               :

-----------------------------------------------------x

## DEFENDANT FUSCO'S MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S MOTIONS IN LIMINE

### PRELIMINARY STATEMENT

Defendant Emilio Fusco submits this Memorandum of Law in opposition to the government's motions *in limine*. ("Govt. Br.   "). In its motions, the government seeks: (1) to admit evidence of "other bad acts of the defendant's [sic]" as proof of the charged crimes; (2) to admit evidence of the defendant's prior prison terms; (3) to admit certain statements "that *the defendants'* victims," Bruno and Westerman, made to law enforcement prior to their murders; (4) to admit evidence of the defendant's flight to Italy in April 2010 as evidence of consciousness of guilt; (5) to admit expert testimony regarding organized crime; and (6) to empanel an anonymous jury.

As we explain herein, the government's *in limine* motions are meritless and each should be denied.[1]

---

[1] Fusco, of course, reserves his right to object to any evidence, outside the scope of the government's present application.

## I.   The Government Motion To Admit Evidence Of Other Bad Acts Should Be Denied

In Point I of its brief (Govt. Br. 2-26), the government seeks to admit evidence of "other bad acts of the defendant's [sic] as relevant proof of the charged crimes." Govt. Br. 1.  The government asserts that this evidence is admissible "to prove the specific charged predicate offenses underlying the racketeering conspiracy; to prove the existence and nature of the charged racketeering enterprise more generally; and to prove the background of the relationships of the defendant with his co-conspirators, and with the enterprise." Govt. Br. 2.

The racketeering conspiracy and predicate offenses are charged in Counts One and Two of the indictment.  Count One indicts Fusco with conspiring to participate in the affairs of a racketeering enterprise, from 2001 through February 2010, in violation of 18 U.S.C. § 1962 (d).  It charges that Fusco and his co-conspirators agreed to conduct and participate in the affairs of the Genovese Family through a pattern of racketeering activity.

Count Two accuses Fusco of a substantive racketeering offense, from in or about 2001 through February 2010, in violation of 18 U.S.C. § 1962(c).  Fusco is charged in four  racketeering acts: (1) Racketeering Act One, the November 2003 murder of Adolfo Bruno; (2) Racketeering Act Two, the November 2003 murder of Gary Westerman; (3) Racketeering Act Three, the conspiracy to extort and extortion of James Santaniello; and (4) Racketeering Act Four, conspiracy to distribute marijuana.

Although there are other counts in the redacted indictment, the government does not claim that the uncharged crimes are offered in connection with them. Govt. Br. 3

**Overview: Applicable Law**

Evidence of uncharged acts is admissible, outside of the strictures of Rule 404(b), as direct evidence of the charged crimes, where such acts *"arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story* of the crime on trial." *See United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)(emphasis added). Accordingly, in conspiracy cases, any act "that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged." *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir.1999) (internal quotation marks and alterations omitted); *see also United States v. Thai*, 29 F.3d 785, 812 (2d Cir.1994) ("When the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself.").

Evidence of uncharged crimes may also be admissible under Federal Rule of Evidence 404(b):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

Because of concern that unduly prejudicial evidence might be introduced under Rule 404 (b), the Supreme Court formulated a four-part test. *Huddleston v. United States*, 485 U.S. 681, 691 (1988). A district court must (1) find a purpose for admission other than simply to show propensity; (2) find the evidence relevant under Rule 402; (3) find that the Rule 403 probative value / prejudice test is satisfied; and (4) instruct the jury that the evidence is to be considered only for the purpose for which it was admitted. *Id.*

3

Among other reasons, other-acts evidence may be admissible under Rule 404(b) to "complete the story of the crimes charged," to "help explain to the jury how the illegal relationship between the participants in the crime developed," *United States v. Williams*, 205 F.3d 23, 33–34 (2d Cir. 2000), or to explain "the mutual trust that existed between coconspirators," *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993). Such evidence is also admissible to corroborate other testimony, to the extent the government demonstrates that "the corroboration is direct and the matter corroborated is significant." *United States v. Everett*, 825 F.2d 658, 660 (2d Cir. 1987).

Even if evidence is relevant and potentially admissible for one of the foregoing purposes, however, the court must also consider its admissibility under Rule 403, under which relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). Evidence is considered prejudicial if it tends "unfairly to excite emotions against the defendant." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Accordingly, evidence that is more "inflammatory," "sensational," or "disturbing" than conduct charged in the indictment is likely to be found unfairly prejudicial. *United States v. Mercado*, 573 F.3d 138, 145 (2d Cir. 2009); *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992); *see also United States v. Williams*, 585 F.3d 703, 708 (2d Cir. 2009) (the government should not be

permitted to introduce into evidence "unsavory details which go beyond what is necessary to make the point"). In conducting the required Rule 403 balancing, the court should consider whether any evidentiary alternatives exist, which are similarly probative but less prejudicial to the defendant. *Old Chief*, 519 U.S. at 182–83; *see also United States v. McCallum*, 584 F.3d 471, 477 (2d Cir. 2009).

Evidence is not admissible merely because it is background. In short, inflammatory and prejudicial evidence is inadmissible where its exclusion "would not have left any gaps in the Government's case, nor have left the jury wondering about the missing pieces." *Williams,* 585 F.3d at 708. Admitting excessive uncharged crime evidence ignores a "common sense precaution which should clearly be taken ... to limit the prosecutor's presentation to such facts ... as are reasonably necessary to prove the point for which the evidence is admitted, and to exclude unsavory details which go beyond what is necessary to make the point." *Id.*, citing, David W. Louisell & Christopher B. Mueller, *Federal Evidence* § 140, at 209 (rev. ed. 1985); *see also United States v. Bradwell*, 388 F.2d 619, 622 (2d Cir. 1968) (discussing the undue prejudice that can result when the "minute peg of relevancy [is] entirely obscured by the dirty linen hung upon it" (citation omitted)).

Where the other-act evidence is inflammatory, a court must carefully consider whether it will be used by only in connection with the proper purpose for which it was admitted, or whether instead it is likely to be misused. *Curley*, at 56 (reversing conviction where district court abused its discretion by admitting evidence that the defendant's brother had previously intimidated the victim). Evidence is also unfairly prejudicial when "it tends to have some adverse effect upon a defendant beyond tending to prove the

fact or issue that justified its admission into evidence." *United States v. Massino*, 546 F.3d 123, 132 (2d Cir. 2008) (internal quotation marks omitted). If the other acts tend to prove a fact not in issue or "to excite emotions against the defendant," they create a prejudicial effect. *Figueroa*, at 943. A district court abuses its discretion when it admits such evidence with a high possibility of jury misuse but with only slightly more probative value than other evidence on the same issue. *See McCallum*, 584 F.3d at 477 (finding that "we are at a loss to understand how the court or the government could believe that the prior convictions were necessary to prove McCallum's intent and knowledge and that they passed muster under Rule 403").

Even though the Second Circuit embraces the so-called inclusionary approach to admitting evidence of other bad acts and uncharged crimes, district courts should not presume that such evidence is relevant or admissible. *Curley*, at 56. If uncharged crimes are offered by the prosecution for a particular inference, the court must consider all the evidence presented to the jury and determine whether a reasonable jury could find the advocated inference. *Id.* at 56. The court abuses its discretion if the evidence is "not sufficiently similar" to the charged conduct or if "the chain of inferences necessary to connect [the] evidence with the ultimate fact to be proved [is] unduly long." *Id.,* (citing *United States v. Peterson*, 808 F.2d 969, 974 (2d Cir. 1987)).

For other-acts evidence to be considered relevant under Rule 401, the government must show that a jury could "'reasonably conclude that the act occurred and that *the defendant was the actor*.'" *United States v. Gilan*, 967 F.2d 776, 780 (2d Cir. 1992) (quoting *Huddleston*, 485 U.S. at 689)(emphasis added). Moreover, the court must determine whether the jury "could reasonably find" such involvement by a

preponderance of the evidence. *Huddleston*, at 690. Thus, in the pretrial stage, the court must demand at least some proof that an act was committed and that defendant Fusco had a role in that act.

A limiting instruction is required to prevent a jury for using uncharged crimes for an improper purpose, and an insufficient instruction is reversible error. *Williams*, 585 F.3d at 709 (reversing where a limiting instruction addressing other acts of drug dealing, but not addressing uncharged guns, was general and vague, and saying that limiting instructions must be clear and unequivocal); *see also United States v. Becker*, 502 F.3d 122, 133 (2d Cir. 2007). Although it is ordinarily presumed that a jury will followed any of the court's limiting instruction the proper use of uncharged crimes, "this presumption is dropped where there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense." *United States v. Colombo*, 909 F.2d 711, 715 (2d Cir. 1990).

**Analysis**:

The government's motion separates the uncharged crimes it seeks to introduce into eight sections, identified as "a" through "h" in its. Each category will be addressed individually in the order presented by the government. Applying the foregoing principles, the government's proffer is fatally defective for at least three reasons. First, it is obvious that the present motion is, to a significant degree, a cut-and-paste transfer from the *in limine* motion filed against the other three defendants. Thus, on page 17 of the brief, the government maintains that "Tranghese will testify that, as a result of this beating, his ties with *the defendants on trial* and the Genovese family were severed." *Id.* (emphasis added). Also, on page 25 of the government's brief, it mentions the

"defendants" in a plural form at least five times, again showing that the other-acts argument has not been tailored for Fusco individually.

