# RICHARD B. LIND

ATTORNEY AT LAW

880 THIRD AVENUE

13TH FLOOR

NEW YORK, N.Y. 10022

—

TELEPHONE (212) 888-7725

FACSIMILE (212) 371-2961

E-MAIL: rlindesq@aol.com

WEBSITE: www.richardlindlawyer.com

September 26, 2012

## SENTENCING MEMORANDUM

**Via ECF and Hand**

Hon. P. Kevin Castel
United States District Judge
U.S. Courthouse
500 Pearl Street
New York, NY 10007

Re:   <u>United States v. Emilio Fusco</u>
09 Cr. 1239 (PKC)

Dear Judge Castel:

This Sentencing Memorandum is submitted on behalf of defendant Emilio Fusco, who is scheduled to be sentenced on October 10, 2012. For the reasons set forth below, it is respectfully requested that Fusco be given a non-Guidelines sentence, well below the applicable Sentencing Guidelines range of 78 to 97 months' imprisonment.

## BACKGROUND

### I.     THE INDICTMENT AND JURY VERDICT

Indictment S4 09 Cr. 1239-R (PKC) charged Fusco in five counts.  Count One charged Fusco with racketeering conspiracy, i.e., conspiring to participate in the affairs of the Genovese Organized Crime Family (the "Family") through a pattern of racketeering activity, including murder, extortion, and narcotics distribution. Count Two accused Fusco of substantive racketeering, and alleged four predicate acts of racketeering, namely, the murders or conspiracy to murder Adolfo Bruno, and Gary Westerman, extortion or conspiracy to extort James Santaniello, and conspiracy to distribute marijuana.  Count Three indicted Fusco with conspiracy to commit extortion; Count Four charged Fusco with extortion; and Count Five accused Fusco of interstate travel in aid of racketeering.

1

RICHARD B. LIND

The jury found Fusco guilty of racketeering conspiracy (Count One), extortion conspiracy (Count Three), and interstate travel in aid of racketeering (Count Five). The jury acquitted Fusco on the substantive racketeering charge (Count Two) because it found only one of the predicates was "proved," to wit, conspiracy to distribute marijuana, whereas it found the Bruno and Westerman murders, and the extortion acts not "proved." The jury also acquitted Fusco on the substantive extortion count (Count Four).[1]

## II.     INITIAL PSR AND PARTIES' OBJECTIONS THERETO

### A. THE PSR

The initial Presentence Report ("PSR") prepared for Fusco recited the criminal charges against Fusco and briefly noted his conviction on Counts One, Three, and Five. PSR, ¶¶ 1-16. The PSR then detailed the alleged offense conduct, PSR, ¶¶ 30-62, which had been drawn from information provided by the government and court records. PSR, ¶ 29.

The PSR next carried out an offense-level computation. *See* PSR, ¶¶ 66-92. The PSR determined that Fusco's offense conduct should be broken down into two "Groups," pursuant to U.S.S.G. (or "Guidelines") § 3D1.2(b). Group 1 consisted of Counts One, Three, and Five; Group 2 consisted solely of Racketeering Act Four. PSR, ¶¶ 66-69. The PSR calculated that the Adjusted Offense Level (Subtotal) for Group 1 was 25, and that the Adjusted Offense Level for Group 2 was 20. *See* PSR, ¶¶ 70-82. Employing a multiple-count adjustment, the PSR calculated the Total Offense Level to be level 26. PSR, ¶¶ 83-92.

The PSR determined that Fusco's Criminal History Category was III, based on Fusco's prior felony conviction in 2003 (three Criminal History points) and because he committed the instant while incarcerated or on supervised release (two Criminal History points). PSR, ¶¶ 93-100. Based on a Total Offense Level of 26 and Criminal History Category III, the PSR established that Fusco's Guidelines sentencing range was 78 to 97 months' imprisonment. PSR, ¶ 142.

Notably, the PSR declined to include in its Guidelines computation two upward adjustments that had been proposed by the government, namely: a two-level increase, pursuant to Guidelines § 3C1.1, because Fusco's prior counsel had submitted an allegedly false affidavit in connection with a bail hearing for Fusco; and a separate sentence increase on the ground that the Bruno and Westerman murders were proved by a preponderance of the evidence and thus could be considered relevant conduct. *See* PSR, ¶¶ 63, 154.

---

[1] Fusco subsequently moved to set aside the jury verdict and grant him judgment of acquittal or a new trial on Counts Three and Five, and Racketeering Act Four of Count Two (the conspiracy to distribute marijuana). This Court denied Fusco's motions in a written opinion. *See United States v. Emilio Fusco*, 2012 WL 4320456 (S.D.N.Y. Sep. 17, 2012).

RICHARD B. LIND

### B. FUSCO'S REPONSE TO THE PSR

In a letter dated September 7, 2012, Fusco responded to the PSR ("Deft. 9/7 Ltr."). A copy of that letter is annexed hereto as Exhibit A.  Among the many objections advanced, Fusco *disputed that*:

- Fusco "regularly traveled" to New York to conduct Family business, and that Fusco threatened business customers  (*see* PSR, ¶ 33);
- Fusco had any role in developing a plan to murder Adolfo Bruno or in its execution (*see* PSR, ¶¶ 49, 51);
- Fusco was involved in any way in the murder of Gary Westerman, or that the FBI agent's testimony "strongly corroborated" Fusco's alleged involvement in that murder (*see* PSR, ¶¶ 52-55);
- Fusco intended to flee the jurisdiction (*see* PSR, ¶ 56);
- Fusco received proceeds from the Family while incarcerated (*see* PSR, ¶ 57);
- Fusco was involved in extortion or that he used his status as a Family member to intimidate customers into giving him their dumpster accounts, or that Fusco, or his family, received  money from extortions (*see* PSR, ¶¶ 58-61);
- Fusco sold hundreds of pounds of marijuana with Tony Capua (¶ 61);
- Fusco's prior attorney filed a false affidavit in connection with a bail application (*see* PSR, ¶ 62).

Deft. 9/7 Ltr. at 2-4.

In his letter, Fusco also objected to the PSR's overall offense-level computation, and to specific enhancements – particularly for amount of loss (PSR, ¶ 72), and Fusco's role in the offense (PSR, ¶ 74). Deft. 9/7 Ltr. at 4-5. As a consequence, Fusco also disputed the Guidelines sentencing range set forth in the PSR (*see* PSR, ¶ 142), and contended that it should be 41-51 months' imprisonment rather than 78 to 97 months. Finally, Fusco disputed the *government's* contention that it proved the Westerman and Bruno murders by a preponderance of the evidence, and that, accordingly, such acquitted conduct should increase the Guidelines range. Deft. 9/7 Ltr. at 5.

### C. GOVERNMENT RESPONSE TO PSR

In a letter dated September 14, 2012 (Govt. 9/14 Ltr."), the government responded to the PSR.  A copy of the government's letter is annexed hereto as Exhibit B. The government objected to the PSR's Guidelines analysis on various grounds, including that the PSR omitted the two murders from its Guidelines calculation and failed to impose an enhancement for obstruction of justice; it set forth an incorrect base offense level of 20 for Fusco's narcotics trafficking, as alleged in Racketeering Act Four; the PSR improperly grouped together Counts Three and Five; and failed to establish separate Groups for Fusco's alleged gambling and loansharking.

RICHARD B. LIND

## II.   THE REVISED PSR

On September 21, 2012, the Probation Office emailed copies of the revised PSR ("Revised PSR" or "RPSR")) to the parties and to the Court.[2] The Revised PSR made a few minor corrections to the initial PSR.  RPSR at 31. The Revised PSR, however, rejected both sides' objections to the initial PSR. *See* RPSR at 31-33.  The Revised PSR recommended a sentence of 78 months' imprisonment (on each Count of conviction, to run concurrently) -- the lowest end of the Guidelines range, as well as and a three-year term of supervised release.  The PSR did not recommend a fine. *See* RPSR at 34.

## DISCUSSION

## I.   THE COURT SHOULD REJECT THE PROPOSED SENTENCING ENHANCEMENTS, OR GRANT FUSCO'S REQUEST FOR A *FATICO* HEARING

As noted, the government seeks sentencing enhancements on various grounds, principally: (a) a "relevant-conduct" enhancement based on Fusco's alleged participation in the Westerman and Bruno murders, notwithstanding Fusco's acquittal on both murders; (b) an increase in Fusco's Guidelines level, far beyond Level 20,  as calculated in the PSR and Revised PSR, based on his conviction on Racketeering Act Four, for conspiracy to distribute marijuana; a (c) a two-level increase based on obstructive conduct by Fusco's former attorney in filing an allegedly false affidavit; and (d) two separate enhancement for loss amount and role adjustment. All of these proposed increases should be summarily rejected by the Court.  In the event that the Court is inclined to grant any enhancement sought by the government, Fusco respectfully requests a hearing.