The Government, in an effort to circumvent Rule 404(b)'s ban on propensity evidence, asserts, in the most conclusory terms, that the proposed uncharged crimes is admissible to prove the specific charged predicate offenses underlying the racketeering conspiracy. This is simply wrong. Even assuming, *arguendo*, that such events occurred, there is absolutely no proof that these actions, committed by more than a dozen other people, are relevant, to the specific predicate offenses. Nor is there evidence that they were done in furtherance of this particular enterprise. Many of the crimes alleged in the government brief occurred in the 1990s, well before the 2001 starting point of the charged racketeering conspiracy. The government does not provide detail of its proof of these uncharged crimes, nor evidence linking them to the charged conspiracy.

Second, the government frequently uses the term "the evidence will show" since it frequently fails to cite specific evidence against Fusco. Thus, for many of the acts the government seeks to introduce, there is no offer of proof as to the nature and extent of the evidence. This deprives the court of the opportunity to gauge the reliability of the uncharged crimes, the degree to which the jury could draw relevant inferences, and the extent of any prejudice.

Third, and most important, the government fails to show how most of its evidence is direct evidence of the enterprise, as required under *Carboni* and its progeny. Instead, what the government is actually seeking to offer is Rule 404(b) evidence, which is far more objectionable and problematic. Indeed, for many of the specific acts the government offers, the defense requests a far more detailed proffer to explore all factors

related to its relevance, reliability, prejudice, and cumulative nature. *See United States v. Ramirez*, 894 F.2d 565, 569 (2d Cir. 1990) (similar act evidence not relevant unless court determines that a jury "could reasonably find by a preponderance of the evidence that the act occurred and that the defendant committed the act").

Finally, much of the proffered other-act evidence is of marginal relevance at best, while the prejudice flowing therefrom is enormous. As described by the government, the evidence of uncharged crimes appears to be far more voluminous and complicated than the offenses charged in the indictment. This is remarkable given that the indictment charges a racketeering conspiracy spanning numerous states and almost a decade's worth of events. Therefore, admission of the proposed evidence of prior bad acts will, we submit, amount to a "waste of time" and the "needless presentation of cumulative evidence."

In light of the foregoing, the Court should reject the government's argument that the proffered evidence should be admitted to establish the predicate offenses. Stripped of its window-dressing, the Government's intent is simply trying to parade before the jury a hodge-podge of alleged additional criminal acts by Fusco and others in a thinly-veiled attempt to demonstrate his propensity for criminal conduct. Such tactics must not be countenanced because it would conflict with the fundamental principle that "a defendant must be tried for what he did, not for who he is." *United States v. Meyers*, 550 F.2d 1036, 1044 (5th Cir. 1977).

### a.  Fusco's Alleged Involvement in The Genovese Crime Family

According to the government, Fusco became involved in the "Genovese Crime Family" after arriving in Springfield, Massachusetts from Italy in the early 1990s.  Fusco was supposedly "close to" Genovese members Francesco and Albert Scibelli, and also came from the same town in Italy.  Fusco was allegedly "made" in the late 1990's and sponsored by Scibelli.  Supposedly, in the late 1990's Fusco was at odds with Adolfo Bruno, a member of the Genovese Family in Springfield, and Fusco arranged two "sit-downs" to settle "beefs" with Bruno.  However, after Bruno ascended to power in 2001, Fusco allegedly fell into line with him.  Fusco went to prison shortly after Bruno's murder on November 23, 2003, but he allegedly continued to receive proceeds from the Genovese Family's racketeering activity in Springfield.  Fusco's wife supposedly was paid $2,500 per month while he was incarcerated.

### Analysis

Most of the foregoing evidence should not be admitted because it is not relevant, under Rule 401.  Much of it predates the time frame of the indictment, which allegedly begins in 2001.  Evidence of being from the same town in Italy as others, aside from being an impermissible attempt to prove guilt by association, is ancient history.  Working as a driver for an alleged capo in the 1990's is not, in and of itself, evidence of criminal activity, nor does it tend to prove the charges in the indictment, which occurred at least a decade later. The government fails to cite disputes with Fusco in the early 1990's over his relationship with his girlfriend.

Moreover, testimony regarding who attended the ceremony when Fusco became a "made" man is singularly irrelevant. In addition, Fusco's being "at odds" or having a

"beef" with Bruno in the 1990's is not relevant to events that occurred more than a decade later. In brief, none of this evidence constitutes proper "enterprise" evidence under *Carboni*. Nor is this proof evidence of prior bad acts under Rule 404(b).

In addition, even if this Court was inclined to admit such proof, it should hesitate in the absence of a specific offer of proof as to how such evidence will be proved or the nature of the evidence. For example, the government's motion does not explain the nature of the "beef" with Bruno or whether there is direct evidence of it. This prevents the court from weighing its potential prejudice and probative value, under Rule 403.

The putative evidence about Fusco's wife receiving $2,500 per month, while Fusco was incarcerated, is particularly inflammatory and unduly prejudicial. Not only does Fusco categorically deny this claim, there is no valid reason to inform the jury that Fusco was incarcerated. The reason for any payments to his wife is speculative, at best. There has been no offer of proof from the government as to whether any witness saw payments made to Fusco's wife, knew of the amount, or knew how many payments were made. This certainly is not proper *Carboni* evidence.

Moreover, none of the proffered evidence is necessary "to provide background for the events alleged in the indictment" or "to enable the jury to understand the complete story of the crimes charged." *United States v. Reifler*, 446 F.3d 65, 91–92 (2d Cir. 2006). Instead, the proposed testimony is separate and distinct from whatever evidence the government may have of the crimes charged. Finally, the proffered evidence is inadmissible because any probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

11

### b.  Fusco's Alleged Involvement in Illegal Gambling and Loansharking

According to the Government, Fusco was involved in operating illegal gambling businesses and loansharking, between the mid-1990s and at least 2008, including illegal sports gambling with Albert Scibelli and others, loansharking, and a numbers operation with Anthony DeLevo.  In addition, according to the government, evidence of such illegal activity includes Fusco's guilty plea in the District of Massachusetts on June 4, 2003 to racketeering conspiracy and money laundering charges.  Fusco was sentenced to 33 months' imprisonment and was incarcerated between November 28, 2003 and February 9, 2006.  He then was in a halfway house until May 8, 2006.

The government contends that Fusco continued to participate in the numbers business, during and after his imprisonment.  Fusco supposedly resumed control of the Genovese numbers operation upon his release from prison in 2006.  In the fall of 2008, Anthony Arillotta allegedly ceded control of his interest in the Genovese numbers operation, for a weekly payment from Fusco of $1,300.

In addition to his loansharking activity with the Scibellis, the government also seeks to show that Fusco committed loansharking with Carmine Manzi, and also with Anthony Arillotta.  Furthermore, Fusco was involved in a sports betting operation with Giuseppe Manzi.  *See* Govt. Br. 6-8.

### Analysis

Even if the government's proffer on these alleged crimes was accurate, which Fusco disputes, it is not admissible as proof of the enterprise.  Such conclusory evidence – frequently described as "the evidence will show" (Govt. Br. 6) is hardly proof of the

racketeering enterprise because it did not arise out of the same transaction and is not inextricably intertwined with the evidence regarding the charged offense. *See Carboni,* at 44. Indeed, it will be contradicted by documentation. In particular, evidence of a numbers operation is, at most, Rule 404(b) evidence, which is totally irrelevant to the charges that Fusco is facing. As indicated by the government, this activity allegedly commenced in the "mid-1990's." Indeed, if anything, such evidence would impermissibly encourage to the jury to find that the defendant must be guilty of the charged crimes because he has a propensity to commit gambling crimes.

Moreover, as mentioned, this evidence should be excluded under Rule 403. The government's proffer of uncharged crimes would amount to informing the jury that Fusco, starting approximately six years prior to the time frame of the indictment, was involved in a crime spree involving multiple instances of illegal sports gambling, illegal gambling operations, numbers operations, and loansharking. This is impermissible propensity evidence, and not evidence relevant to whether the defendant actually committed the crimes charged.

The Court should all exclude all evidence of Fusco's guilty plea in the federal district court in Massachusetts on June 4, 2003 to charges of racketeering conspiracy and money laundering conspiracy. First, the instant indictment also charges a racketeering conspiracy, and introduction of a prior plea and conviction for the same offense will be overwhelmingly prejudicial, and amount simply to an insinuation of racketeering activity. *See United States v. McCallum,* at 476:

> Consequently, as we have repeatedly held, prior convictions should
> not be admitted unless the court has carefully conducted the Rule 403
> balancing test required by *Huddleston. See, e.g., United States v.*

*Salameh*, 152 F.3d 88, 110 (2d Cir.1998) (per curiam) ("To avoid acting arbitrarily, the district court must make a 'conscientious assessment' of whether unfair prejudice substantially outweighs probative value." (quoting *United States v. Birney*, 686 F.2d 102, 106 (2d Cir.1982))); *United States v. Williams*, 596 F.2d 44, 51 (2d Cir.1979) ("District judges must *carefully scrutinize* both the basis for the claimed relevance of [prior crimes] evidence and the balance between its probative value and prejudicial effect. The key to a fair trial in such cases is *careful determination* by the trial judge of both issues, particularly the latter." (emphases added)).[2]

Moreover, this Court should exclude all evidence about the 33-month prison term that Fusco served, plus his time at a halfway house. There is simply no relevance to the fact that Fusco was incarcerated or detained for almost one-third of the time frame of the crimes alleged in the indictment. Even if it were relevant, such evidence should be excluded under Rule 403.