Conduct is relevant if it was "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant ... during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S. Sentencing Guidelines Manual § 1B1.3(a)(1) (2011). When the offense of conviction is a RICO conspiracy, relevant conduct may include "underlying predicate acts," even if not proven at trial beyond a reasonable doubt, as long as the sentencing court finds that they were proven "by the lower preponderance of the evidence standard." *United States v. Yannotti,* 541 F.3d 112, 129 (2d Cir. 2008)(citing *United States v. Vaughn,* 430 F.3d 518, 526-27 (2d Cir. 2005)); *accord, United States v. Massino,* 546 F.3d 123, 135-36 (2d Cir. 2008)(per curiam).

There are several reasons why neither the homicides nor an increased amount of marijuana should be included in Fusco's Guidelines computation, including (a)  the government has not offered sufficient proof of any of that conduct – on some of which

---

[2]  A copy of the Revised PSR is being separately filed with the Court.

RICHARD B. LIND

(the murders) the jury acquitted defendant – under any standard of proof; (b) because of the drastic potential impact such unsupported enhancements would have on Fusco's Guidelines range, it should be subject to a more exacting standard of proof and a corresponding downward departure if the proof fails to satisfy that stricter standard; and (c) the impact of such an enhancement would have on defendant's Guidelines range should be ameliorated by consideration of the other sentencing factors enumerated in § 3553(a).

Including the Westerman and Bruno murders as relevant conduct for sentencing purposes herein would exert a drastic impact on Fusco's Guidelines range – potentially raising the range from the 78-97 months recommended by the RPSR to the statutory maximum of 45 years – and implicates the appropriate burden of proof to be utilized. The same is true with respect to the quantity of marijuana the government seeks to attribute to Mr. Fusco, as it would vault his Guidelines offense level from 20 to 34.

Even before the Supreme Court commenced its series of decisions beginning with *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and carrying through *Booker*, and beyond,[3] in which the Court has held that elements of an offense must be decided by a jury, *beyond a reasonable doubt* (and not by a judge as a "sentencing factor"), the Second Circuit acknowledged the problem inherent in evaluating Guidelines enhancements by the "preponderance of the evidence" standard rather than by a more exacting burden of proof, particularly when the enhancements can result in a substantial increase in the defendant's sentence.

As a remedial measure, the Circuit established a process by which sentencing courts could ensure that dramatic increases in a defendant's offense level, imposed by either adjustments or inclusion of relevant conduct, could be alleviated by a secondary level of analysis that subjected the facts to a more demanding standard of proof and, if those facts did not meet that standard, an appropriate downward departure.

That process has survived *Booker*, and is indeed augmented by the advisory nature of the Guidelines, and a sentencing court's capacity to balance extreme Guidelines calculations against the sentencing factors listed in § 3553(a) in order to arrive at a sentence "sufficient, but not greater than necessary" to achieve the purposes of sentencing identified in § 3553(a)(2)(A)-(D)

In addressing the burden of proof issue in the pre-*Booker* environment, the Second Circuit several times grappled with the inexorable tension between a defendant's Due Process and Sixth Amendment rights at sentencing, and the preponderance of the evidence standard. For example, in *United States v. Cordoba-Murgas*, 233 F.3d 704 (2d Cir. 2000), the Second Circuit clarified its various opinions on the issue, explaining that "the enhancement of a sentence based upon a defendant's 'relevant conduct,' if done without regard to the weight of the evidence proving the relevant conduct, may result in a

---

[3] The line of cases includes most recently *Southern Union Co. v. United States*,--- U.S.-----, 132 S. Ct. 2344 (2012) (extending *Booker* principles to criminal fines).

RICHARD B. LIND

total term of incarceration which is excessive, inappropriate, and unintended under Sentencing Guidelines." *Id.*, 233 F.3d at 708.

The court in *Cordoba-Murgas*, also declared that "the factual finding by a preponderance of the evidence is a preliminary step susceptible to adjustment," 233 F.3d at 709, and provided the following direction to sentencing courts after finding such enhancements or relevant conduct by a preponderance of the evidence:

> under the combination of circumstances that may be present here, including (i) an enormous upward adjustment (ii) for uncharged conduct (iii) not proved at trial and (iv) found by only a preponderance of the evidence, (v) where the court has substantial doubts as to the accuracy of the finding, the Court would be authorized to depart downward from the scheduled adjustment by reason of the extraordinary combination of circumstances.

*Id.* at 708.

Since *Booker*, that doctrine has not been disturbed. For example, in *Vaughn*, in addressing whether acquitted conduct could be used in calculating a Guidelines range (and deciding it could), then-Judge Sotomayor, writing for the panel, considered it important to remind courts that

> We restate, however, that while district courts may take into account acquitted conduct in calculating a defendant's Guidelines range, they are not required to do so. Rather, district courts should consider the jury's acquittal when assessing the weight and quality of the evidence presented by the prosecution and determining a reasonable sentence. *See Cordoba-Murgas,* 233 F.3d at 708 (acknowledging that enhancements based on relevant conduct may be excessive when imposed "without regard to the weight of the evidence proving the relevant conduct") (citation omitted); *United States v. Gigante,* 94 F.3d 53, 56 (2d Cir.1996) (holding that, for sentencing purposes, "the preponderance standard is no more than a *threshold* basis for adjustments and departures, and the weight of the evidence, at some point along a continuum of sentence severity, should be considered") (emphasis in original).

430 F.3d at 527.

The decisions in *Yannotti* or *Massino* do not alter the foregoing analysis. In *Yannotti*, the jury convicted the defendant of RICO conspiracy, but deadlocked on the substantive RICO count. *Id.*, 541 F.3d at 118. The jury also deadlocked on an alleged kidnaping conspiracy, *id.*, at 119, and the court made the unremarkable determination that it "could be factored into Yannotti's sentence as relevant conduct pursuant to §1B1.3." *Id.*, at 128. The Court did not address *Cordoba-Murgas*, or *Gigante*, or whether the effect of the relevant conduct could be moderated by imposition of a higher

RICHARD B. LIND

burden of proof and a downward departure, as those cases authorize. Of particular significance, in *Yannotti*, while the jury had marked on the verdict sheet "not proven" with respect to murders and attempted murders, *id.*, at 118-19, that conduct was *not* included in the Guidelines calculation or sentence as relevant conduct (but only the kidnaping conspiracy was in dispute). *Id.*, at 127-28.

*Massino* is also readily distinguishable. There, the jury had failed to reach a verdict on murder count(s) (charged as Racketeering Acts as well as separate substantive offenses) *id.*, at 127, 134. Nonetheless, "[o]n appeal, [the appellant did] not challenge the district court's factual finding that [he] was responsible for the Sciascia murder" on a relevant-conduct basis. *Id.*, at 134. Rather, the appellant in *Massino* argued that the murder at issue "was not relevant conduct because it was not related to a conspiratorial object of which [the appellant] was convicted." *Id.*

Thus, there are at least two distinct contrasts between this case on the one hand and *Yannotti* and *Massino* on the other. Here, unlike in those cases, Fusco was acquitted of the crimes that the government seeks to utilize as relevant conduct. Moreover, unlike in *Massino*, here, Fusco does not in any way concede that he was responsible for the Westerman and Bruno murders. Instead, our position is that - as the jury correctly found - he did not commit or participate in the two murders, or join any conspiracy to do so; the government has not and cannot prove his participation by *whatever* standard of proof is used; however, even if the government has met the appropriate burden of proof, the quality and character of that evidence, coupled with the extreme effect the murders would have on Fusco's Guidelines level, the Court should either depart downward and/or utilize § 3553(a)'s sentencing factors to ameliorate the impact of such enhancements.

### 1. The Westerman and Bruno Murders

As noted in the PSR, "[t]he Government maintains that murders of Adolfo Bruno and Gary Westerman, which the jury did not find to be proved beyond a reasonable doubt, were proved by a preponderance of the evidence and should be considered in determining the Guidelines range and proper sentence." PSR, ¶ 152. For the legal reasons noted above and the factual grounds explained below, the government's argument regarding those homicides should be rejected.

#### a. The Westerman Murder

As we clearly demonstrate herein, the government woefully failed to prove Fusco's participation in the Westerman murder for a host of reasons, many of which are also applicable to the government's failure of proof with respect to the Bruno murder. First, Arillotta is a liar, whose testimony cannot be credited. Second, it is inconceivable that Fusco would participate in a murder with the Geas brothers, who, only a few months earlier, had robbed Tony Capua, Fusco's alleged partner in crime, of $100,000, and then exposed Fusco to possible retribution - including death – from Bruno and Nigro. Third, there was an utter dearth of corroborating proof to substantiate Arillotta's testimony regarding Fusco's alleged involvement in the Westerman murder. Fourth, unlike the Geas

RICHARD B. LIND

brothers and Arillotta, Fusco had little, if any, motivation to kill Westerman, particularly when weighed against the substantial risk he would face if he was caught engaging in such conduct. Fifth, Fred Geas's first-hand account to Roche of the Westerman murder – which this Court excluded on hearsay grounds at trial – conspicuously omitted any mention of Fusco's alleged role in the Westerman murder – because, in reality, there was none.