In addition, the government's contention that Fusco took over Arillotta's numbers business in 2008 is disputed, inaccurate, and irrelevant. Indeed, the "evidence will show" that Arillotta extorted money from Fusco – not the other way around.

---

[2] *But see United States v. Andreadis*, 366 F.2d 423, 433 (2d Cir. 1966)(admitting state court plea for related charge). Separately, the government seeks to admit the superseding information and superseding indictment to which Fusco pled guilty in June 2003, as well as his judgment of conviction. Certainly, the latter is barred under *McCallum*. As to the prior information and indictment, those also should be precluded for the following reason. It would be highly incongruous for this Court to instruct the jury, as it must, that the indictment in this case is *not evidence*, but that an indictment permit introduction of an indictment from a prior case *as evidence*. Finally, on this issue, if the Court grants the government leave to introduce such documents, defendant will seek to introduce the minutes from Fusco's sentencing proceedings, under the doctrine of completeness. *See* Fed.R.Evid. 106.

### c. Fusco's Alleged Involvement in Narcotics Trafficking

According to the government, Fusco was involved in narcotics trafficking as far back as the early 1990s, up to and including the marijuana distribution charged in Racketeering Act Four. The government also seeks to introduce evidence of Fusco's involvement in cocaine trafficking. The government maintains that Fusco's narcotics trafficking involved members and associates of the Genovese Family, including Anthony Arillotta, Freddy and Ty Geas, Giuseppe Manzi, Louie Santos, Tony Capua, and others. Additionally, the government advances the preposterous claim that Fusco's narcotics dealings constituted a motive for him to murder Gary Westerman, under the theory that the murder was committed to "shield" Fusco's narcotics activities from Bruno and other members of the Genovese Family. Govt. Br. 8.

### Analysis

Evidence of marijuana trafficking in the early 1990s is irrelevant, and is therefore inadmissible under Rule 402. The conclusory, spurious claim that Fusco engaged in cocaine trafficking also is prejudicial and inadmissible because it is a more serious crime than what is charged in the indictment, namely, marijuana trafficking as charged in Racketeering Act Four. If the jury believed that Fusco was willing to traffic in cocaine, there is a grave danger that it would conclude that he is generally predisposed to distribute narcotics. Therefore, jurors might conclude that he would not hesitate to traffic in marijuana, which is generally considered less serious than cocaine.

Moreover, there has been no offer of proof by the government aside from its blanket statement that it "expects to offer evidence" of such uncharged crimes. This

leaves many preliminary questions unanswered, including: (1) will a witness with direct knowledge of these crimes testify; (2) how many uncharged marijuana and/or cocaine transactions are alleged, and what was the quantity of each transaction; (3) are there any police reports or laboratory reports that support the government's allegations; and (4) when did each incident take place? This portion of the motion should be denied or, at a minimum, the government should be required to make a detailed offer of proof.

Additionally, the government's newly-minted theory as to Fusco's narcotics dealings being "one of his motives for committing the murder of Gary Westerman" is simply outrageous and ridiculous. The government offers no concrete proof other than its bald assertion that this was Fusco's motivation for a killing that he totally denies.

### d. Prior Conspiracies by Others To Kill Gary Westerman

The government' seeks to introduce evidence of two prior conspiracies to murder Westerman, each involving Arillotta and Fotios Geas – and neither of which involved Fusco. These allegations, lifted directly from the government's *in limine* brief in the *Nigro* case, have no relevance here. The government asserts that Arillotta is expected to testify that, after Fotios Geas and Westerman were arrested in 1996 for theft of a tractor trailer, a plot was hatched to kill Westerman for fear that he would cooperate with law enforcement. A plot by Arillotta, Louis Santos, and Fotios Geas to kill Westerman was aborted when, instead of Westerman, a woman answered the door when the murder was supposedly about to occur.

The second plot to kill Westerman occurred in 2002 when Arillotta was upset that Westerman was dating his sister-in-law. This scheme involved a proposed drive-by

shooting at a restaurant, involving Fotios Geas and Michael DeCaro. The plot was aborted for unspecified reasons. Govt. Br. 9.

**Analysis**

None of this evidence is remotely relevant to the charges *against* Fusco in the indictment, and it clearly should be excluded under Rule 403. With respect to the 1996 plot, which predates the time frame of the conspiracy, and was devised seven years prior to Westerman's actual murder, Fusco had no involvement whatsoever. Instead, that plot involved Arillotta, Louis Santos, and Fotios Geas. Moreover, the government's description of the reason for aborting the plot (that a woman answered the door) suggests that the plot was not serious.

Likewise, Fusco is not alleged to have participated in, or have known about, the 2002 plot. Instead, that incident involved Arillotta, Fotios Geas, and Michael DeCaro. The government has failed to argue, or provide an offer of proof, that Fusco was aware of either the 1996 or the 2002 plot.   Additionally, since the indictment alleges two separate predicate acts of murder (of Bruno and Westerman) in furtherance of racketeering, there is a grave danger that the jury will use evidence of the aborted plots to find that Fusco, together with others, must be guilty due to his bad character. The motion should be denied as sheer propensity evidence.

The government argues that these two prior plots incidents are admissible to "establishing the existence of the enterprise and the predicate act of murder." However, the government woefully fails to show how such evidence satisfies any of the grounds under *Carboni*, or why its limited relevance – as to Fusco – is not substantially outweighed by its prejudicial nature, under Rule 403.

The decision in *United States v. Gotti*, 399 F. Supp.2d 417 (S.D.N.Y. 2006) is directly on point and supports Fusco's position that such evidence should be excluded. There, defendant Yannotti was charged with conducting the Gambino crime family's affairs through racketeering activities. The government sought to introduce, as "enterprise proof" evidence, a cooperating witness's testimony as to an uncharged murder that defendant allegedly committed in February 1985, prior to being treated as a "first among equals." Despite deeming the proposed testimony relevant to show the nature of the charged RICO enterprise, the court ruled it inadmissible under Rule 403. *Id.* at 420-21 ("Unlike Rule 404(b) evidence, which is admissible only for limited purposes, such as to show the accused's motive or knowledge, the evidence of the Alvino murder is offered as direct proof that Yannotti is a murderer. Thus, the evidence's probative purpose cannot be separated from its devastating prejudicial effect. In view of the slight probative value of this evidence, the difficulty of preparing a defense of an uncharged murder in a short period of time, and the very real danger that the jury will improperly consider such evidence as reflecting a propensity to commit murders, a Rule 403 balancing requires that the evidence regarding Yannotti's participation in the Alvino murder be excluded").

### e. Conspiracy To Murder Giuseppe Manzi

The government seeks to introduce evidence that Fusco regularly distributed narcotics with Giuseppe Manzi. In 2002, Fotios and Ty Geas robbed Manzi's cousin, Tony Capua, at gunpoint of $100,000 in marijuana proceeds. According to the government, Fusco met with Fotios Geas to assert his own interest in the stolen marijuana proceeds, but Geas obtained support from Adolfo Bruno. The government maintains that Fusco had to "back down" because of his desire to shield his narcotics activity from the

Genovese Family. Fotios Geas allegedly paid $5,000 to Bruno for his support in this dispute.

The dispute between the Manzi crew and the Arillotta/Geas crew escalated in 2003 when the Geas brothers offered $10,000 to Frank Roche to kill Giuseppe Manzi. As background, the government intends to introduce evidence that Ty Geas had broken a window in Manzi's restaurant, that the Geas brothers, Fusco, Arillotta, Roche, and others participated in a fight and shooting in the Civic Pub in downtown Springfield. Allegedly, Arillotta, Fusco, Roche, the Geas brothers, and others drove to the Civic Pub, armed with a gun, golf clubs, baseball bats, and an ice pick. Fotios Geas allegedly brandished a firearm at Civic Pub employees and shot at the front door, injuring two people.

The government contends that two nights later, on August 31, 2003, Arillotta's home was shot at several times. Then, supposedly Arillotta, Fusco, and the Geas brothers drove around Springfield searching for Manzi and his associates with the intention of killing them with AK-47 assault rifles. Nobody was located or killed.

Frankie Roche is expected to testify that, after the August 31, incident, the Geas brothers upped their offer to $25,000 to murder Manzi and those who had shot Arillotta's house, using an AK-47. The plan allegedly was aborted when Fusco arranged a meeting between Manzi and Arillotta and the Geas brothers. Govt. Br. 10-12.

### Analysis

This convoluted tale of betrayal and violence, including the brandishing and shooting of firearms, is extremely prejudicial because Fusco was not involved in any of these acts of violence. Instead, the incidents involve the injury of two innocent bystanders, both employees of the Civic Pub, after shots were fired at the front door – but

not by Fusco. Indeed, Fusco disputes he was present during any violence at the Civic Pub. The government's itemization of weapons used during the melee include golf clubs, baseball bats, and ice picks. In retaliation, there allegedly was discussion of using an AK-47 to kill Manzi and his associates. The government's tableau of violence is irrelevant as to Fusco and should be excluded in any event under Rule 403.