There can be little question that Arillotta is a schemer and a chronic liar. Arillotta admitted he actively lied to his wife of 17 years, and cheated on her- not only with his wife's sister, but also with a stripper. Moreover, Arillotta admitted on cross-examination that he hid $80,000 in a Ziploc bag in his closet, to which only he had access, while at the same time his wife and children were forced to live on food stamps. When confronted with this fact on cross-examination Arillotta maintained that his wife "went on food stamps, but she didn't have to go on food stamps," and that his wife was "going to have to look for the money somewhere, it wasn't coming from me anymore." Tr. 471-72.

While forcing his wife and children into a life of poverty, Arillotta was cheating on her with a stripper named Michelle. In one taped conversation, Michelle alerted Arillotta that his wife had uncovered their relationship. Arillotta responded by telling the stripper in a taped conversation from jail that "you know she doesn't know that we sleep together," and that the stripper should "just tell her that we were friends. *Stick to the story.* She doesn't know we were sleeping together." Tr. 585 (emphasis added). Arillotta then immediately proceeded to lie to his wife about his relationship with the stripper.

A further instance of Arillotta's proclivity for lying was his promise to Bruno, the local boss, that if allowed back into the fold after a charge for selling marijuana had been dismissed, Arillotta would not continue selling drugs:

> Q. And he [Bruno] asked you to tell him truthfully whether you were going to quit selling drugs; do you remember that?
> A. He [Bruno] asked me [Arillotta] if I was done selling marijuana.
> Q. And you told him, yes?
> A. Yes.
> Q. And that was a lie.
> A. Yes

Tr. 506-07.

However, perhaps Arillotta's most telling deceit was his willful non-disclosure to Bruno, Tranghese, and Fusco that Arillotta had become a "made man" in New York City on August 11, 2003. *See* Tr. 462. Tranghese testified he did not learn that Arillotta had become a "made" man until after Bruno's death in November 2003. Tr. 1209.[4] Arillotta

---

[4] Indeed, at the earlier *Nigro* trial, Tranghese testified that Arillotta could not bring the relevant page from Fusco presentence report in the District of Massachusetts (GX 202) down to New York because he (Arillotta) was still an associate of the Family. *United*

RICHARD B. LIND

admitted that he never told Bruno - the man who had brought Arillotta into the mob, and whom Arillotta would then plot to kill – purportedly because Arillotta wanted to "keep it [his induction] under the radar." Tr. 266, 458. This was a blatant lie, since Arillotta told his father, the Geas brothers, and a drug addict associate of the Family about Arillotta's induction, even though they were not "made" members of the Family. Tr. 456-57. As the record made clear, the true reason was that as early as the summer of 2003, Arillotta, and the Geas brothers were plotting with Nigro to eliminate Bruno, Tr. 869-74, and Arillotta did not want to alert Bruno as to Arillotta's newly-promoted status because that would put Bruno on guard.

The second reason the government cannot prove its case, even by a preponderance of the evidence, is that it is inconceivable that Fusco would participate in the murder of Westerman – or Bruno - with the Geas brothers, who had robbed Fusco's crime partner of $100,000 and then exposed Fusco to the possibility of being executed. As the Court will undoubtedly recall, Arillotta testified that in the summer of 2003, the Geases had been consigned 30 pounds of high-end marijuana worth about $100,000 from Tony Capua, who was Fusco's alleged partner in marijuana distribution. Capua sought to collect the money from the Geases at their father's house. Ty Geas lured Capua into the backyard and "picked up Tony Capua and slammed him to the ground, and Freddie Geas got on top of him and put a gun to his head." Tr. 270-271. Capua thereupon proceeded to "piss[] and shit[] himself." Tr. 271.

Shortly after this robbery, Fusco supposedly left his business card at the Geas's apartment and informed the Geases that "the money they robbed from Tony was his [Fusco's] money and that they [the Geases] had to give the money back." Tr. 271. Freddie Geas delivered Fusco's business card to Bruno and advised him of the Geases' robbery of Capua; and that the $100,000 was the proceeds of drug dealing. Fusco became furious, as even Arillotta testified: "He [Fusco] was upset [by] the fact Freddie showed Bruno the card. He was mad at Freddie. He was just very upset that Freddie went to Bruno about this." Tr. 275-76. Bruno thereupon sought permission from Nigro to have Fusco killed or "clipped" because of his involvement in the marijuana business. As a consequence, eventually, Fusco abandoned his demand for the Geases to refund any portion of the $100,000 they had robbed from Capua. See Tr. 276-77.

In short, even crediting Arillotta's account, the Geases robbed Fusco of $100,000 and exposed him to being banished or killed by the Family for engaging in narcotics dealing. It is inconceivable, and preposterous, that in light of these events, that Fusco would commit *any act – much less murder –* as a favor to the Geases. Nonetheless, the government would have this Court believe the preposterous contention that Fusco, a man

---

States v. Nigro. Tr. 1566 ("*Nigro* Tr."). Tranghese testified he was going to bring GX 202 down to New York "[c]ause I was the senior friend there and *Anthony wasn't a made member*." *Id.* (emphasis added). By contrast, at this trial Arillotta asserted that he told Tranghese about being "made" the same day it happened, i.e., August 11, 2003. Tr. 460.

RICHARD B. LIND

the government repeatedly characterized as "shrewd,"[5] would participate in a murder at the drop of a hat as a favor to the Geases.

Third, the government failed to introduce a scintilla of corroboration to substantiate Arillotta's fabricated testimony as to Fusco's alleged involvement in the Westerman murder. According to Arillotta, the third, and successful effort to kill Westerman[6] was executed on the very same day it was hatched, i.e., November 4, 2003. That day, Arillotta met with the Geases at a cigar shop. Ty Geas was ranting and raving that "nobody was getting killed." Tr. 357. The three developed a plan to lure Westerman to Joe Ielamo's house on the pretense that the Geases and Westerman would rob the occupant, whereas in fact they intended to kill Westerman and dump his body in a pre-dug hole. Tr. 358. The Geases suggested that Arillotta participate in the murder. He agreed to do it since if Westerman was an informant against the Geases, "it could eventually lead to me [Arillotta]." Tr. 359. Fred Geas then requested that Arillotta recruit Fusco for the murder because Westerman "a big guy, and you know, it would be better if we had four of us there." Tr. 360.

Later that day, Arillotta supposedly called Fusco on a telephone at the Fusions restaurant. Shortly thereafter, Arillotta allegedly drove with Tony Vetrano to the restaurant where Fusco was having a drink. Arillotta disclosed to Fusco that the Geases planned to kill Westerman, and wanted Arillotta and Fusco to assist. Notwithstanding Fusco's prior run-in with the Geases in the Capua affair, and his lack of any prior relationship with Westerman,[7] Fusco supposedly jumped at the chance: "[H]e [Fusco] was all for it." Tr. 361.

Arillotta and Fusco were supposedly then driven by Vetrano to a driveway near Ielamo's house. When Vetrano departed, Arillotta and Fusco walked to Ielamo's house and waited in a garage near the house for about a half hour, during which the two purportedly discussed the upcoming murder of Westerman. Fusco again repeated "[t]hat he was all for it." Tr. 363. Eventually the Geases and Westerman arrived. They heard yelling outside. Fusco and Arillotta exited the garage to see the Geases holding Westerman who was motionless. Fusco allegedly picked up a shovel and smashed it into Westerman's head to finish him off; Arillotta followed suit. The four men dragged Westerman's body to the grave. As the body was lying there, inches from the grave, Fred Geas shot Westerman in the skull.

---

[5] See e.g. Tr. 1425 ("Emilio Fusco was shrewd"), Tr. 1430 ("shrewd as always, Fusco…"); Tr. 1431 ("this is where Fusco's shrewdness pays off"); Tr. 1445 ("once again, Fusco was shrewd"); Tr. 1452 ("Fusco, always shrewd").

[6] According to Arillotta, there had been two prior plans to kill Westerman, supposedly because he was a police informant, in 1996 and then in 2002, involving Arillotta and the Geases. Fusco had no involvement in either attempt, and both fizzled in execution. Tr. 345-52.

[7] As Arillotta admitted, around that point in time, Fusco had no relationship with Westerman: "[t]hey knew each other, but no business or anything that I [Arillotta] know of." Tr. 353.

RICHARD B. LIND

This evidence was preposterous. At the time in question, Fusco believed that Arillotta was merely an associate. It is absurd that Fusco would be taking directions from someone he believed to be well below him in the Family hierarchy.