Nonetheless, the government asserts that such evidence is "admissible proof of Fusco's membership in the charged enterprise, as well as *his association with* Fotios and Ty Geas, which is relevant to the murders of Adolfo Bruno and Gary Westerman, among other crimes." Govt. Br. 10 (emphasis added). In short, the government admits it is trying to prove guilt *by association*, which is prohibited. In addition, the government asserts the evidence is "necessary to prove the relationship of trust among Fusco, Anthony Arillotta, and Frankie Roche." *Id.* This is simply ridiculous. *Fusco hardly knew, let alone trusted, Roche.* Moreover, the evidence will show – as the government's own description of the facts makes clear – that there no trust between Arillotta and Fusco.

In addition, even if this evidence was somehow relevant, it should be excluded under Rule 403 because its probative value is substantially outweighed by its prejudicial effect. These uncharged crimes are sensational and shocking, and liable to be used as evidence of Fusco's bad character to show propensity to act in conformity therewith.

Indeed, as the government's own narrative of events makes crystal clear, Fusco came to the aid of Manzi when the Geas brothers robbed his cousin of $100,000. Thus, the government's brief states, Fusco intervened to patch matters up between Manzi and Arillotta and the Geas brothers. This is totally inconsistent with an intention to murder Manzi. *See* Govt. Br. 12.

### f. Fusco's Alleged Relationship with Muscarella

The government seeks to introduce evidence that, while serving his federal prison term for the 2003 indictment, Fusco was incarcerated with a reputed Genovese capo, Ernest Muscarella, at the federal prison at Fort Dix. Fusco supposedly fought another individual on behalf of Muscarella and years later told Arillotta that he did so to show respect to Muscarella.

Fusco also purportedly complained to Muscarella that Fusco's family was not receiving enough money from Arillotta and the Genovese Family. Allegedly, Muscarella relayed Fusco's complaint to Artie Nigro, who then questioned Arillotta about whether he was taking care of Fusco's family. Govt. Br. 13.

### Analysis

This evidence should be excluded because it is not relevant, and because it is highly prejudicial due to the fact that it reveals to the jury that Fusco previously served time in jail. *See McCallum*, at 477 (concurring with district court concern "over the prejudicial impact of proof of McCallum's periods of incarceration").

First of all, the government makes no offer of proof of what competent evidence will show that Fusco served time with Muscarella, or what evidence there is that he participated in a fight. In order to fully litigate this issue, and the circumstances of any fight or violence in the jail, both sides would have to call either prison guards or inmates who were present for the events. At a minimum, the government should be required to offer documentary proof of this incident. In any event, this is clearly a collateral issue that should be precluded.

Moreover, the government does not give a time frame for when Fusco allegedly told Arillotta that he got into the fight "to demonstrate his respect for Muscarella." The government only says that it happened "later." Without more details, and without knowing the time frame, there is no way to judge the accuracy of Arillotta's account, or Fusco's statement – which we dispute. Indeed, Fusco maintains that his prison fight had nothing to do with Muscarella. There are many reasons why a person would fight in jail, including self-defense or defense of others. The circumstances of any such fight at FCI Fort Dix, on an unknown date, are irrelevant.

Also, even if Fusco wanted to show respect for Muscarella, it would not necessarily have anything to do with the Genovese Crime Family. Showing respect to another person in jail is not necessarily indicative of allegiance or association with organized crime. At times, it is a matter of survival.

Finally, the government seeks to introduce several layers of hearsay, without specifying the basis of knowledge for any testifying witness. For example, there is no competent witness to testify that (1) Fusco's complained to Muscarella that his family was not receiving enough money, or that (2) that Muscarella passed any such complaint on to Nigro. Even if Arillotta testifies that Nigro had a conversation with him, Arillotta would have no basis of knowledge of what prompted Nigro to speak.

In short, because of its conclusory nature highly dubious relevance, such proof should be excluded.

### g. Alleged Evidence of Additional Extortions

The government seeks to introduce other evidence regarding other extortions by Fusco and members of the Springfield crew.  The proposed evidence includes extortion of at least four different businesses in Massachusetts and Connecticut, plus "assorted Springfield- based loansharks and bookmakers," including Messrs. Desimone, Naioleari, Santos, Manzi, and Fattini. Govt. Br. 12-14.

Additionally, according to the government, from 2006 to 2010, Fusco, the Geas brothers and Anthony Arillotta extorted restaurants and other Businesses at the "Big E" for a total amount ranging from $15,000 to $20,000.  Further, the proposed evidence includes Fusco's use of extortion to gain control of "dumpster accounts" from various businesses after his release from prison in 2006, as well as a plan to kill Louis Santos in a dispute over a dumpster account.

**Analysis:**

If evidence of other alleged extortions is admitted, it opens a Pandora's box because the defense does not concede, and will vigorously contest, the accuracy of the government's account.  Moreover, the government fails to explain why such other extortions are relevant since those contested events shed no light on the extortion charged in the indictment.  Instead, the most likely and impermissible use of such evidence would be to demonstrate propensity and bad character.

Particularly troubling here are the volume of uncharged extortions that are offered, the lack of any time frame, and the conclusory nature of the government proffer. The Government's laundry list of other extortions can only be described as excessive: "other extortions include *but are not limited to* owners of local businesses, such as the

Red Rose, Café Manhattan, and the Hot Club in Springfield, Massachusetts, Club Blu in Hartford, Connecticut, and assorted Springfield-based loansharks and bookmakers (including Robert Desimone, Louis Naioleari, Louie Santos, Carmine Manzi, and Ryan Fattini). Furthermore, from approximately 2006 through 2010, Fusco, the Geas brothers, and Anthony Arillotta extorted restaurants and other businesses at the "Big E" fair for a total amount ranging from $15,000 to $20,000." Govt. Br. 14 (emphasis added).  It is clear that all of the foregoing evidence is not inextricably tied to, or part of, or necessary to explain, the extortion of Jimmy Santaniello. Thus it is not only fails to meet the *Carboni* test, it is extraordinarily prejudicial under rule 403.

Specifically regarding the alleged "Big E" extortion, Fusco disputes that he was involved in any such extortionate activity. Indeed, others – not Fusco – were involved in such extortions of Anthony Delevo's wife. In addition, the evidence will show that Fusco turned down an offer to invest in the Big E upon advice of his accountant.  The same is true of the purported extortion involving the dumpster accounts, which becomes even more objectionable since it supposedly the government's totally conclusory and baseless contention that it involved an alleged plot to kill Louis Santos.  This Court should exercise its considerable discretion to exclude such evidence.  First of all, a dumpster account seems like a flimsy and unbelievable reason for murder, and such uncharged crimes should not be allowed unless the Court is confident of the accuracy and probative value of such inflammatory charges.

### h. Evidence of Additional Acts of Violence

The government's last offering is noteworthy for being crammed full of highly prejudicial and irrelevant acts of violence, to the point where one act is almost indistinguishable from the next, and the whole borders on incomprehensible. In May 2003, Arthur Nigro asked Anthony Arillotta to kill Frank Dadabo, a union official. Arillotta and Ty Geas shot Dabado on May 19, 2003, but he survived. In July 2008, Arillotta had a conversation with Fusco in which Fusco allegedly said that Muscarella approved of that shooting.

In October 2003, Ty Geas paid Frankie Roche $1,000 for administering a beating with a baseball bat to a Massachusetts man who was having an affair with the wife of a mob associate. In the fall of 2003, Roche tried on two occasions to kill Louis Santos, a Genovese associate, who was cooperating with law enforcement. Nigro instructed Arillotta to kill Louis Santos, in part to send a message to Bruno who had declined to have Santos killed. The hit allegedly was called off when Fusco's presentence report ("PSR") surfaced, and Nigro decided to kill Bruno.

During the same time period, Arthur Nigro participated in the violent beating of Antony DeFranco, a Genovese Family associate, in the Bronx, New York. It was supposedly administered because Defranco had been disrespectful. On July 11, 2004, Fotios Geas and associate Angelo Malafronte assaulted three individuals in Springfield. Geas was sentenced to two years in prison.

In August 2006, Fotios Geas and other administered a beating to Felix Tranghese due to a dispute related to extortion. Unrelated, around the time of this beating, the

evidence will show that Fotios Geas and supposedly Emilio Fusco were extorting other bookmakers and street criminals in the amount of $10,000 per month.

### Analysis

It is painfully clear, that this section of the government's brief was lifted *verbatim* from its *in limine* brief in the *Nigro* trial. A clue is the statement on page 17 of the present government brief that Tranghese's ties "with the *defendants on trial …*" were severed." *Id.* (emphasis added). In the other trial, such acts of violence might have some relevance – here they have none.  Fusco is *not involved in any* of the asserted other acts of violence. Instead, the brief merely ramps up violent acts, perhaps with the aspiration that the jury will throw in the towel, and convict Fusco on quantity and not substance.

Indeed, by the end of the trial, there is no way that the jury will even remember all these acts of violence, let alone remember the purpose for which each is introduced. Such a convoluted scenario of individual violent acts is bound to obscure the ultimate question of guilt with respect to the actual crimes charged.  Moreover, the government fails to provide an offer of proof for each, and there is a grave danger of creating a myriad of wasteful mini-trials within the trial at hand.