Further, it bears emphasis that *the government failed* to adduce any corroborating proof that Arillotta called Fusco at the Fusions restaurant, even though the authorities knew their phone numbers; *or any evidence* that they met at the Fusions restaurant; *or* that Fusco accompanied Arillotta to Joe Ielamo's house; *or* that Fusco waited in the garage there; *or* that Fusco hit Westerman on the head a dozen times with a shovel; *or* that he helped drag and bury Westerman's body.[8]

The government also sought to get some corroboration mileage out of the fact that Fusco supposedly "chain-smoked a couple packs a day," Tr. 368, coupled with the fact that there were cigarette *filters*[9] discovered at the grave site seven years later. Tr. 681-82. As it played out, however, the government's feeble proffer disintegrated since its own expert acknowledged that because no DNA was recovered from the filters, he was "not able to make any conclusion about any individual about whether they may or may not have come in contact with these items. This includes any contact from Mr. Fusco." Tr. 713.

In addition, while Arillotta testified, on cross-examination, that he did not recall ever seeing Westerman smoke, Tr. 499, on the defense case, it was established that at least in 1997, Westerman smoked a pack a day. Tr. 1397-98. Accordingly, there was more than a reasonable possibility that the filters uncovered in the grave belonged to Westerman – and there was no proof that they belonged to Fusco.

Fourth, as noted above, unlike the Geases and Arillotta, Fusco had no motivation to kill Westerman, particularly when weighed against any potential risk to him. This stands in sharp contrast to the Geases' motivation, because Westerman had directly implicated them in illegal activity. Arillotta also a similar motivation, coupled with his demented hatred for Westerman since Westerman had the temerity to marry Arillotta's sister-in-law and thus presumably end Arillotta's sexual liaisons with her.

Finally, the Court should take into account Fred Geas's prison conversation with Frankie Roche in which he candidly admitted the details of the Westerman killing, which the Court excluded at trial on hearsay grounds. Tr. 982-83. However, hearsay can be considered in connection with sentencing proceedings. *See e.g. United States v. Broxmyer*, --- F.3d ---- , 2012 WL 3660316, at *11 (2d Cir. Aug. 28, 2012)(citing *United States v. Gomez*, 580 F.3d 94, 105 (2d Cir. 2009)). Moreover, the substance is exactly

---

[8] Indeed, the sole record of a phone call was that night from Fusions restaurant to Ty Geas, at 8:01 p.m., Tr. 863, presumably made by Arillotta, even though he denied ever going back to the Fusions restaurant after the Westerman killing.

[9] The government witness admitted that the items found were cigarette filters, not butts. Tr. 688.

RICHARD B. LIND

what *the government introduced* at the 2011 trial of Fusco's codefendants before this Court. *See Nigro* Tr. 1360-62.

In their conversation, Geas told Roche that he, his brother Ty, and Arillotta – Freddie Geas *did not include Fusco as a participant* – had set up a fake robbery, so that the three killers could get Westerman to a certain spot and kill Westerman there. Significantly, Freddie Geas told Roche that all four men (the three killers and Westerman) had masks on, as part of the robbery ruse. Roche testified that Freddie Geas shot Westerman with a .25 caliber weapon but it had a faulty silencer on it, so the bullet bounced off Westerman's head. In addition, Geas further told Roche that Ty Geas had also shot Westerman, with a .22 caliber gun.

The trustworthiness of Geas's statement was amply demonstrated by the following: it was inculpatory since it directly implicated both Geases in a murder; the statement was made during the period of the conspiracy, and was made to a co-conspirator and participant in another murder – the Bruno killing – whom Geas clearly trusted. Moreover, Freddie Geas's description of the murder was corroborated by the government's own evidence at trial, particularly the Westerman grave site discovery, which revealed the presence of .22 and .25 caliber casings, Tr. 674. and significantly, the discovery of Westerman's own "robbery" mask near his remains. *See* Tr. 691; GX 459, 460. It must be recalled that the jury acquitted Fusco even without this exculpatory evidence.

In sum, the government plainly failed to prove Fusco's participation in the Westerman murder, even under a preponderance standard, and thus it should not be considered as "relevant conduct."

### b.  The Bruno Murder

The government also failed to prove, even under a preponderance standard, that Fusco participated in the planning or execution of the Bruno murder. Again, we respectfully refer the Court to, and re-emphasize, the first three reasons cited above in connection with the Westerman murder that undermine the government's position as to the Bruno murder, namely: Arillotta was not a credible witness; it was highly unlikely that Fusco would participate in a murder with the Geas brothers; the government lacked any corroboration about the essential allegations against Fusco in connection with Bruno murder. As we explain below, there are additional compelling reasons that demonstrate that the government failed to satisfy even by a preponderance standard. Pivotal testimony by Frankie Roche, the triggerman, was false and was directly controverted not only by his own prior testimony at the *Nigro* trial, but also by the sworn grand jury testimony of his roommate, Billy Johnston. Nigro's motivation to have Bruno killed was propelled by a number of factors other than the revelation in Fusco's Pre-Sentence Report in his District of Massachusetts case (GX 202) that Bruno may have been a "rat;" by contrast, as was clearly shown in the defense case, Fusco, had little incentive to have Bruno killed.

12

RICHARD B. LIND

According to Arillotta, the Bruno killing was set in motion in early September 2003, when Fusco received a pre-sentence report from his attorney in a federal case in the District of Massachusetts, in which he had pleaded guilty to certain charges. Fusco was having a heated conversation in a coffee shop with Bruno regarding the report. After the two parted company, Fusco showed Arillotta a page from the report (GX 202) and complained to Arillotta that it revealed Bruno to be a "rat," because he had revealed to an FBI agent that Fusco was in fact a "made" member of the Family. Fusco and Arillotta drove to a newspaper store in East Longmeadow, MA, where Felix Tranghese, a senior member of the Springfield sect, joined them. Tranghese also concurred in the view that Bruno was a "rat." Tr. 318-21.

Arillotta testified that, shortly thereafter, Tranghese took the document (GX 202) to New York, where he presented it to Nigro and John Bologna, an associate of Nigro's. Tr. 321. According to Arillotta, in *late September 2003*, Tranghese met with Arillotta and Fusco at a Friendly's restaurant in Massachusetts. Tr. 530-31. Arillotta testified that Tranghese reported to him and Fusco that day that Nigro and two other mob bosses had approved the killing of Bruno for his misconduct. Tr. 324-25, 529.

According to Arillotta, after the meeting at Friendly's in late September 2003, in the ensuing weeks, a series of conversations took place between Arillotta and others regarding about plans to murder Bruno. Tr. 326-330. One plot, according to Arillotta, involved a meeting at a gas station, attended by Arillotta, Bruno, Tranghese, and Fusco. The plan was to lure Bruno into a car with the others so that he could be shot. According to Arillotta, at the actual meeting Tranghese told Bruno that Tranghese had been contacted by Nigro, who wanted Bruno to come to New York to confer with him; however, Bruno brusquely rejected the request. Tr. 330-32.

Eventually, Freddie Geas decided to enlist Frankie Roche to do the actual shooting, even though Arillotta recognized that Roche was involved with a dispute with Bruno. Tr. 337-38. Arillotta also agreed to pay Roche $10,000 for the killing. Tr. 465. According to Arillotta, at one point, he, the Geases, Tranghese, and Fusco, discussed the need for a weapon to accomplish the killing. Fusco supposedly volunteered a .45 caliber gun. According to Arillotta, Fusco advised that he had brought the gun and left it behind the dumpster of the Family Pizzeria Restaurant -- or, in the back of the restaurant by the dumpster. Tr. 339-40. Fusco also agreed to assist in the plot by signaling to Fred Geas when Bruno was at the Mount Carmel Club in Springfield, so that Geas could kill him near the Mount Carmel Social Club in Springfield. Tr. 341-42. Eventually, Bruno was killed on Sunday, November 23, 2003 at about 9 p.m.

As was true of most of his testimony, Arillotta's account of the Bruno murder was wholly unreliable and was directly contradicted by the government's own witnesses' differing versions. Thus, Frankie Roche testified that he had been told by Fred Geas *that Arillotta was leaving the gun at the dumpster*, Tr. 1019-20, a fact that Arillotta of course adamantly denied. *See* Tr. 540. Roche was *never told* that Fusco was leaving a gun at the Family Pizza dumpster. Tr. 1019-20. Indeed, the record made clear that there was

13

absolutely no corroboration that Fusco left the .45 weapon at the dumpster, or indeed that Fusco had ever illegally possessed a weapon during his entire career with the Family.

By contrast, there was abundant circumstantial evidence that Arillotta left the gun at the dumpster, which was just minutes from his house. Tr. 537. Indeed, the record made plain that it was Arillotta's *modus operandi* to conceal guns and money when engaged in criminal activity. Arillotta hid $80,000 inside a Ziploc bag in a closet in his home, to conceal it from his family and the authorities. Tr. 469. He hid two guns in the attic of his mother's home before they were used to shoot Frank Dadabo. Tr. 482. Arillotta then hid the same guns under the car, or, on a later occasion in the bushes, when he and the Geases shot Dadabo. Tr. 485-87. In 1996, Arillotta hid $70,000 in his house's drop ceiling so that authorities would not uncover it. Tr. 488. Arillotta hid two AK-47's in Joe Ielamo's house; and in 1990 when he was arrested for weapons possession, the gun was hidden in the car he was driving. Tr. 489-91.