Evidence of such uncharged violence is clearly objectionable, especially where so many acts are grouped together.   Even worse, most of the violent acts in this section occur at about the same time as the murder of Bruno (fall of 2003) and the murder of Westerman (November 2003).  This will cause the jury to speculate that, during this time period, Fusco and his associates made a habit of committing violent acts.  The prejudice to Fusco is incalculable, and the proof should be precluded under Rule 403.

## II. The Government Motion To Admit Evidence
## Of Fusco's Prior Prison Term

In Point II of its brief (Govt. Br. 27-29), the government seeks to introduce "testimony and evidence regarding prior prison terms served by Fusco and his co-conspirators (including the Geas brothers and Arthur Nigro)." Govt. Br. 27. The government asserts that this evidence is necessary "to prove how Fusco's relationship developed with other co-coconspirators, including the government's cooperating witnesses, and to explain Fusco's whereabouts between late 2003 and February 2006." *Id.* Additionally, according to the government, Arillotta will testify that, when Fusco was in prison, Arillotta sent messages to Fusco related to racketeering activity.

Additionally, the government seeks to introduce recordings of telephone calls between Fotios and Ty Geas, while Ty Geas was incarcerated, in which they discuss news reports of the FBI digging for Westerman's body and in which they refer to "the broken-English guy." *Id.* at 27-28. Similarly the government seeks to introduce consensually made recordings of telephone conversations between a cooperating witness (John Bologna) and Arthur Nigro, while Nigro was incarcerated, in which Fusco was mentioned. *Id.* at 28-29.

### Analysis

As we argued in Point One, the fact that Fusco was incarcerated should be excluded under Rule 403 because its marginal relevance is substantially outweighed by the danger of unfair prejudice. If admitted at all, the evidence should be tailored in such a way that it does not refer to Fusco's incarceration.

Moreover, the government's attempt to admit the telephone conversations between the Geas brothers in April 2010 should be denied for a number of reasons. First, the conversations fail to satisfy the requirements for admission of co-conspirator hearsay under Rule 801(d)(2)(E), namely, that the conversations occurred during the course of the conspiracy, and that they were in furtherance of the conspiracy. Second, admission of the reference by one of the Geas brothers to a broken-English individual would impermissibly require the jury to speculate whether it is indeed Fusco – an extremely prejudicial leap.

In addition, the October 2008 phone conversation between Nigro and Bologna should not be admitted. As we explain below, the few statements about Fusco were made by Bologna, and are inadmissible because he was a government cooperator.

Pursuant to Rule 801(d)(2)(e) of the Federal Rules of Evidence, a statement is not hearsay if the statement is "offered against an opposing party" and "was made by the party's coconspirator during and in furtherance of the conspiracy." Pursuant to this rule, a district court may admit an out-of-court declaration that would otherwise be hearsay if it finds "by a preponderance of the evidence (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." *United States v. Farhane*, 634 F.3d 127, 161 (2d Cir. 2011); *see Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987).

Generally, a statement is not made in the course of the conspiracy when it is made after the main objective of the conspiracy has been accomplished. *Krulewitch v. United States*, 336 U.S. 440 (1949). Here, the April 2010 phone conversations between the Geas

28

brothers took place nearly seven years after the subpredicate conspiracy to murder Westerman charged in Racketeering Act Two. *See* indictment, ¶ 22(a).  Equally important, the April 2010 conversations between the Geas brothers occurred two months after the *end date* of the racketeering conspiracy alleged in the indictment, to wit, February 2010.  As such, it is irrefutable that such conversations were not made during the course of either conspiracy. Furthermore, as of April 2010, the alleged racketeering conspiracy had, to a large extent, been dismantled.

At most, the phone conversations between the Geas brothers constituted inadmissible hearsay, during the post-conspiracy "concealment phase." As the Supreme Court held in *Grunewald v. United States*, 353 U.S. 391 (1957), "[o]nce the coconspirators achieve the goals of the conspiracy, statements concerning acts of concealment *(or to avoid punishment)* are generally inadmissible." *Id.* at 405-06 (emphasis added).[3] *See also United States v. Stratton*, 779 F.2d 820, 829 (2d Cir. 1985)("It should be noted that although Farbar's remarks demonstrate an attempt to evade justice by keeping Nassif Berro silent, statements made during the 'concealment phase' of a conspiracy are not 'in furtherance of' the conspiracy within the meaning of Fed.R.Evid. 801 (d)(2)(E)") (citing *Krulewitch v. United States,* 336 U.S. at 443–44). The rationale for this general prohibition is that "the act of concealment typically is not part of a conspiracy's primary criminal objective," and therefore statements designed to conceal

---

[3] As the Court further stressed in *Grunewald*, "every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces. Sanctioning the Government's theory would for all practical purposes wipe out the statute of limitations in conspiracy cases, as well as extend indefinitely the time within which hearsay declarations will bind co-conspirators." *Id.* at 402.

the conspiracy are not made "in furtherance of" the conspiracy. *United States v. Gajo*, 290 F.3d 922, 928 (7th Cir. 2002).

The Geas brothers' phone calls were also not in furtherance of any conspiracy – certainly not the Westerman murder conspiracy. As the "in furtherance" term implies, the statements must in some way have been designed to promote or facilitate achievement of the goals of the ongoing conspiracy, as by, for example, providing reassurance to a coconspirator, seeking to induce a coconspirator's assistance, serving to foster trust and cohesiveness, or informing coconspirators as to the progress or status of the conspiracy, *see, e.g., United States v. Rahme*, 813 F.2d 31, 35–36 (2d Cir. 1987), or by prompting the listener—who need not be a coconspirator—to respond in a way that promotes or facilitates the carrying out of a criminal activity, *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989). Mere "idle chatter" does not satisfy the in-furtherance requirement. *United States v. Paone*, 782 F.2d 386, 390 (2d Cir.).

In the context of organized crime, the conspiracy requirement of Rule 801(d)(2)(E) requires proof of more than "the general existence of the Mafia." *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). Rather, a preponderance of the evidence must demonstrate a common agreement to achieve a particular objective in furtherance of which the out-of-court statement is made. See *United States v. Russo*, 302 F.3d 37, 44 (2d Cir. 2002).

In the phone calls, the Geases do not discuss any affirmative acts that should be committed; they simply discuss new reports. The "in furtherance" requirement of Rule 801 is not met by a mere narrative by one coconspirator of the facts of another's past activities. *United States v. Heinemann*, 801 F.2d 86, 95–96 (2d Cir. 1986) ; *see also*

*United States v. Eubanks*, 591 F.2d 513 (9th Cir. 1979) (incriminating statements by coconspirator to his wife describing his criminal activities were not made "in furtherance" of the conspiracy). The Geas brothers' statements do not satisfy the "in furtherance" prong of Rule 801 because they were not "designed to promote or facilitate achievement of the goals of the *ongoing conspiracy*." *United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993)(emphasis added). The statements did not provide reassurance, induce a coconspirator's assistance, or prompt the listener to respond in a way that promotes or facilitates the carrying out of a criminal activity." *Id.* Because the Geas brothers' statements in April 2010 were neither "during" nor "in furtherance" of the conspiracy, they are inadmissible under Rule 801(d)(2)(E).

The phone conversations between the Geases are also inadmissible because they are highly prejudicial. While they never mention Fusco by name, the government maintains that they were probably talking about Fusco when they refer to "the broken English guy." That argument is at best speculative since there are many people who speak "broken English" in the United States, including Springfield, Massachusetts. In fact the evidence will show that relatives of the Geas brothers speak "broken English." Thus to have the jury speculate that the reference could only be to Fusco is not only baseless, it is extraordinarily prejudicial. *United States v. Wright*, 799 F.2d 423 (8th Cir. 1986) (in prison contraband case, excluding testimony from an informant who claimed he had given the defendant some kind of "content" to hold, where it was speculative as to whether "content" meant marijuana); *United States v. Carneglia*, 256 F.R.D. 384 (E.D.N.Y. 2009) (recordings of a conversation between a government informant and a coconspirator offered under Rule 801(d)(2)(E) are excluded under Rules 402 and 403

because the informant's statements about the defendant provide only context and the statements of the coconspirator were ambiguous since he merely echoed the defendant's name).

The conversation between Nigro and Bologna is also clearly inadmissible.  The only references to Fusco are made by Bologna, a cooperator, and as such cannot be considered for their truth. It is well settled that the statements of a cooperating witness— who is acting as a law enforcement agent—designed to inculpate, in the form of a recording offered to prove the truth of the cooperating witness's statements, are not admissible. Thus, the "recorded statements [of the cooperating witness] are admissible [only] to provide the context for the [co-conspirator] declarant's admissions." *United States v. Stratton,* 779 F.2d 820, 830 (2d Cir.1985); *see also United States v. Paulino,* 445 F.3d 211, 216–17 (2d Cir.2006) (reaffirming after *Crawford* that statements that are admitted for context and not for the truth do not implicate confrontation clause rights of the defendant); *United States v. Barone*, 913 F.2d 46, 49 (2d Cir. 1990)(the statements made by cooperating witness "on the recording were not to be considered as evidence, but were only to be used to assist the jury in understanding Barone's responses");   *United States v. Murray,* 618 F.2d 892, 900 (2d Cir.1980) (holding it proper for trial court to instruct jury not to consider recorded statements of cooperating witness for their truth).

In short, the government's application to admit the prison conversations should be denied.