Moreover, it would have been incredibly stupid for the "always shrewd" Fusco to have left the weapon in the dumpster, since it could have been located by someone else, contaminated in the autumn air, or otherwise disposed of. Also, if Fusco actually had been involved in murdering a high-ranking *capo* of the Family, such as Bruno, surely he would have picked someone far more sophisticated and professional than a "crash dummy" like Roche. *See* Tr. 298, 305 (Arillotta testimony relating how Fred Geas described Roche as "crash dummy"). Indeed, if Fusco was actually involved in the planning or execution of Bruno, he could have murdered Bruno the night of November 7, 2003 when they were both riding in Bruno's car. Tr. 858.

In addition, as Arillotta himself testified on direct examination, the "always shrewd" Fusco cautioned Arillotta to "[b]e very careful. There's *a lot of heat that's going around. Stay away from Freddy and Ty*. They are the ones that had the most attention drawn to them, *to isolate ourselves from Freddy and Ty*. Tr. 372 (emphasis added). The government would have this Court believe that Fusco nonetheless willy-nilly abandoned his own advice to benefit the Geases, men who had robbed his alleged partner and exposed Fusco to the possibly of execution.

Tranghese also directly contradicted Arillotta's version of events. Thus, he contradicted Arillotta's fabricated testimony regarding the meeting at the Felix's gas station. Tranghese testified that there was no plan made there to lure Bruno down to New York and kill him along the way. Tr. 1205. Tranghese also contradicted Arillotta's testimony as to when the all-important meeting at Friendly's - where he advised Arillotta and Fusco of the decision to murder Bruno - took place. Tranghese testified that the meeting took place in mid-*November* 2003, Tr. 1215-16 *and not* in September 2003, as Arillotta testified. Tr. 529-30. Tranghese said that he gave the order shortly before Fusco had to go to jail, "whether it was November or December." Tr. 1216. *See also* Tr. 1225.

The two-month difference is very significant because it is transparent that Arillotta and the Geas brothers had established their own agenda – which did not involve

RICHARD B. LIND

Fusco or Tranghese.  Indeed, Tranghese's *direct* testimony on the meeting at Friendly's is particularly revealing:

> Q. How did Fusco and Arillotta react when they got that order [from Nigro to kill Bruno]?

> *A.* Emilio told me that he didn't know what he could do, *that he was leaving to go jail shortly*, and Arillotta took it in stride *like he already knew about it.*

Tr. 1145 (emphasis added).

The testimony of Frankie Roche, the government's other principal witness regarding the Bruno murder, was equally unreliable.  He testified that he had been offered $10,000 up to $25,000, to kill a number of individuals, including Louis Santos, Giuseppe Manzi, and cohorts named Mike and Matt. Tr. 898-918.  Roche became roommates with Brian Croteau and Billy Johnston in October 2003.  Tr. 916-18.  About that same time, he and Johnston beat an individual at the behest of Ty Geas. Tr. 919-20.

In the fall of 2003, Roche was offered $10,000 to shoot Bruno, whom the Geases regarded as a "rat." According to Roche, around the same time Fusco also showed Roche a copy of his Pre-Sentence Report in the District of Massachusetts (GX 202) at the same coffee shop he had displayed GX 202 to Arillotta. Tr. 934-37.  Shortly thereafter, Roche met Fred Geas at a McDonald's parking lot in Enfield, CT, where he  gave Roche a .380 to be used in the shooting. Geas told Roche to call him the next day. Tr. 938-39.  Roche testified that when he called Fred Geas the next day, "he [Fred Geas] said 7:00, the Family Pizza in Springfield, that *the little guy [Arillotta] would be leaving the gun under the dumpster.*" Tr. 939 (emphasis added). Roche testified that he went to Family Pizza at 7 p.m. that night and located a single handgun under the front of the dumpster. Tr. 939-40.

Roche decided that the optimum location to shoot Bruno was outside the Mount Carmel Society location.  He tried to track Bruno there using an unregistered car that Roche had obtained from his other roommate, Brandon Croteau.  Roche realized that his plan was not going to work, so Fred Geas advised him that "he [Geas] *was going to have Emilio Fusco let us know* when Bruno's going to be around," Tr. 943-44 (emphasis added), supposedly because Fusco was the only person Bruno trusted. Tr. 944.

During the same time period, Mike DeCaro alerted Roche that Bruno was looking for Roche, to seek restitution from him because a bar in which Bruno had an interest had been smashed up by Roche. Tr.  944; *see also* Tr. 543 (Arillotta). One night DeCaro pressed the Bruno issue and Roche punched him in the face.  Roche testified that he never had to pay any restitution "[b]ecause I killed Bruno" the following night, Nov. 23, 2003. Tr. 946.

RICHARD B. LIND

That night, Roche got a call at Billy Johnston's residence from Fred Geas, which Roche recognized on the caller ID was from a West Springfield pay phone. Tr. 947. Roche was alerted that Bruno "was going to be around tonight," so he could kill him. Tr. 949. Roche testified that he had to wait for Croteau to come home: *"he [Croteau] was going to bring me to my car* so I could go down to Mount Carmel and wait for Bruno to arrive." Tr. 949. When Croteau came home, Roche was transported to his car and drove down to Mount Carmel. After Roche had waited for about fifteen minutes, Bruno came out of the Mount Carmel club. Roche approached Bruno and him and shot him five or six times, killing Bruno, at about 9 p.m. that night. Tr. 950-51.

On cross-examination, Roche testified that he got the call from Fred Geas regarding Bruno's whereabouts at about 6:30 p.m. the evening of November 23, but had "to wait on Brandon Croteau to come home, bring me to my car, then I [drove] down." Tr. 1011-12. Roche testified he arrived at the Mount Carmel Society at about 8 p.m. Tr. 1012.

Roche's testimony regarding his activities that night is a fabrication and was contradicted by his own prior testimony at the *Nigro* trial and by the sworn grand jury testimony of Billy Johnston, who did not testify at either trial.[10] At the prior trial, Roche testified that after the phone call from Geas, he immediately "got in my car and I went down to the club to try to catch – I was trying to catch Bruno before he went in. But his truck was already at the club." *Nigro* Tr. 1320-21. In sworn grand jury testimony, Johnston testified that neither he nor Croteau drove Roche to his car, and that Roche had left the Johnston residence before 7 p.m. *See* Johnston Jencks Act material, 3516-24, at 57-60.

The reason for Roche's fabrication is that he was attempting to establish a (false) connection between the phone call from Geas at about 6 p.m., Tr. 1319-21, and his shooting of Bruno, which took about three hours later, i.e. around 9 p.m. Because Roche testified at both trials that he waited for Bruno only about 15 minutes, Tr. 950, he had to devise a way to show that he was delayed for several hours. Thus, he testified falsely to fill in the time gap.

Johnston also controverted Roche's testimony that he picked up only one handgun at the Family Pizza. On cross-examination, Roche denied that he picked up more than one gun. Tr. 1052-53. Johnston, however, in detailed testimony before a grand jury recounted how he drove Roche to the Family Pizza where picked up a .45 and a .22 gun. 3516-24, at 49-54. This testimony is also relevant because it undermines Arillotta's account that Fusco only left one handgun.

Moreover, as with the Westerman shooting, there was absolutely no corroborating evidence that Fusco participated in the Bruno killing. As noted, the sole "proof" that Fusco left the gun at the Family Pizza was Arillotta's testimony. Equally significant, was the total absence of corroboration that Fusco in fact alerted Fred Geas of Bruno's

---

[10] Defendant Fusco attempted to subpoena Johnston for trial but could not locate him.

RICHARD B. LIND

whereabouts the night of Nov. 23, 2003. Indeed, the record shows that the extant records reveal that Fusco did not contact the Geases that night. *See* Tr. 1322.

In addition, as the record made clear, Nigro had other reasons to order Bruno's killing other than Fusco's pre-sentence report. Bruno was a drunk; he did not "kick back" enough money to Nigro; Bruno was involved in disputes with other Family members, particularly a scam in which, Bruno and his partner lost $250,000 that was orchestrated by a Florida colleague of Nigro's, whereupon Bruno started bad mouthing Nigro to other Family members. Tr. 313-17, 1352-36. As a consequence Nigro ordered that Bruno be put on the pay-no-mind list. Tr. 317, and later ordered his killing.