### III. The Government's Motion To Admit Fusco's Travel to Italy As Evidence of Consciousness of Guilt Should Be Denied

In Point III of its brief (Govt. Br. 35-38), the government seeks an *in limine* ruling to admit evidence that Fusco's travel to Italy in April 2010, was in fact a flight to avoid arrest for the Westerman murder, and demonstrates Fusco's consciousness of guilt in that murder. In support of its motion, the government intends to introduce evidence that the FBI began searching for Westerman's remains on April 5, 2010 and that that evening local reporters were covering the story. According to the government, local papers ran a story indicating that human remains had been found a few days later.

The government also states in its brief that, on April 13, 2010, Fusco flew to Rome, Italy on a round-trip ticket he purchased on April 8, 2010. Fusco did not return from Italy, and was arrested there on July 29, 2010.

<u>Analysis</u>

As we explain herein, the government's application should be denied, because it is legally and factually baseless. Preliminarily, it must be emphasized that the government should be precluded from introducing evidence of any news reports regarding the search for Westerman's remains because they are rank hearsay. *See United States v. Difeaux,* 163 F.3d 725, 729 (2d Cir. 1998) (holding that newspaper articles alleging improper motivations of prosecutor's office were impermissible hearsay); *United States v. Mingo*, 112 F.3d 506 (2d Cir. 1996)(holding that "the newspaper article qualified as hearsay under Federal Rule of Evidence 801(c)"); *see also Roberts v. City of Shreveport,* 397 F.3d 287, 295 (5th Cir.2005) (newspaper articles are "classic inadmissible hearsay").

In accordance with this well-established principle, this Court, in *United States v. Brown,* No. 04 Cr. 804 (PKC), 2006 WL 2724025 (S.D.N.Y., Sep. 22, 2006) declined to permit the reopening of a defendant's case to receive two inadmissible newspaper articles, "*determining that the articles constituted hearsay,* and that even if they were not admitted for the truth of their contents, *the prejudice that would result from their admission would substantially outweigh their probative value. Fed.R.Evid. 403.*" *Id.,* at *11 (emphasis added).

Even if the news accounts were admissible, the government cites no evidence that Fusco was aware of the media accounts at the time he purchased his ticket and/or departed for Italy. *Compare, e.g., United States v. Davalos,* 4 Fed.Appx. 361, 362-63 (9th Cir. 2001)(admitting newspapers describing murder where they were found in defendants' car).

Moreover, the government's factual presentation is insufficient to demonstrate flight. As noted, the government's theory relies solely on the fact that Fusco traveled to Italy on April 13, 2010 (before any charges were filed against him), at a time when he was under no travel restrictions based upon the speculative assertion, not proof, that his purpose in going to Italy, were he has family members, was to avoid prosecution on these charges which were not filed until July 20, 2010.

The government neglects to mention the while Fusco and his wife were on a five-day vacation on the island of St. Kitt, two FBI agents went to his home and told his son they wanted to speak to him. Upon his return of February 20, 2010, Fusco contacted the agents and was told and received a letter from the local U.S. Attorney's Office that he was under investigation for conspiracy and murder and that the government wished to

speak to him concerning the matter. Fusco advised the government that he would have his lawyer contact them.  When the agents refused to provide any information, Counsel did not hear further from the agents.

Thus, it is clear that Fusco knew on February 20, 2010 that he was the subject of a murder investigation by the FBI,  he did not leave the country until almost two months later; a fact clearly inconsistent with the government's purely speculative assertion that he left to avoid arrest and prosecution in this case.

As also noted in the government's recitation, on April 8, 2010, Fusco purchased an airline ticket to leave the United States on April 13, 2010, on Alitalia Airlines Flight #615 from Logan Airport in Boston to Rome, Italy and connecting flight #1263 from Rome to Naples. At the same time, he also booked his return trip leaving Naples on April 23, 2010, arriving in Boston the same day. The purpose of his trip was to attend his sister's fiftieth birthday party, to visit his elderly and widowed mother who has various health issues and to see his brother who also has substantial health problems.

Review of the records of the travel agency, discloses his return trip to the United States was re-scheduled several times. Originally, he was to return to the United States on April 23, 2010. Due to his mother's health problems and other family issues he re-scheduled his return for May 1, 2010 and then to May 23, 2010. However, the Iceland volcano eruptions beginning mid-April and continuing through on or about May 21, 2010 caused massive cancellation of European flights.[4]

---

[4] At trial, the Court will be asked to take judicial notice that between mid-April and late May 2010 successive volcanic eruptions in Iceland resulted in the cancellation of flights to, from and through Europe by twenty European countries including Italy.

As a result his return flight was re-scheduled for June 13, 2010 and later to July 12, 2010, due to his pursuit of two business opportunities that culminated in the successful negotiation and August 6, 2010 execution of two business contracts, both of which are in the Government's possession. Notably, the fact he booked and paid for his return trip on April 8, 2010 is completely inconsistent with the Government's purely speculative claim that he traveled to Italy to avoid prosecution,. Indeed, given that he was made aware by the FBI in February 2010 that he was being investigated for murder and conspiracy it is unreasonable to expect that he would wait until April 13, 2010 to leave the country to avoid arrest and prosecution. Certainly, given his discussion with the FBI agents in February, he would reasonably assume that charges were about to be filed. Thus, it was only after several months passed, that he made his travel arrangements on April 8, 2010.

In fact, since the media coverage covering the dig began on April 5, 2010, the real questions are if Emilio Fusco was attempting to flee the United States for fear that he was about to be arrested and prosecuted for the Westerman murder, why did he wait until April 8th to purchase his tickets; why did he book his trip for April 13, instead of for immediate departure; and, why did he purchase a return ticket for April 23,2010 instead of simply purchasing a one way ticket for considerably less money?

In sum, the evidence of Fusco's alleged consciousness of guilt is speculative at best and its introduction should be denied by the Court.

## IV.   The Government 's Motion To Admit The Victim's Statements Should Be Denied

In Point IV of its brief (Govt. Br. 29-35), the government moves to admit the statements of Adolfo Bruno and Gary Westerman to law enforcement officers prior to their murders. According to the government, such statements, while hearsay, are nevertheless admissible because they fall within "a well-established exception [to the hearsay rule] that applies to cases such as this to permit the admission of statements of a victim who was killed to prevent *his communication of information to law enforcement*." Govt. Br. 32 (emphasis added).   The government's brief clearly misstates the applicable rule, and its application in this regard should be denied.

As we explain herein, the forfeiture-by-misconduct rules applies only where a defendant seeks to preclude the unavailability of a *witness* or *potential witness* – and not, as the government  asserts, where the victim had been simply an informant. In addition, the government's proffer should be precluded under Rule 403 of the Federal Rules of Evidence. The applicable common-law principle was codified as Rule 804(b)(6) of the Federal Rules of Evidence, and provides, under the heading "Forfeiture by wrongdoing," that the hearsay rule does not require the exclusion of "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant *as a witness. "* Fed.R.Evid. 804(b)(6) (emphasis added). Under Rule 804(b)(6), "a party forfeits the right to object on hearsay grounds to the admission of a declarant's prior statement when the party's deliberate wrongdoing or acquiescence therein procured the unavailability of *the declarant as a witness.*" Fed.R.Evid. 804(b)(6) advisory committee's note to subdivision (b)(6)(emphasis added).

In *Giles v. California,* 554 U.S. 353 (2008), a decision not cited in the government's brief, the Supreme Court held that the forfeiture-by-wrongdoing doctrine applies "only when the defendant engaged in conduct *designed to prevent the witness from testifying.*" *Id.*, 554 U.S. at 359 (emphasis added in part). The Supreme Court observed:

> In 1997, this Court approved a Federal Rule of Evidence, entitled "Forfeiture by wrongdoing," which applies only when the defendant "engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Fed. Rule Evid. 804(b)(6). We have described this as a rule "which codifies the forfeiture doctrine." *Davis v. Washington,* 547 U.S. 813, 833 (2006). Every commentator we are aware of has concluded the requirement of intent "means that *the exception applies only if the defendant has in mind* the particular purpose of *making the witness unavailable.*"

*Id.* at 367 (emphasis added)(citation omitted).