Roche, the "crash dummy," also had his own reasons to shoot Bruno, which had nothing at all to do with Fusco: Roche wanted to – and did – get $10,000 for executing Bruno, from Arillotta, via the Geases; Roche was able to cancel Bruno's claim for restitution for the damage he inflicted at Emo's bar; and even the dim-witted Roche realized that once Bruno was eliminated, Arillotta and the Geases, his only source of employment, would take over the Springfield turf, and thus be able to offer Roche more patronage.

By contrast, the record makes equally clear that Fusco, who initially was irate, had little, if any, motivation to kill Bruno after his meeting with counsel and his sentencing in the Massachusetts case, in which he received a short sentence. *See* Tr. 1326-34. The murder took place on November 23, 2003, only five days before Fusco had to report to prison for a three-year stint. He had to realize that in his absence, Arillotta and his crew would take over Springfield – which is exactly what occurred.

In sum, it is clear that there was not sufficient evidence even to sustain the government's preponderance burden and its application to seek a relevant-conduct adjustment should be denied as to the Bruno murder as well.

### 2. The Government's Attempt to Boost Fusco's Offense Level on Racketeering Act Four Should Be Denied

As we explain herein, there are myriad reasons why the government's baseless request to boost Fusco's Guidelines level from 20 to 34 on Racketeering Act Four should be denied. However, before we articulate our argument, it is important to focus on a significant factual dispute relating to the government's claim. Paragraph 61 of the initial PSR stated, *inter alia*, that "[i]n the 1990's, **FUSCO** sold hundreds of pounds of marijuana per month with ARILLOTTA, *Tony Capua*, Guiseppe Manzi, Louie Santos and others." *Id.*, ¶ 61 (emphasis added).

In his September 7, 2012 letter to the Probation Office, annexed hereto as Exhibit A, Fusco objected to paragraph 61, stating that "Fusco disputes the substance of this paragraph, particularly the allegation that he sold *hundreds of pounds of marijuana* with others, including Tony Capua, in the 1990's. *Indeed, Capua was about 14-15 years*

RICHARD B. LIND

*old in the early 1990's.*" Deft. 9/7/12 Ltr. at 4 (emphasis added).  In its September 14, 2012 letter to the Probation Office, annexed hereto as Exhibit B, the government disputed Fusco's assertion, and claimed that "Tony Capua's date of birth is *December 15, 1971.*" Govt. 9/14 Ltr. at 2 n.2 (emphasis added).

In fact, the government is wrong.  Capua was born in 1979 and in fact was 13 or 14 years old in the early 1990's. To substantiate our position, annexed hereto as Exhibit C is a copy of government trial exhibit 55, which Arillotta testified was a photo of Capua (Tr. 186), and Exhibit D, which consists of copies of Capua's current driver's license and his birth certificate.[11] The license and birth certificate substantiate our position. The government offers no proof that Capua was born in 1971.

In light of this, it is difficult, if not impossible, to credit the government's central assertion that from the early 1990's to 2010, "Arillotta dealt with Fusco during that entire time period, as did others, *including Tony Capua, who was Fusco's most significant marijuana distribution partner from the early 1990's to his arrest in 2010.*" Govt. 9/14 Ltr. at 2 (emphasis added). Consequently, we submit that the Court should reject the entirety of the government's factual assertions in support of its application.

However, even if somehow this Court could ignore the foregoing, there exist numerous other grounds on which the Court should reject the government's argument. First, the time period alleged in Racketeering Act Four is from 2002 to 2010, but the evidence the government relies upon is for a period from 1993-1999, which is far removed from the period alleged in the racketeering act, and the government cites no authority for its inclusion in this charge. Second, the government offers no proof that the same conspiracy which allegedly started in 1993 continued uninterrupted through 2010. Third, the government's outrageous extrapolation – that the conspiracy distributed 100 kilos *each  month for seven consecutive years* -- is based exclusively on the *unsupported and unverified estimate by Arillotta. See* Tr. 176.  Of course, No records or other testimony are cited.

Fourth, the government should be estopped from arguing that Racketeering Act Four involved between 3,000 kilograms and 10,000 kilograms of marijuana, because the government failed to allege *any amount* of marijuana in the Indictment, and thereby deprived the jury of an opportunity to determine the issue by the reasonable doubt standard.  Instead, Racketeering Act Four charged only a violation of 21 U.S.C. §841(b)(1)(D), which involves less than 50 kilograms of marijuana. Thus, the government plainly sought to have its cake and eat it too.  It avoided the possibility that the jury might return a not-guilty verdict on a charge seeking a higher level, such as subsections 841(b)(1)(C), (B), or (A). But now that its allegation was "proven," the government seeks to take advantage of that fact and seek to boost Fusco's penalty by a stratospheric amount.

---

[11] Because Exhibit D contains personal identifying information a redacted copy will be filed in connection with this Sentencing Memorandum.  An unredacted copy of Exhibit E will be transmitted to the Court and government.

RICHARD B. LIND

By failing to permit the jury to decide the issue of quantity, which was within the government's power in fashioning the indictment, the government forfeited the ability to claim that Fusco should be held responsible for more than 50 kilograms of marijuana. Otherwise, the government could easily frustrate a defendant's Sixth Amendment right to a jury trial through its charging discretion, achieving through the "back door" at sentencing what it feared it could not accomplish with a jury. In such a case, as the Supreme Court correctly recognized in *Apprendi v. New Jersey*, 530 U.S. 466, 495 (2000), "[w]hen a judge's finding based on a mere preponderance of the evidence authorizes an increase in the maximum punishment, it is appropriately characterized as 'a tail which wags the dog of the substantive offense.' " (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986)); *accord, United States v. Holquin*, 436 F.3d 111, 117 (2d Cir. 2006). That clearly is the case here.

As the Second Circuit has repeatedly held, drug quantity is an element of the offenses that charge drug distribution. *See, e..g., United States v. Gonzalez*, 686 F.3d 122, 129-30 (2d Cir. 2012)(*citing United States v. Thomas*, 274 F.3d 655, 673 (2d Cir. 2001) (*en* banc)). Thus, the issue of the amount of marijuana involved in the conspiracy of which Fusco was allegedly a member was ripe for, and capable of, a jury determination beyond a reasonable doubt. However, in not charging a specific minimum quantity, the government forfeited any claim to the adjustment for quantity at this stage.

For instance, in *United States v. Barnes*, 158 F.3d 662, 667 (2d Cir. 1998), the Second Circuit vacated a sentence based on the quantity of crack, rather than the amount of heroin (which would have resulted in a dramatically lower mandatory minimum sentence), because the absence of a special verdict on the issue of which prong of the conspiracy – crack or heroin – the jury had found guilt precluded such a determination for sentencing purposes. *See also United States v. Orozco-Prada*, 732 F.2d 1076, 1083-84 (2d Cir. 1984).

The Supreme Court's opinion in *Castillo v. United States*, 530 U.S. 120 (2000) is also instructive on this issue. There, in deciding that the type of weapon possessed (in *Castillo*, whether it constituted a "machinegun") was an element that had to be found by a jury beyond a reasonable doubt, and was not a "sentencing factor" to be determined subsequently by a judge, the Court explained that "a contrary rule – one that leaves the machinegun matter to the sentencing judge – might unnecessarily produce a conflict between the judge and the jury[] . . . because, under our case law interpreting the statute here at issue, a jury may well have to decide which of several weapons the defendant actively used, rather than passively possessed." *Id.*, at 128.

As the Court recognized in *Castillo*, "in such a case, the sentencing judge will not necessarily know which 'firearm' supports the jury's determination." 530 U.S. at 128. As a result, "[u]nder these circumstances, a judge's later, sentencing-related decision that the defendant used the machinegun, rather than, say, the pistol, might conflict with the jury's belief that he actively used the pistol, which factual belief underlay its firearm "use" conviction." *Id.*, *citing cf. United States v, Alerta*, 96 F.3d 1230, 1234-1235 (9th Cir. 1996) (in the absence of a specific jury finding regarding the type of weapon that

19

Richard B. Lind

defendant used, it was possible that the jury did not find "use" of a machinegun even though the judge imposed the 30-year mandatory statutory sentence).

Moreover, in *Castillo* the Court noted that with respect to a factor that would result in a significantly higher sentence, "we would assume a preference jury determination of so important a factual matter." 530 U.S. at 131 (citations omitted). The Court also pointed out that the lower standard of proof involved in a judicial sentencing determination would be inappropriate as well. 530 U.S. at 128. As the Court concluded, "[t]here is no reason to think that Congress would have wanted a judge's views to prevail in a case of so direct a factual conflict, particularly when the sentencing judge applies a lower standard of proof and when 25 additional years in prison are at stake." *Id.*

Four years later, in *Blakely v. Washington*, 542 U.S. 296 (2004), the Court reiterated that "[t]he jury could not function as circuit breaker in the State's machinery of justice if it were relegated to making a determination that the defendant at some point did something wrong, a mere preliminary to a judicial inquisition into the facts of the crime the State actually seeks to punish." *Id.*, at 306-07. *See also United States v. Allen*, 644 F. Supp.2d 422, 434 (S.D.N.Y. 2009) *(*"[i]t may violate due process for a defendant to be charged with one crime and then sentenced based on other crimes carrying a higher Guidelines range") (footnote omitted)(*citing Blakely*, 542 U.S. at 306-07).