Pre- and post-*Giles* Second Circuit precedent on this issue also requires that the defendant intend *to prevent a witness from testifying* – as distinguished from preventing an individual from simply furnishing information to law enforcement officials. *See United States v. Vallee*, 304 Fed.Appx. 916, 920 (2d Cir. 2008)("In *Giles v. California,* 554 U.S. 353 (2008), the Supreme Court held that the forfeiture-by-wrongdoing doctrine applies 'only when the defendant engaged in conduct *designed* to prevent the *witness from testifying.*' *Id.* at 2683 (emphasis in original). This Circuit's precedent at the time of trial was not to the contrary."); *United States v. Stewart,* 485 F.3d 666, 672 (2d Cir. 2007)(holding that "[a] defendant who wrongfully and intentionally renders a *declarant unavailable as a witness* in any proceeding forfeits the right to exclude ... the declarant's statements at that proceeding and any subsequent proceeding")(internal quotation marks omitted) (emphasis added) ; *United States v. Dhinsa,* 243 F.3d 635, 653 (2d Cir. 2001)("By its plain terms, Rule 804(b)(6) requires a finding that the defendant acted with

the *intention of making the declarant unavailable as a witness*. This conclusion is not disputed by the parties")(emphasis added); *United States v. Miller*, 116 F.3d 641, 667 (2d Cir. 1997)("The right to confront hostile *witnesses* may be constructively waived by a defendant's conduct")(emphasis added); *United States v. Thai*, 29 F.3d 785, 815 (2d Cir. 1994)("In the present case, the district court ... found 'by clear and convincing evidence,'... that *Thai and Lan Tran 'caused the unavailability of the witness [Sen Van Ta] and that he was made unavailable to prevent him from being a potential witness' ");  *United States v. Aguiar*, 975 F.2d 45, 47 (2d Cir. 1992)("A defendant who *procures a witness's absence* waives the right of confrontation for all purposes with regard to that witness, not just to the admission of sworn hearsay statements")(emphasis added); *United States v. Mastrangelo*, 693 F.2d 269, 272-73 (2d Cir. 1982)(holding that "if a *witness' silence* is procured by the defendant himself, whether by chicanery ... or by actual violence or murder ..., the defendant cannot then assert his confrontation clause rights in order to prevent prior grand jury testimony of that *witness* from being admitted against him. Any other result would mock the very system of justice the confrontation clause was designed to protect")(emphasis added).

Moreover, this Court, in *Brown v. Smith*, No. 06 Civ. 1429 (PKC), 2008 WL 4922014, *8 (S.D.N.Y. Nov. 12, 2008), recognized that the application of the rule centered on whether a *witness* was rendered unavailable: "The Second Circuit, as well as a majority of other circuit courts, has applied the waiver-by-misconduct rule in cases where the *defendant has wrongfully procured a witness's silence* through threats, actual violence or murder." *Id.* at *8 (emphasis added)(internal quotation marks and citations omitted).

Indeed, none of the decisions cited in the government brief turned on whether the victim was simply an informant, or "rat," as distinguished from being a *witness, or potential witness.* The only case that is somewhat supportive of the government's position is the First Circuit's ruling in *United States v. Houlihan*, 92 F.3d 1271 (1st Cir. 1996) – which also is not cited in the government's brief -- and in any event that case is readily distinguishable.

In *Houlihan*, a pre-*Giles* case, defendants argued that the waiver-by-misconduct doctrine did not apply because the victim, named Sargent, "was not an *actual* witness-no charges had been lodged against Houlihan or Nardone at the time of Sargent's murder, and no grand jury had as yet been convened-but at most a turncoat cooperating with the police. Thus, they could not have been on notice that they were waiving a trial right." *Houlihan*, 92 F.3d at 1279.   The First Circuit rejected the argument, holding:

> When a defendant murders an individual who is a percipient witness to acts of criminality (or procures his demise) in order to prevent him from appearing at an upcoming trial, he denies the government the benefit of the witness's live testimony. In much the same way, when a defendant murders such a witness (or procures his demise) in order to prevent him from *assisting an ongoing criminal investigation*, he is denying the government the benefit of the witness's live testimony at a future trial. In short, the two situations are fair congeners: *as long as it is reasonably foreseeable that the investigation will culminate in the bringing of charges*, the mere fact that the homicide occurs at an earlier step in the pavane should not affect the operation of the waiver-by-misconduct doctrine.

*Id.* at 1279-80 (emphasis added).

Here, unlike in *Houlihan*, there was *no ongoing criminal investigation* that Bruno was assisting; he was simply *confirming* ancient information to the FBI agent regarding

Fusco's having become a "made" man.[5]  Moreover, it was not "reasonably foreseeable" that Bruno's stale information to the authorities would culminate in the bringing of charges.  In short, even assuming for purposes of discussion that Fusco was involved in the Bruno murder – which of course we deny - as punishment for his confirming to the FBI that Fusco was a "made" man, such an act does not actuate the exemption of Rule 804(b)(6). In addition, if the government is permitted to introduce Bruno's statement in the PSR, Fusco will seek admission of the entire FBI 302 relating to the conversation, to show that Bruno's  statements was activated by a desire to curry favor with the FBI agent. *See* Fed.R.Evid. 106 ("[A]n adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."); *see also United States v. Castro,* 813 F.2d 571, 575–76 (2d Cir.1987) (under the completeness doctrine, the "omitted portion of a statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair *150 and impartial understanding of the admitted portion.").

The government's arguments in support of admission of the statements by Westerman to the police are even more absurd.  It must be recalled that Westerman was in jail from 1996 to 2002, and Fusco had no contact with him during that period.  Indeed, Fusco denies ever having met him.

However, even if the government's arguments passed muster under Rule 804(b)(6) - which they clearly do not - the statements by Bruno and Westerman should

---

[5]  Indeed, the fact that Fusco was allegedly a "made" man had already been made public in the Superseding Indictment to which Fusco pleaded guilty – which stated that he was a "made" man.

be precluded under Rule 403 of the Federal Rules of Evidence. *See e.g. Dhinsa*, at 655-56 (holding that, "while a finding that a statement may be admitted under Rule 804(b)(6)..., the district court must still balance the probative value of the evidence against its prejudicial effect in accordance with Rule 403"); *Houlihan,* 92 F.3d at 1282 n. 6 ("[Where a defendant waives his confrontation rights], a district court still should exclude relevant but highly inflammatory evidence, misconduct notwithstanding, if the danger of unfair prejudice substantially outweighs the evidence's probative value.").

Under Rule 403, the court may exclude evidence that has "probative value ... substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. Evidence presents a danger of unfair prejudice when "it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence," such as "prov[ing] some adverse fact not properly in issue or unfairly ... excit[ing] emotions against the defendant." *United States v. Quattrone,* 441 F.3d 153, 186 (2d Cir. 2006) (citations omitted). Rule 403 requires the court to assess the "probative value of the proffered item as well as the harmful consequences that might flow from its admission." 5 Berger, et al., *Federal Evidence* § 403.02[1]. "Relevant evidence may be excluded if its probative value is not worth the problems that its admission may cause." *Id.*

In particular, the alleged Westerman statements, recounted at pages 30-31 of the government's brief, run afoul of Rule 403. The statements do not mention Fusco at all; instead, one statement, in 1996, led to an arrest of Fotios Geas's arrest – which is outside the time period of the charges in this case. Other statements, in 2003, mention the Geas

brothers and Arillotta but conspicuously not Fusco. Thus, it would be extraordinarily
prejudicial to Fusco – who was not mentioned by Westerman at all – to have to be
saddled with such hearsay, all of which merely supports the government's strained theory
that Westerman was killed because he was cooperating with the state police.

Similarly prejudicial is the statement that Bruno made to an FBI agent in 2002.[6]
The statement is plainly taken out of a context of a longer colloquy between Bruno and
the agent. Among other things, during the conversation, the FBI agent also told Bruno
that Chris Berte and Carmine Manzi wanted to "'put a 'hit' on Bruno."

In sum, the government has plainly failed to satisfy the requirements of Rule
804(b)(6), and its proof is in any event excludable under Rule 403. Thus, its argument
should be rejected.

## V. Any Expert Testimony Should Be Curtailed

By letter dated December 27, 2010,  the government notified defense counsel that
it intended to call an organized crime expert witness, John Carillo, to testify at trial. In its
brief, the government details the four points on which Mr. Carillo intends to testify. See
Govt. Br. 38. Fed.R.Evid. 702 permits expert testimony "if scientific, technical or other
specialized knowledge will assist the trier of fact to determine a fact in issue." In *United
States v. Matera,* 489 F.3d 115 (2d Cir.2007), the Second Circuit approved of the
admission of expert testimony regarding "the composition and structure of organized
crime families generally" and noted that "this Circuit has approved the admission of
expert testimony in organized crime cases 'to help explain the operation, structure,

---

[6]  The PSR (GX 202) incorrectly gives the year.

membership, and terminology of organized crime families.' " *Id.* at 121 (collecting

cases).

In *United States v. Mejia,* 545 F.3d 179 (2d Cir.2008), however, the Second

Circuit placed certain limitations on expert testimony by law enforcement agents more

generally. The court in *Mejia* first recounted in detail its own history of permitting expert

witness testimony, including in particular testimony relating to the structure and internal

operating rules of organized crime families. *Id.* at 189-90 (collecting cases). The *Mejia*

court observed that:

> Our decision to permit such expert testimony reflects our understanding
> that, just as an anthropologist might be equipped by education and
> fieldwork to testify to the cultural mores of a particular social group, law
> enforcement officers may be equipped by experience and training to speak
> to the operation, symbols, jargon, and internal structure of criminal
> organizations. Officers interact with members of the organization, study
> its operations, and exchange information with other officers. As a result,
> they are able to break through the group's antipathy towards outsiders and
> gain valuable knowledge about its parochial practices and insular lexicon.
> Allowing law enforcement officers to act as experts in cases involving
> these oft-impenetrable criminal organizations thus responds to the same
> concerns that animated the enactment (and their members) are typically
> charged with violating, such as [the racketeering statutes].

*Id.* at 190 (citations omitted).

The court further held that "despite the utility of, and need for, expertise of

this sort, its use must be limited to those issues where sociological knowledge is

appropriate." *Id.*  It detailed that problems surface in situations where

> that officer becomes, rather than a sociologist describing the inner
> workings of a closed community, a chronicler of the recent past whose
> pronouncements on elements of the charged offense serve as shortcuts to
> proving guilt. As the officer's purported expertise narrows from 'organized
> crime' to 'this particular gang,' from the meaning of 'capo' to the
> criminality of the defendant, the officer's testimony becomes more central
> to the case, more corroborative of the witnesses, and more like a summary
> of the facts than an aid in understanding them.