Here, the government's deliberate decision *not* to charge a specific amount of marijuana, thereby eliminating a jury determination on the issue pursuant to the reasonable doubt standard, should foreclose the government's *post hoc* attempt to attribute such an extraordinarily large quantity of marijuana pursuant to a lower standard of proof. While the Second Circuit case law has focused on threshold amounts for mandatory minimum sentences, if Fusco is saddled with a Base Offense Level of 34, rather than 20 as calculated in the PSR, and sentenced on that basis, the result is functionally the same: Defendant will have been denied his Sixth Amendment right to a jury trial on the issue of drug quantity.

Finally, the government's request for a four-level role increase - solely based on the fact that Fusco was "the only made member of the conspiracy (Govt. 9/14 Ltr. at 3) – should be rejected. *See United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006). There, the appeals court determined that, in sentencing a defendant convicted of racketeering and racketeering conspiracy, the court did not clearly err in declining to impose a leadership role enhancement under the Guidelines solely based on the fact that the defendant held the position of acting "boss" of a New York crime family whose members had been prosecuted. *Id.* at 349.

### 3.  No Obstruction Enhancement Is Justified

The government also seeks a two-level increase, pursuant to U.S.S.G. § 3C1.1, because Fusco's prior, discharged counsel, William Aronwald, Esq., submitted a false affidavit on defendant's behalf in July 2011, in connection with an application for bail. *See* PSR, ¶ 63. As stated in the PSR, "the Government contends that the defendant's

RICHARD B. LIND

flight to Italy was designed to avoid prosecution and not to attend to sick members and attend a birthday party as asserted." *Id.* The government's application is utterly frivolous and should be swiftly rejected.

First, it should be stressed that Section 3C1.1 speaks of a *defendant* obstructing justice – by filing a false affidavit, and *not the attorney for* a defendant. Our research did not locate any decisions where a defendant was held liable because his *attorney* obstructed justice. Moreover, Aronwald's affidavit was not false or inaccurate, as the trial testimony of Fusco's sister made clear. She testified that Fusco came to Italy to attend her fiftieth birthday party on April 26, 2010. Tr. 1366. Defendant remained in Italy for some time to take care of his mother, who developed heart arrhythmia, and because "she kept saying [to Fusco], 'Stay with me.' " Tr. 1368-69. In addition, the government, on cross-examination, itself elicited that Ms. Fusco told her brother "do not leave" because of the presence of volcanoes in Iceland; and that Fusco's sick mother "was afraid about her son leaving at that time." Tr. 1373.[12]

In sum, the government's request for an obstruction enhancement should be denied.

### 4. The Enhancements Sought In The PSR Should Be Denied

Defendant Fusco presses the objections he earlier advanced to paragraphs 72 (offense amount) and 75 (role adjustment) of the PSR. In particular, he disputes that he was involved, let alone a leader in any extortion, and particularly refutes the allegation that his dumpster business was an illegal enterprise. Fusco requests a hearing on both issues.

## II. A BELOW-GUIDELINES SENTENCE IS PLAINLY WARRANTED

### A. GOVERNING PRINCIPLES

As this Court is aware, the Supreme Court held in *United States v. Booker,* 543 U.S. 220 (2005), that the mandatory nature of the United States Sentencing Guidelines violated the Sixth Amendment. In its remedy opinion, the Court severed 18 U.S.C. § 3553(b)(1), which had rendered the Guidelines binding on federal sentences. This left 18 U.S.C. § 3553(a) in effect. Last year, in *Pepper v. United States*, --- U.S. ----, 131 S. Ct. 1229 (2011), the Court *twice* emphasized that a sentencing judge assumes "an overarching duty overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than necessary' to comply with the sentencing purposes set forth in § 3553(a)(2)." *Id.*, at 1242, 1243. *See also United States v. Dorvee*, 604 F.3d 84, 93 (2d Cir. 2010) ("[u]nder §3553(a)'s 'parsimony clause,' it is the sentencing court's duty to

---

[12] The fact that, unbeknownst to the Fuscos, the volcanoes did not interrupt Alitalia from Italy to the United States is clearly irrelevant.

RICHARD B. LIND

'impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth' at 18 U.S.C. §3553(a)(2)"), *quoting United States v. Samas*, 561 F.3d 108, 110 (2d Cir. 2009).

As the Second Circuit explained in *Dorvee*,

> [e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the §3553(a) sentencing factors. *See [United States v.] Cavera*, 550 F.3d [180,]189 [(2d Cir. 2008) (*en banc*)].

604 F.3d at 93. *See also Pepper*, 131 S. Ct. at 1244-45 (statute – 18 U.S.C. §3742(g)(2) – precluding consideration, at re-sentencing, of post-sentence rehabilitation was invalid because it had the effect of making the Guidelines mandatory in "an entire set of cases").

As the Supreme Court declared in *Nelson v. United States*, 550 U.S. 350 (2009), "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Id.*, at 351 (emphasis in original).[13] *See also Dorvee*, 604 F.3d at 93 ("[i]n conducting this review [of the §3553(a) sentencing factors], a district court needs to be mindful of the fact that it is 'emphatically clear' that the 'Guidelines are guidelines – that is, they are truly advisory' ")(internal quotation marks omitted).

Indeed, in *Pepper*, Justice Sotomayor again hearkened back to *Koon v. United States*, 518 U.S. 81 (1996) – as Justice Stevens had in *Rita v. United States*, 551 U.S. 338, 364 (2007) (Stevens, J., *concurring*) – repeating that

> "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

*Id.* at 1239-40 (*quoting Koon*, 518 U.S. at 113).

Thus, while sentencing judges must still consider the Guidelines, *see* 18 U.S.C. § 3553(a)(4), nothing in the statute provides any reason to treat that calculation as more controlling of the final sentencing decision than any of the other factors a court *must*

---

[13]  While the Supreme Court's ruling in *Rita v. United States*, 551 U.S. 338 (2007), established that a within-Guidelines sentence can be presumptively reasonable, *id.* at 347, that presumption is restricted to appellate review and "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Id.* at 351 (*Booker*, 543 U.S. at 259-60). *See also Nelson*, 550 U.S. at 351.

RICHARD B. LIND

consider under § 3553(a) as a whole. *See United States v. Menyweather*, 431 F.3d 692, 701 (9th Cir. 2005).

Moreover, the Supreme Court has been vigilant in ensuring that the Guidelines are genuinely advisory, and not merely a default sentence ratified by appellate courts by rote. For example, in *Nelson*, 550 U.S. at 350, the Court *twice* remanded the Fourth Circuit's decision(s) that affirmed a sentence even though the District Court had stated that while the Guidelines were not mandatory, they enjoyed a presumption of "reasonableness."[14] *See also Pepper*, at 1236-40. Thus, in *Nelson*, the Court reiterated that "district judges, in considering how the various statutory sentencing factors apply to an individual defendant may not presume that the Guidelines range is reasonable." 550 U.S. at 351 (internal quotation marks omitted).

The broad discretion afforded district courts to determine a sentence also conforms with 18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." In fact, in *Pepper*, the Court cited § 3661 as an important means of achieving just sentences: "[p]ermitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" *Id.* at 1240, (*quoting Wasman v. United States*, 468 U.S. 559, 564 (1984)).[15]

As the Supreme Court directed in *Gall*, "after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." 552 U.S. at 49. The Second Circuit has also instructed that

> the district court is not bound in ambiguous circumstances
> such as these to choose one Guidelines range in particular,
> and is free to take the more flexible – and often, more
> direct – approach of arriving at a more appropriate sentence
> outside the Guidelines. In light of *Booker*, the judge could

---

[14] *See* 237 Fed.Appx. 819 (4th Cir. 2007) and 276 Fed.Appx. 331 (4th Cir. 2008).

[15] Indeed, the Court's opinion in *Pepper* opened with the following statement:

> [t]his Court has long recognized that sentencing judges
> "exercise a wide discretion" in the types of evidence they
> may consider when imposing sentence and that "[h]ighly
> relevant-if not essential-to [the] selection of an appropriate
> sentence is the possession of the fullest information
> possible concerning the defendant's life and
> characteristics."

*Id.* at 1235 (*quoting Williams v. New York*, 337 U.S. 241, 246-247 (1949)).

23

RICHARD B. LIND

> simply look at all of the facts, take both suggestions into
> account, consider the § 3553(a) factors, and come up with a
> "hybrid" approach if he so chose.

*United States v. Dhafir*, 577 F.3d 411, 415 (2d Cir. 2009).