*Id.* at 190-91. In short, problems arise where the expert's area of expertise "happens to be the defendant." *Id.* at 191.

The government has pledged to confine Mr. Carillo's testimony to the subjects permitted by the Second Circuit in various cases, namely "to explain to the jury the operation, structure, membership, *and terminology* of organized crime families.' Govt. Br. 42 (emphasis added)(internal quotations marks and citation omitted).  Nevertheless, we submit its proffer raises two problems.

First, the government in its letter did not identify "terminology" as a topic on which Mr. Carillo would opine.  Second, and more importantly, we object to both Mr. Carillo and cooperating witness Arillotta testifying to the same subjects since it would have the impermissible effect of placing an imprimatur of expertise on Arillotta's testimony, which has been condemned by the Second Circuit. *See United States v. Dukagjini*, 326 F.3d 45, 55 (2d Cir. 55 (2d Cir. 2003)("We find that the district court erred in allowing Biggs to stray from his proper expert function. Biggs acted at times as a summary prosecution witness; the effect was a bolstering of the testimony of the cooperating co-defendants and an impinging upon the exclusive function of the jury").

Accordingly, we respectfully submit that Mr. Carillo's testimony should be circumscribed in the manner set out above.

## VI. The Government's Request for An Anonymous Jury Should Be Denied

In Point VI of its brief, the government seeks the empanelment of an anonymous jury. As we explain herein, the government's request should be denied. Because the use of an anonymous jury may undermine the presumption of innocence and interfere with the defendant's ability to conduct an effective voir dire, its empaneling requires "strong reason to believe that the jury needs protection." *United States v. Thomas,* 757 F.2d 1359, 1365 (2d Cir. 1985). *See also United States v. Wong,* 40 F.3d 1347, 1376 (2d Cir. 1994) ("Empaneling an anonymous jury undoubtedly has serious implications for a defendant's interest in effectively conducting voir dire and in maintaining the presumption of innocence."); *United States v. Amuso,* 21 F.3d 1251, 1264 (2d Cir. 1994)("In deciding whether the district court properly granted a sequestered and anonymous jury, we must balance the defendant's interest in conducting meaningful *voir dire* and in maintaining the presumption of innocence, against the jury member's interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict").

Factors that have been considered in determining the appropriateness of an anonymous jury include: (1) the seriousness of the charges; (2) the threat of corruption of the judicial process; and (3) the potential for publicity. *See, e.g., United States v. Thai,* 29 F.3d 785, 801 (2d Cir. 1994); *United States v. Paccione,* 949 F.2d 1183, 1192-93 (2d Cir. 1991); *United States v. Vario,* 943 F.2d 236 (2d Cir. 1991); *United States v. Tutino,* 883 F.2d 1125, 1132 (2d Cir. 1989); *United States v. Persico,* 832 F.2d 705, 717 (2d Cir. 1987). *See also United States v. Coonan,* 664 F. Supp. 861, 862 (S.D.N.Y.1987) ("Our analysis is to be guided by the following factors: 1) the seriousness of the offenses

46

charged, and whether defendants are alleged to be part of a group that possesses the means to harm jurors, 2) whether defendants have engaged in past attempts to interfere with the judicial process, and 3) the degree of pretrial publicity").

A motion for an anonymous jury must "receive close judicial scrutiny and be evaluated in the light of reason, principle, and common sense." *Thomas,* 757 F.2d at 1363. *See also Coonan,* 664 F. Supp. at 862 ("As the Second Circuit has recognized, the presumption of innocence is part of the foundation of our system of criminal justice, and a practice which burdens it-such as the use of an anonymous jury-must receive careful scrutiny."). Assuming that there is a "strong reason to believe that the jury needs protection," *Thomas,* 757 F.2d at 1365, the district court has broad discretion to determine whether to grant an anonymous jury and whether to hold an evidentiary hearing concerning the proffered factual basis for an anonymous jury. *United States v. Aulicino,* 44 F.3d 1102, 1116 (2d Cir.1995); *Wong,* 40 F.3d at 1376; *Paccione,* 949 F.2d at 1192.

## A.  Seriousness of charges

In considering the seriousness of the charges, it is important to underscore what this Court has repeatedly emphasized, namely, that "Emilio Fusco is not charged with the crime of murder;" "Emilio Leo Fusco is not charged with murder in the only indictment pending against him." 7/26/11 Detention Hearing Tr. 65.  Moreover, this Court, in its opinion on Fusco's application to bar trial on certain charges, stressed that "Fusco's argument that the government has explicitly charged Fusco with murder … merits little discussion. Fusco is not named in the substantive murder counts, Counts 3 through 5. *An AUSA's loosely phrased statement at a pretrial conference that Fusco was charged with*

*the Bruno and Westerman murders cannot supersede the plain language of the grand jury's indictment.*" *United States v. Fusco*, 2011 WL 5116843, 4 (S.D.N.Y. Oct. 27, 2011)(emphasis added).

How much weight then should be given the government's diametrically inconsistent argument now – not in the extradition or bail context, but in seeking an anonymous jury - that "Fusco is charged with the most serious of offenses, principally *multiple murders* committed with and for the Mafia" and that "[b]eyond the *charged murders*, the Indictment charges" other offenses ?  Govt. Br. 45-46. We submit the government's contentions deserve no weight.

In addition, "a decision to [grant a request for an anonymous jury] cannot be based solely on government allegations that a defendant is part of criminal organization." *United States v. Persico*,  As the Court of Appeals said in *United States v. Vario:* "The invocation of the words 'organized crime,' 'mob,' or 'Mafia,' unless there is something more, does not warrant an anonymous jury. family. 943 F.2d 236, 241 (2d Cir.1991)

### B.  Corruption of Judicial Process

The government has also not alleged jury corruption. *Compare,  Vario,* 943 F.2d at 240 ("An obstruction of justice charge, particularly one involving jury tampering, has always been a crucial factor in our decisions regarding anonymous juries."); *Tutino,* 883 F.2d at 1132-33 (defendant's history of jury tampering attempt coupled with defendant's serious criminal records was sufficient to justify empaneling of an anonymous jury); *Thomas,* 757 F.2d at 1365 (empaneling of an anonymous jury was justified because of "strong evidence of defendants' past attempts to interfere with the judicial process").

Moreover, as we stressed in Point IV of this brief, Fusco's alleged participation in the murders of Westerman and Bruno – which we deny – does not constitute corruption of the judicial process.

It is important to stress that with respect to Fusco, his alleged criminal acts of violence for the most part took place nearly a decade ago, in conjunction with others who are either incarcerated or government cooperators; in addition, the locus of such alleged acts was in Springfield, Massachusetts - hundreds of miles from the Southern District. In such circumstances, an anonymous jury should not be empanelled. *See United States v. Eppolito*, No. 05 CR 192, 2006 WL 220061, *2 (E.D.N.Y. Jan. 30, 2006)(denying request for anonymous jury because "[w]hile the defendants have been charged with numerous acts of tampering, retaliation, and obstruction of justice, the most recent of these acts is alleged to have occurred in 1991. The defendants have since retired from their positions as New York City police detectives and moved across the country to Las Vegas, where they have now lived for more than a decade....There appears to be no reason to expect the local mafia to take action to against a juror on behalf of their alleged erstwhile allies).

### C.  Publicity

Contrary to the government's baseless contention, there has been very little publicity of the case against Emilio Fusco (the "Fusco case") – as distinguished from the proceedings against his three co-defendants, (denominated by the government as "this case"). This is understandable since, as mentioned, the principal crimes in the Fusco case took place nearly a decade ago, in a jurisdiction hundreds of miles from this District.  In its brief, the government mostly cuts-and-pastes its claims regarding publicity from its

earlier *in limine* brief. A review of the search engine Google.com reveals that there has been no local publicity about the Fusco case. The only references to the Fusco case have been in months-old digital articles in Masslive.com.  It is highly doubtful that any juror in this District reads Masslive. In such circumstances, the government unsupported claim of substantial publicity must be rejected. *Compare, United States v. Persico,* 832 F.2d at 717 (2d Cir.1987) (" 'extensive publicity this case is *expected* to continue to attract' " supported use of anonymous jury) (emphasis supplied); *United States v. Barnes,* 604 F.2d 121, 141 (2d Cir.1979) ("in a case that generated as much pretrial publicity as this one did and in which allegations of dangerous and unscrupulous conduct abounded," anonymous jury served valid purpose).   Finally, while the government is correct that Fusco's defense counsel sought to have all submissions relating to an attorney's fee dispute be filed under seal, that was to ensure that prior counsel's intention of  disclosing attorney-client-privileged material, and in any event occurred more than six months ago. In sum, the government's request for the empanelment of an anonymous jury is defective on all three grounds.  It should be denied by the Court.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that this Court should deny the government's *in limine* motions in their entirety.

Dated: New York, New York
    March 21, 2012

Respectfully submitted,

**RICHARD B. LIND, ESQ.**

*Attorney for Defendant Emilio Fusco*
488 Madison Avenue – 19th Floor
New York, NY 10022
(212) 888-7725