The Supreme Court has also pointed out the inherent limitations of the Guidelines, which cannot, and were not designed to, incorporate many factors relevant to an individualized sentencing determination. As Justice Stevens explained in *Rita*,

> [t]he [Sentencing] Commission has not developed any
> standards or recommendations that affect sentencing ranges
> for many individual characteristics. Matters such as age,
> education, mental or emotional condition, medical
> condition (including drug or alcohol addiction),
> employment history, lack of guidance as a youth, family
> ties, or military, civic, charitable, or public service are not
> ordinarily considered under the Guidelines. *See* United
> States Sentencing Commission, Guidelines Manual §§
> 5H1.1-6, 11, and 12 (Nov.2006).

551 U.S. at 364-65 (footnote omitted) (Stevens, J., concurring).

However, as Justice Stevens noted, "[t]hese are . . . matters that § 3553(a) authorizes the sentencing judge to consider. *See, e.g.,* 18 U.S.C. § 3553(a)(1)." *Id.,* at 365. Thus, as the Second Circuit has recognized, "[t]he Supreme Court has clearly signaled that district courts enjoy considerable discretion in identifying the grounds that can justify a non-Guidelines sentence." *United States v. Jones*, 531 F.3d 163, 172 (2d Cir. 2008).

Nor could a Guidelines sentence be justified pursuant to the standard mandated by statute, and reaffirmed by the Supreme Court: that the sentence be "sufficient but not greater than necessary" to comply with the statutorily enumerated purposes of sentencing. 18 U.S.C. §3553(a). *See also Pepper* at 1242, 1243; *Kimbrough v. United States*, 552 U.S. 85, 101, 110 (201-) (§3553(a) "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing . . ."). In addition, the notion that a "sufficient, but not greater than necessary" sentence exists only within the confines of the advisory Guidelines is simply specious, and has been rejected by courts. *See e.g. United States v. Williams*, 372 F. Supp.2d 1335, 1337 (M.D. Fla. 2005) (noting government *always* opposes any sentence outside (below) the Guidelines as "unreasonable." . . . "Thus, while paying lip service to *Booker* and the statute, the government flouts the efficacy of the Supreme Court's opinion").

RICHARD B. LIND

## B. STATISTICAL SUPPORT FOR
## BELOW-GUIDELINES SENTENCE

The United States Sentencing Commission (hereinafter "the Sentencing Commission") publishes each quarter an abstract of federal sentencing statistics entitled *U.S. Sentencing Commission Preliminary Quarterly Data Report* (hereinafter "*Quarterly Data Report*").[16] The figures in the most recent version, the *2 st Quarter Release, Preliminary Fiscal Year 2012 Data*, which covers sentences imposed from January 1, 2012 through March 31, 2012, demonstrate that the Guidelines no longer constitute the predominant factor in the majority of sentences in the Southern District of New York ("SDNY") (or the Eastern District of New York, either).

For example, the *Quarterly Data Report* reveals that within the Second Circuit, a clear majority of sentences, 63.7%, were *not* within the calculated Guidelines range. *See Quarterly Data Report*, at 2.[17] The SDNY figures are even more dramatic: 70.4% of sentences were outside the Guidelines range (along with 70.3% in the Eastern District of New York), ranking SDNY fourth nationally among districts with the lowest rates of sentences within the Guidelines. *Id.*[18] Those numbers represent a continuing trend since *Booker* was decided January 12, 2005: in the first quarter of 2005, 70.5% of sentences nationally were within the Guidelines range. *Id.*, at 12. That number initially decreased to 61.8% by the first quarter of 2006, then remained essentially steady (60.7% for first quarter 2007, and 60.0% for first quarter 2008), before resuming its decline in 2009 and again through fiscal 2010 and 2011. *Id.*

In addition, only a minute fraction – 0.5% – of all SDNY sentences were *above* the Guidelines range, while 69.9% were *below* the range. In addition, the reasons for sentences below the Guidelines have evolved as well. Currently, in SDNY, only 17% of sentences[19] are attributable to government-sponsored motions,[20] while §3553(a) factors, Guidelines downward departures, and/or a combination thereof are responsible for 52.9% (all of which were *below* the Guidelines range). *Quarterly Data Report*, at 3.[21] That

---

[16] The *Quarterly Data Report* is available at <http://www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/Quarterly_Sentencing_Updates/USSC_2012_2nd_Quarter_Report.pdf>. Prior quarterly data is also available on the Sentencing Commission's web site, www.ussc.gov.

[17] Nationally, 53.5% of sentences were *within* the Guidelines range. *Quarterly Data Report*, at 1.

[18] SDNY trailed only the Southern District of California, the Eastern District of Wisconsin, and the District of Vermont. *See Quarterly Data Report*, at 2-6.

[19] The percentages are of *all* sentences within the District, as that is how the figures are presented in the *Quarterly Data Report*.

[20] Of those, 16.3% are the result of motions pursuant to §5K1.1, and the remaining 0.7% are listed merely as "Other Government Sponsored." *Quarterly Data Report*, at 3.

[21] The components of below-Guidelines sentences in SDNY (other than government-sponsored) were as follows:  (1) downward departures alone:  3.5%;  (2) downward

RICHARD B. LIND

represents the highest percentage of non-government sponsored below-Guidelines sentences among *all* districts.[22] Also, the proportion of §3553(a)-based below-Guidelines sentences relative to government-sponsored below-Guidelines has increased dramatically since *Booker. Compare, U.S. Sentencing Commission Preliminary Quarterly Data Report*, 3rd Quarter Release, Preliminary Fiscal Year 2006 Data, Through July 30, 2006, at 3.

Thus, in SDNY, a sentence *below* the Guidelines range is the overriding *norm*, and *not* the exception. Even excluding cases involving §5K1.1 (or other government-sponsored) motions, the incidence in SDNY of a below-Guidelines sentence based on §3553(a) factors and/or Guidelines downward departures (54.2%) still exceeds the ratio of within-Guidelines sentences (29.6%) by 90%. Thus, any support for a Guidelines sentence for Fusco in this case not only ignores all § 3553(a) factors other than the Guidelines (and particularly as they relate to him), but also defies empirical reality in this District.

## C. CONSIDERATION OF FUSCO AS AN INDIVIDUAL

As recounted in the RPSR, Emilio Fusco is 43 years old. He was born and raised in Quindici, Italy. His father died in 2007. His mother is 77 and continues to reside in Quindici, as do his siblings. Prior to his arrest in 2010, defendant periodically travelled back to Italy to care for his father and mother. RPSR, ¶¶ 103-106, 114.

Fusco came to the United States in 1991 and became a naturalized citizen in 1998. Fusco married his wife Jenny in 1993. They have three sons, all of whom reside with their mother in a private house in Longmeadow, MA. PSR, ¶¶ 107-113.

From November 2003 to approximately mid-2006, Fusco served a sentence of imprisonment as a result of his conviction in the criminal case in the District of Massachusetts. Shortly after his release from prison, Fusco incorporated Alliance Waste Co, Inc. in Massachusetts, which he operated a sole owner until his arrest in July 2010. As described in the PSR, his company served as a broker between commercial business and garbage collection companies. His revenue from the company was the main source of income for his family. He filed income taxes from 2008 to 2011, and reported adjusted gross income ranging between approximately $75,000 and $175,000. PSR, ¶¶ 96-97, 130, 139.

---

departure with §3553(a) factors: 3%; and (3) §3553(a) factors alone: 46.4%. *Quarterly Data Report*, at 3.

[22] In contrast, for example, 56.1% of *all* sentences in the Southern District of California involved "fast track" downward departures due to "§5K3.1 Early Disposition" departures, and only 8.6% of all sentences were below the Guidelines and *not* attributable to a government-sponsored departure. *Quarterly Data Report*, at 7.

RICHARD B. LIND

      I recognize that, in a case like this, where the government has charged a man with the most serious crimes, and has otherwise demonized every act he has taken, a court may lose sight of the fact that Fusco has strong human qualities. I submit that the more than thirty letters that are collectively annexed hereto as Exhibit E, demonstrate just that. These heartfelt and unedited letters, from family, relatives, and friends clearly show that Fusco is a deeply devoted parent and son, and a loving husband. Other letters voice how Emilio is empathetic, selfless, and trustworthy, a man who possesses a fundamental integrity, including as a businessman.

      It is also worth noting, in my experience as a defense lawyer, I have never experienced such family devotion to a client. I believe it would be a travesty to sentence Emilio to a long sentence in this case, based on the unsupported and perjurious testimony of an Anthony Arillotta or a Frankie Roche. I submit that the man they depicted is not the real Emilio Fusco. Instead, he is the man described in the letters the Court has before it.

### **CONCLUSION**

      For the foregoing reasons, it is respectfully submitted that this Court should sentence Emilio Fusco to a below-Guidelines sentence.

Respectfully submitted,

Richard B. Lind

Enclosures
cc: AUSAs Goldman and McQuaid (by email)(w/ encls.)

27