UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                     :

UNITED STATES OF AMERICA       :

                                     :

             -v.-          :     09 Cr. 1239 (PKC)

                                     :

JOHN BOLOGNA,              :

                                     :

                    Defendant.  :

                                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S SENTENCING MEMORANDUM FOR
## JOHN BOLOGNA

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America

Miriam E. Rocah
Daniel S. Goldman
Assistant United States Attorneys

     - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                        :
UNITED STATES OF AMERICA                :
                                        :
              -v.-                      :        09 Cr. 1239 (PKC)
                                        :
JOHN BOLOGNA,                           :
                                        :
                        Defendant.      :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S SENTENCING MEMORANDUM FOR
## JOHN BOLOGNA

The Government respectfully submits this memorandum in advance of the sentencing of

John Bologna.  Bologna pled guilty before this Court on December 29, 2009, to a nine-count

Information.  Among other things, Bologna pled guilty to participating in a Racketeering

conspiracy and substantive RICO violations related to his association with the Genovese

Organized Crime Family (the "Genovese Family"), and admitted to conspiring to murder

Genovese Family Captain Adolfo Bruno, who was killed November 23, 2003.

At the time of his guilty plea, Bologna signed a cooperation agreement with the

Government.  Pursuant to that cooperation agreement, both before and after his guilty plea,

Bologna provided the Government with immensely useful assistance; indeed, as explained in

more detail below, Bologna's assistance played a critical role in forming the basis for the charges

in United States v. Arthur Nigro, et al., 09 Cr. 1239, which resulted in the eventual convictions of

Arthur Nigro, Fotios Geas, Ty Geas, and Emilio Fusco (as well as the guilty pleas of Anthony

Arillotta and Felix Tranghese) on murder[1] and racketeering charges.  Nevertheless, subsequent to the date of Bologna's cooperation agreement, it was discovered that he had violated his agreement in several important respects, most notably by minimizing his participation in certain crimes and wholly failing to disclose his participation in numerous other significant crimes (including the attempted murder of Frank Dadabo).

As a result of Bologna's breaches of his cooperation agreement, the Government elected not to call Bologna as a witness at the *Nigro* trial in March 2011 and the *Fusco* trial in April 2012.  For the same reasons, the Government does not intend to file a motion for a downward departure on Bologna's behalf pursuant to Rule 5K1.1 of the Sentencing Guidelines. However, as explained below, the Government acknowledges that Bologna's substantial assistance to the Government is a proper consideration for the Court under Section 3553(a), and, accordingly, the Government does not oppose a below-Guidelines sentence.

## Background

### A.    Offense Conduct

John Bologna was a long-time associate of the Gambino Organized Crime Family, who from the 1970's through the 1990's ran large-scale bookmaking operations and assisted in the Gambino Family's corrupt control of the garbage industry throughout the 1990s.

Beginning around 1999, Bologna became affiliated with the Genovese Organized Crime Family and, specifically, Arthur Nigro.  Bologna -- who was never "made" -- essentially became Nigro's right-hand-man in overseeing certain Genovese Family rackets up until Nigro's arrest on

---

[1]       Fusco was acquitted of the murder charges but the Court found by a preponderance of the evidence that he participated in the murders of Adolfo Bruno and Gary Westerman and principally sentenced him to 25 years' imprisonment.

extortion charges in February 2006.  It was during this critical period that Nigro was himself gaining power within the Genovese Family and began, with Bologna's help, exerting control over the Genovese Family's operations in Springfield, Massachusetts, and South Florida, ultimately becoming Acting Boss of the Family in approximately 2003.

1.     Bologna's trips to Springfield, Massachusetts, and Extortion (Racketeering Act Two)

Starting around 2001, acting at Nigro's behest, Bologna began traveling to Springfield, Massachusetts every weekend, both to boost the power of the Nigro-supported local Genovese Family Captain, Adolfo Bruno, and to identify additional ways for the Springfield crew to make money, particularly through increased extortions.

Once in Springfield, Bologna identified numerous strip clubs and restaurants as targets for extortions, and began encouraging members of the Springfield crew of the Genovese Family to pressure various businessmen for money.  On at least one occasion, Bologna himself threatened an individual named James Santaniello to force him to pay increased extortion money out of the profits from a strip club Santaniello owned called the Mardi Gras.  After the threat, Santaniello agreed to increase his monthly payments.

During these trips, Bologna became close with Anthony Arillotta , then an associate in the Genovese Family, whom Bologna began pushing for Nigro to have "made" in New York.  In Fall 2002, after Bologna had been traveling to Springfield for approximately one year at Nigro's behest, Anthony Arillotta began to visit Bologna and Nigro in New York more often; in essence, Arillotta took Bologna's place as Nigro's "eyes and ears" in Springfield.  During one such visit, Bologna introduced Arillotta to an individual that Arillotta thought would be able to sell him

marijuana; in fact, the individual had AK-47s for sale.  Arillotta agreed to purchase two such

guns, and Bologna had another individual (Mario Imbesi) drive the AK-47s to Arillotta in

Springfield.

      2.     The Attempted Murder of Frank Dadabo (Not explicitly charged)

On one of Arillotta's visits to the Bronx to see Bologna and Nigro, Nigro instructed

Arillotta to do a "piece of work" for him regarding an individual named Frank Dadabo, a Cement

Mason's Union member who had disrespected Nigro.  When Arillotta asked Bologna for

clarification of what, precisely, Nigro wanted done, Bologna walked over to Nigro to find out;

Nigro told Bologna to have Arillotta kill Dadabo, and Bologna relayed the message.  On May 19,

2003, acting on Nigro's orders (received through Bologna), Arillotta, together with two members

of his crew -- Fotios and Ty Geas -- attempted to murder Frank Dadabo. They shot him

approximately nine times as Dadabo left his apartment, and left him for dead (although Dadabo

eventually lived).

After the Dadabo shooting, Bologna continued to encourage Nigro to induct Arillotta into

the Genovese Family, and to push Bruno to the side.  Nigro inducted Arillotta into the Genovese

Crime Family in August 2003.

      3.     The Murder of Adolfo Bruno (Racketeering Act One)

By late summer 2003, Arthur Nigro's relationship with Adolfo Bruno had soured.   Nigro

felt (in part because Bologna reported this) that Bruno was not sharing enough of the proceeds

from the rackets in Springfield with Nigro.  Then Bruno had a dispute with another Genovese

Captain in Florida, Ray Ruggiero, and Nigro resolved the dispute in favor of Ruggiero; Bruno

did not take kindly to this and even began bad-mouthing Nigro to other members and associates

of the Genovese Family.  And on several occasions, Nigro instructed Bologna to tell Bruno to come to New York to meet Nigro; each time Bruno refused to come.  After Bruno denied the third request, Bruno was put on the "pay no mind" list and was, in essence, isolated within the Genovese Family.

In the fall of 2003, Felix Tranghese, a made member of the Genovese Family, traveled to New York to meet with Nigro and showed Bologna paperwork (which Bologna believed to be a page from an FBI report) showing that Bruno had spoken with an FBI agent and told the agent that Emilio Fusco was a made member of the Genovese Family.  Obviously, this was a considerable problem for Bruno, as it suggested that Bruno was cooperating with law enforcement or, at least, that he had violated his oath to the Genovese Family by speaking to law enforcement on at least one occasion.

Nigro eventually ordered Tranghese to have Bruno killed, and then gave Anthony Arillotta the same order.  Arillotta and the Geas brothers then planned the murder with the assistance of Emilio Fusco, and they ultimately recruited Frankie Roche to carry out the job.  Frankie Roche killed Bruno on November 23, 2003.

Although Bologna did not have a direct role in the planning of the murder or in giving the order itself, he knew full well that the order had been given.  Indeed, on multiple occasions when Arillotta and Tranghese were slow to carry out Nigro's order, Bologna encouraged them to "do what they had been told to do" in carrying out the murder.

4.    Continued Extortions in Springfield

Following the murder of Bruno, Arillotta could no longer travel to New York because he had been arrested for a gambling charge and was on pre-trial release.  Accordingly, Bologna

(and, on occasion, Nigro) began meeting with him at a rest area on the highway just inside Massachusetts.  At these meetings, Bologna continued to press Arillotta (and sometimes Felix Tranghese) to step up their extortions and other criminal activity in Springfield so as to send more money to Nigro in New York.

In particular, Bologna and Nigro pressed Arillotta to move into the vending business, which had previously been controlled by other made members of the Genovese Family who were not sharing sufficient profits with Nigro.

In addition, in Spring 2004, Nigro and Bologna instructed Tranghese and Arillotta to attempt to extort Michael and Anthony Grant, two Hartford-based owners of a new strip club that was being opened in Manhattan -- the Hustler club.  While that extortion effort ultimately was called off because the FBI began investigating, Bologna had been instrumental in pressing others to move forward in the extortion effort.

5.     Illegal Gambling (Racketeering Acts Four and Five)

Throughout the period described above, not only was Bologna involved in assisting Nigro's oversight of illegal activities in Springfield (which included the operation of illegal poker machines and sports books), he was also managing an illegal gambling business in New York. Bologna was involved in operating illegal gambling businesses since at least the 1970s.  In the early 2000s he began assisting his brothers, Charles and Joe, in the operation of their own sportsbook and in using an offshore wireroom in Costa Rica to facilitate it.  In or about 2004, at the request of Nigro, Bologna introduced Genovese Family member Steve Alfisi, who operated his own sportsbook, to Bologna's brothers.  Ultimately, Alfisi financed a spinoff of this gambling business and other associates of Alfisi were then brought in to help operate this sportsbook —

including Mark Caio, James Coumoutsos, and George Coumoutsos.

In addition, Bologna owned and operated a social club in Port Chester, New York until approximately 2005. He collected between $1,500 and $2,000 per week from hosting poker and continental games at the social club.

6.    Loansharking and Extortion of James Downey (Racketeering Act Three)

Starting in around 2004, Bologna was also involved in the extortion of an individual named James Downey. James Downey was a Genovese Family associate who, for a time, was involved in a clothing business in Florida. In or about 1999, he began operating a nightclub in Peekskill, New York, called Club Passion. Several years later, Downey planned to start a wholesale designer clothing business in New York. Downey approached Bologna to ask if Steve Alfisi would provide him with a start up loan, and then Downey went to see Nigro. Nigro and Alfisi agreed that Alfisi would loan Downey approximately $100,000. Downey was required to repay the loan in full within 3 months. Rather than having Downey pay a set percentage of interest on the loan, Downey was expected to make indefinite monthly interest payments of $10,000, payable in $5,000 checks from the clothing business to Bologna and Nigro, to help both Bologna and Nigro declare a legitimate source of income. Bologna and Nigro were present in Nigro's house when Alfisi gave Downey $100,000 in cash.

Subsequently, Downey told Bologna that he had given Alfisi two payments of $5,000, but Downey did not make any additional payments. When Downey failed to repay the principal in full after three months, Alfisi, Nigro, and Bologna agreed to take the money directly from the weekly cash earnings of the nightclub that Downey partially owned, and that they would prohibit Downey from working at the nightclub until the loan was repaid. Bologna met Downey at

Bologna's home and told Downey, who was afraid of Bologna, that he could not go to his club until he repaid the loan.   For more than a year, Bologna collected cash from the nightclub on a weekly basis from Downey's partner, Tony Napoli, which Bologna passed to Alfisi.  All told, through legitimate and illegitimate means, Bologna and Alfisi collected approximately $80,000 on the debt from Downey.

When Napoli was subpoenaed to testify in the Grand Jury, he told Bologna that he would lie and say that he was not aware of any loan.   Bologna told both Nigro and Alfisi about the subpoena and what Napoli had told him.  After Napoli testified in the Grand Jury, he told Bologna that he did not tell the FBI about the loan.

Some time later, in mid-2007, Alfisi met Bologna at a diner in the Bronx and instructed Bologna to make a tape recording of Downey stating that Downey was not paying off any loanshark loan to Alfisi.  Alfisi gave Bologna a tape recorder to make the recording.  Bologna then recorded a conversation with Downey and gave the recording to Alfisi.  Within a week, Alfisi told Bologna that he had reviewed the recording with his attorney and that his attorney wanted Bologna to make another (better) recording with Downey.  Bologna refused.

## C.   Bologna's Cooperation

Bologna began cooperating in October 2007, and did so on essentially two fronts: (1) proffers of historical information, in which Bologna detailed his and others' involvement in assorted crimes; and (2) proactive cooperation, including consensually recording in-person meetings and telephone calls.  On each front, Bologna's cooperation was very valuable, but, as

described below, was also problematic.[2]

    1.    <u>Proffers</u>

John Bologna began proffering with the Government in October 2007 and continued through December 2009.  Bologna met with the Government on eleven separate occasions for debriefings (primarily in late 2007 and early 2008).

Bologna provided tremendous information and details of events that the Government did not previously know, including conduct that implicated Bologna in serious crimes.  Moreover, Bologna's information dramatically advanced the Government's investigation into the Bruno homicide, as well as assorted other crimes involving the Springfield crew of the Genovese Family.  While the Government had suspected that Nigro, Arillotta, and others were involved in the Bruno homicide and additional crimes, the Government had no direct proof until Bologna began proffering.  Bologna provided clear, credible information about the series of events that led to Bruno's murder, and provided clear, credible information about Nigro's crimes more generally.

Regarding the Bruno murder in particular, Bologna explained a series of disputes that had caused rising tension between Nigro and Bruno in the year preceding his murder.  Of particular significance, Bologna recounted that Felix Tranghese (a made member of the Genovese Family based in Springfield) had come to New York and showed Nigro and Bologna a piece of paper that indicated to them that Bruno was cooperating with the Government or might start cooperating with the Government.  Specifically, Bologna recalled seeing what he thought was an

---

    [2] Prior to becoming a cooperating witness with the U.S. Attorney's Office, Bologna provided information to the FBI as a Confidential Informant dating back to 1996.

FBI report that showed that Bruno had spoken to an FBI agent and provided information about members of the Genovese Family in Springfield, and that Bruno had made incriminating statements to Michael D'Urso, when D'Urso was making recordings for the Government as a cooperating witness.  The Government was then able to identify this piece of paper, which corroborated Bologna's account.  But before Bologna had provided this information to the Government, we had no idea that there was any specific triggering event for the murder.

Bologna further explained that a few months before Bruno was killed, Arillotta told Bologna that he and others had been given the order to kill Bruno.  Bologna said that he and Arillotta had two or three additional conversations regarding the murder of Bruno.  During one of those conversations, Arillotta told Bologna that "they" were having trouble getting the job done.  Specifically, Arillotta told Bologna that they had tried to set up Bruno by luring him to a house for dinner, but that it had not worked because Bruno did not show up.  Bologna told Arillotta that he should do what he had been told to do.  According to Bologna, Arillotta also told him that Arillotta and Tranghese had both been told to kill Bruno, but that Arillotta did not trust Tranghese.  Bologna suggested to Arillotta that he leave Tranghese out of the arrangements for killing Bruno.  Bologna later told Nigro about at least one of his conversations with Arillotta, and Nigro replied that "the kid" (i.e., Arillotta) knew what he needed to do. While at times Bologna somewhat downplayed his knowledge of the plot, essentially all of this information would later be corroborated by other witnesses and evidence.

In addition to providing details on the Bruno murder, Bologna provided credible information about the Downey extortion, the long-running extortion of James Santaniello (the owner of the Mardi Gras strip club in Springfield), the general structure of the Genovese Family,

and assorted other crimes in which various people had participated.

    2.    <u>Proactive Cooperation</u>

Bologna's proactive cooperation began the day that he agreed to cooperate in October 2007.  At the time, Bologna was already involved in running an illegal sports gambling operation with members of Steve Alfisi's crew -- most prominently Mark Caio.  Accordingly, the same day that he agreed to cooperate, Bologna made a consensually recorded phone call to Caio to discuss their gambling operation.  From that point forward, Bologna continued to consensually record phone calls and meetings with assorted targets up until January 2010.

Over the 26 months during which Bologna was on the streets proactively cooperating, there were several lapses in activity for various reasons, such as a stroke Bologna suffered and the incarceration of several primary targets. In general, however, Bologna continually and dependably recorded conversations during this period.  Bologna consensually recorded over 100 calls and/or meetings that he had with assorted targets.  Bologna did resist the agents' efforts to have him meet with certain individuals, but overall Bologna was very active in making recordings.  Moreover, in agreeing to make these consensually recorded conversations, Bologna placed himself at considerable personal risk.  The conversations generally fall into four rough categories:

    (a)    *Recordings with crew members concerning gambling*

The largest portion of Bologna's recordings were with Mark Caio and other associates of the Genovese Family (including James Coumoutsos and George Coumoutsos).  These recordings related primarily to the targets' operation of an illegal sports gambling business, which was financed by Steve Alfisi.  The sportsbook utilized an offshore wire room in Costa Rica to manage

its business, and brought in hundreds of thousands of dollars in revenue.

During the recorded conversations with these targets, Bologna not only elicited incriminating statements from the targets about the gambling business, but also information about their relationships with other co-conspirators more generally.

(b)    *Recordings with Arthur Nigro*

As noted above, by the time Bologna began cooperating, Nigro was already in prison as a result of a prior charge brought by this Office.  However, this Office and the FBI sought and obtained authorization to arrange for Bologna to meet with Nigro in the Federal Correctional Institution at Fort Dix, where Bologna would record his conversations.  Bologna met with and recorded Nigro on four separate occasions at the request of the FBI, between June 2008 and October 2008.  Each time, Bologna traveled to Fort Dix with Nigro's girlfriend, Margaret DiFeo.

In these recordings, Bologna elicited numerous incriminating statements from Nigro -- particularly as to Nigro's knowledge of and relationships with other members and associates of the Genovese Family. Unfortunately, the visiting room was generally quite loud, making it extremely difficult to hear the audio at several key times.  Accordingly, through no fault of Bologna, these recordings were ultimately deemed to be of less use than the Government had initially hoped.  Nevertheless, as this Court is aware, one of these recordings (from October 6, 2008) would ultimately be used at the *Nigro* trial in March 2011.  It is respectfully submitted that the recording was extremely powerful evidence against Nigro in that it corroborated the testimony of numerous cooperating witnesses, and provided significant color as to the relationships Nigro had with his co-conspirators.

(c)    *Recording of Anthony Arillotta*

In the fall of 2008, after Arillotta was released from prison in Massachusetts, and acting at the FBI's request, Bologna made numerous efforts to meet with and record Anthony Arillotta. Given that Bologna had provided significant information about Arillotta's role in numerous crimes (including the Bruno murder), and because Bologna had been close with Arillotta, the Government anticipated that this would be a significant opportunity to gain evidence against Arillotta.

Bologna began making overtures to meet with Arillotta starting in July 2008, and Arillotta repeatedly dodged his efforts. Ultimately, Bologna was able to meet with and record Anthony Arillotta on October 5, 2008. Prior to the meeting, Bologna's handling agents urged him to speak with Arillotta about assorted topics and, in particular, the Bruno murder.

During the meeting, Bologna eventually steered the conversation to the Bruno murder, and the fact that Fred Geas was then facing trial in Massachusetts. Bologna expressed some concerns about whether Fred Geas could be trusted, particularly given that Frankie Roche had by that point pled guilty and cooperated with law enforcement. Arillotta, however, quickly reacted by proclaiming Fred Geas's innocence and reciting the mob's party line – that the Bruno murder had been done by Roche because of a private beef Roche was having with Bruno. Rather than call Arillotta on that obvious misstatement, Bologna said, in essence – "right, right."

After the conversation concluded, when Bologna recounted what had happened, Bologna's handling agents were stunned that Bologna permitted Arillotta to recite the false claims about why Roche had killed Bruno without saying something to the effect of, "is that the story we're going with these days?" Nevertheless, Bologna credibly explained that he was simply happy to have gotten Arillotta to talk at all about the murder, given that Arillotta and

13

Bologna had both been taught never to talk again about a murder after it had taken place. Bologna urged his handling agents that he would get more from Arillotta the next time they met, yet there was no next time, as the FBI and the U.S. Attorney's Office concluded that Arillotta was apparently so skittish of Bologna that it was not worth further efforts to record conversations with him.

(d)   *Recordings of Louis Cherico*

Bologna consensually recorded approximately 15 conversations that he had with attorney Louis Cherico, who had represented Nigro in a prior case.  Initially, these recordings were made because Nigro was urging Bologna to speak with Cherico about various things.  But in addition, during the course of these conversations, Cherico made numerous incriminating statements to Bologna about a mortgage fraud scheme that he (Cherico) had been involved in committing.  As discussed below, these recordings proved to be extremely strong evidence against Cherico, who was convicted by a jury in this District in the fall of 2011 of bank fraud related to the mortgage fraud scheme.

**D.    Bologna's Guilty Plea**

Bologna pled guilty before Your Honor to a sealed nine-count Information on December 29, 2009, pursuant to a cooperation agreement.[3]  At the time of his guilty plea, the Government consented to Bologna's continued release on a personal recognizance bond, as he had been compliant with the FBI since he had begun cooperating in October 2007 and he was, at the time, continuing to proactively cooperate.

---

[3]  Bologna was prepared to plead guilty long before that date, but it was delayed several times primarily because of his health issues.

The specific crimes to which Bologna pled guilty were the following:

Count One:    RICO Conspiracy

Count Two:    RICO Substantive with the following specified Racketeering Acts:

    (1)    Conspiracy to Murder Adolfo Bruno

    (2)    Conspiracy to Extort and Extortion of James Santaniello

    (3)    Loansharking in connection with a $100,000 to James Downey (identified as "Victim-1" in the Information)

    (4)    Operating an illegal gambling business in Massachusetts

    (5)    Operating an illegal gambling business in New York

    (6)    Interstate Travel in Aid of Racketeering

Count Three:    Conspiring to Murder Adolfo Bruno in Aid of Racketeering[4]

Count Four:    Interstate Travel in Aid of Racketeering

Count Five and Six:    Extortion and Extortion Conspiracy (related to James Santaniello)

Counts Seven and Eight: Loansharking (related to James Downey)

Count Nine:    Operating an Illegal Gambling Business

The Information to which Bologna pled guilty tracked the crimes he had disclosed in his many proffers with the Government -- all of which were, in essence, crimes that the Government was investigating at the time it first approached Bologna in October 2007. During his proffers, Bologna had not revealed his involvement in any crimes about which the Government had no

---

[4] Bologna did *not* plead to aiding and abetting the murder of Adolfo Bruno (he pled only to the murder conspiracy), nor did he plead guilty to any other charge carrying a mandatory minimum sentence.

prior knowledge.  For example, Bologna had never once admitted to the Government anything about his involvement in the attempted murder of Frank Dadabo (about which the Government had no knowledge at the time of Bologna's proffers), the efforts to extort Michael and Anthony Grant, or assorted other shakedowns that would later come to light.

The Government repeatedly stressed to Bologna the importance of disclosing to the Government *all* of his illegal activity.  One example of this is worth noting.  Shortly after Bologna had pled guilty, the Government received information from the FBI's Springfield branch that another witness had told the FBI that Bologna and Bologna's son had been involved in procuring AK-47 machine guns for Anthony Arillotta in Springfield.  Bologna had never mentioned anything about his involvement in obtaining guns for anyone.  In January 2010, an AUSA from this Office and an FBI Special Agent confronted Bologna with this information and, after first denying it, Bologna then admitted that he had helped Arillotta obtain AK-47s.  Bologna claimed that he had resisted telling the Government this information previously because it had involved his son.  But as part of that conversation, the Government repeatedly stressed to Bologna *again* that no matter the reason Bologna was holding back on information, it was absolutely imperative for Bologna to be totally honest about any additional crimes that he had been involved in or about which he had information.  Bologna again affirmed that he understood, but (as later discovered) did not actually comply.

### E.    Disclosure of Bologna's Cooperation and The Immediate Fruits

Bologna's proactive cooperation ceased, and the fact of his cooperation was made public, on January 15, 2010.  The initial disclosure was made to attorneys for Fotios Geas because Fotios Geas was then awaiting trial in the District of Massachusetts for the murder of Adolfo Bruno in

aid of racketeering.  It was anticipated at the time that the United States Attorney's Office for the District of Massachusetts would be calling Bologna as a witness at trial against Fotios Geas. Accordingly, the U.S. Attorney's Office was obligated to disclose certain material regarding Bologna (including the October 5, 2008 recording Bologna had made of Arillotta), which made his cooperation known.

On February 11, 2010, a grand jury sitting in this District returned an Indictment charging Arthur Nigro and Anthony Arillotta with a host of crimes, including racketeering, racketeering conspiracy, and the murder of Adolfo Bruno in aid of racketeering.  In addition, the Indictment charged Steve Alfisi (a made member of the Genovese Family) with being part of the RICO conspiracy and substantive racketeering, and it charged three associates (Mark Caio, James Coumoutsos, and George Coumoutsos) with operating an illegal gambling business.

This Indictment was based significantly on the cooperation of John Bologna.  As explained in more detail below, it would be difficult to overstate the significance of Bologna's cooperation in terms of the Government's ability to seek this Indictment from the Grand Jury.  It was Bologna's proffer statements that gave the Government sufficient evidence to charge Nigro and Arillotta with the crimes with which they were charged, and it was Bologna's proactive cooperation that allowed the Government to charge the four other defendants, as well, all of whom eventually pleaded guilty to the operation of an illegal gambling business.

**F.    Arillotta's Cooperation**

Within weeks of his arrest, Anthony Arillotta expressed a desire to cooperate with the Government, and he began proffering with the Government on March 17, 2010.  As a general matter, Arillotta corroborated nearly everything Bologna had told the Government.  Arillotta did

not contradict information that Bologna had provided or otherwise suggest that any of the affirmative information Bologna had provided was in fact false.  However, Arillotta also provided far more information -- which made clear that Bologna had not told the *entire* truth.

Of particular significance, Arillotta explained to the Government that in May 2003, Arillotta, Fotios Geas, and Ty Geas -- acting on orders of Nigro and Bologna -- had attempted to murder Frank Dadabo in the Bronx.  Arillotta provided detailed information about Bologna's role in the discussions both before and after this shooting.  Indeed, at his initial proffer, Arillotta stated, "I have no idea why I'm not already charged with this."  Of course, the only reason was that Bologna had never said a single word about this shooting to the Government.

The Dadabo shooting was not the only new crime to come to light through Arillotta's proffers.  Arillotta also provided information about the significant role Bologna had played in pressing Arillotta and others to extort the Michael and Anthony Grant (the owners of the Hustler strip club in Manhattan), as well as numerous other business owners in Springfield which, again, had never been mentioned by Bologna during his proffers.

In addition, the tenor of Bologna's role in the offenses was painted somewhat differently by Arillotta.  In essence, Arillotta described Bologna as the instigator for a good deal of the tension that arose in Springfield prior to Bruno's murder.  As Arillotta described it, when Bologna started coming up to Springfield, it was as though dollar signs flashed before Bologna's eyes and Bologna saw a city ripe for the taking.  In addition, Arillotta explained that Bologna was always pitting mobsters against each other, and creating strife where none had previously existed. (Notably, these are depictions that were later corroborated entirely by Felix Tranghese).  Bologna had long painted his own role in a far more passive light -- as one where he was simply carrying

18

out Nigro's orders.

### G.    Confronting Bologna about Omissions

After the Government had debriefed Arillotta approximately six times and investigated certain of the new information, the Government arranged a meeting to confront Bologna about his apparent omissions.  The meeting was held on May 7, 2010.  By that point, Bologna had himself read the significant speculation in the media that Arillotta was cooperating.

The Government began the proffer by stating, in essence, that it knew Bologna had lied about and/or omitted significant events but without specifying to Bologna what those events were.  The Government urged Bologna to take some time to speak with his counsel (Mr. Patel).  Bologna did so, and then began to provide additional information.

Bologna stated that "there was a shooting" he had never told the Government about -- referring, of course, to the Dadabo shooting.  But even here, by this point knowing that Arillotta was cooperating with the Government, Bologna did not describe the whole truth right away.  Bologna described the events but claimed that he had not known ahead of time that Arillotta was going to shoot Dadabo; Bologna claimed that he had believed that Arillotta was simply going to give Dadabo a beating, and only learned after-the-fact that Nigro had instructed Arillotta to shoot him.  This was not consistent with Arillotta's proffers (Arillotta said that it had actually been Bologna who told Arillotta to "kill" Dadabo, after Bologna walked over to Nigro to get more details on what Nigro wanted done).  Accordingly, the Government pressed Bologna on this point.  After approximately 20 minutes of additional probing, Bologna relented and said, in essence, that he knew ahead of time that there would be a shooting. In the course of that same meeting, Bologna acknowledged his participation in the attempted extortion of the Grants, as

19

well as several shakedowns of union contractors (at Nigro's behest).  As a general matter, however, Bologna's ability to provide details on these other extortion schemes tended to be relatively limited.

The Government met with Bologna two more times to further debrief him after learning of his withholding, and Bologna continued to provide additional pieces of information.  Although some of the omissions were unintentional oversights (given the sheer number of small-scale shakedowns he had either participated in or knew about), many of them were deliberate withholding.  For example, when the Government met with Bologna again in late May 2010, Bologna informed the Government, for the first time, about an incident where he had learned that Nigro himself had been shot at in around 2003.  Bologna explained that sometime after the attempted murder of Frank Dadabo, Bologna got a call from Mark Caio to come over to Caio's house.  When Bologna arrived, he learned that someone had fired several shots at Nigro and missed.  Bologna met with Caio, Steve Alfisi, Nigro, and James Coumoutsos to discuss what to do.  According to Bologna, all except Bologna were armed with guns, and they drove around the neighborhood trying to decide what to do.  According to Bologna, they ultimately decided not to talk about it further, and simply wait to see what they heard from the streets.  Needless to say, it was mystifying to the Government that Bologna had withheld this event in all of his prior proffers -- particularly considering that Mark Caio and James Coumoutsos were people that he was consensually recording on a weekly basis.  But Bologna was unable to provide an explanation as to why, prior to May 2010, he had never told the Government anything about it despite numerous warnings from the Government that Bologna was being given a last chance to come completely clean.

**H.      Termination of Bologna's Cooperation Agreement**

Ultimately, this Office concluded that, in light of Bologna's breach of his cooperation agreement, it would not file a motion on Bologna's behalf pursuant to Rule 5K1.1 of the Sentencing Guidelines.  As noted above, Bologna's withholding of information was repeated, and it was significant.  More to the point, given the seriousness of Bologna's underlying conduct and the importance of his information in charging others with serious crimes, it was inexcusable.

Even before the decision not to file a motion on Bologna's behalf pursuant to Rule 5K1.1 of the Sentencing Guidelines was reached, a decision was made to seek Bologna's remand. Bologna consented to this remand, and although his surrender was delayed somewhat because of additional health problems, he surrendered to the Marshals on October 7, 2010.  In addition, as this Court is aware, the Government made a decision not to call Bologna as a witness in both trials in this case.  Notwithstanding the wealth of information Bologna had as to the defendants' roles in the Bruno murder and other crimes, the Government concluded that Bologna simply would not be an effective witness.  The Government believed -- and continues to believe -- that the information that Bologna has provided and to which he would have testified regarding the trial defendants' roles in the charged crimes was true.  Nevertheless, the Government had serious concerns that (1) Bologna would not present as a credible individual to a jury, given his history of duplicity and repeated withholding of information; (2) Bologna would be easily led, through cross-examination, to say things that were inaccurate; and (3) Bologna may still not be telling the whole truth as to things about which the Government does not know.  In both trials, the Government ultimately concluded that notwithstanding the immense help Bologna had provided to the investigation, calling Bologna as a witness at trial would hurt the Government's case far

more than it would help it.

## Discussion

**A.    Legal Standards and Guidelines Analysis**

1.    <u>Legal Standards</u>

The Guidelines still provide strong guidance to the Court in light of <u>United States</u> v.

<u>Booker</u>, 543 U.S. 220 (2005) and <u>United States</u> v. <u>Crosby</u>, 397 F.3d 103 (2d Cir. 2005), although

they are no longer mandatory. "[A] district court should begin all sentencing proceedings by

correctly calculating the applicable Guidelines range"-- that "should be the starting point and the

initial benchmark." <u>Gall</u> v. <u>United States</u>, 128 S. Ct. 586, 596 (2007). The Guidelines' relevance

throughout the sentencing process stems in part from the fact that, while they are advisory, "the

sentencing statutes envision both the sentencing judge and the Commission as carrying out the

same basic § 3553(a) objectives," <u>Rita</u> v. <u>United States</u>, 127 S. Ct. 2456, 2463 (2007), and the

Guidelines are "the product of careful study based on extensive empirical evidence derived from

the review of thousands of individual sentencing decisions," <u>Gall</u>, 128 S. Ct. at 594; <u>see also</u> <u>Rita</u>

v. <u>United States</u>, 127 S. Ct. at 2464. After making the initial Guidelines calculation, a sentencing

judge must then consider seven factors outlined in Title 18, United States Code, Section 3553(a),

and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes"

of sentencing outlined in Section 3553(a)(2). <u>Gall</u>, 128 S. Ct. at 596-97.

**B.    Guidelines Analysis**

**1.    Presentence Report**

The Probation Office applied Section 2E1.1, which governs racketeering offenses, to the

conduct in this case. Pursuant to Section 2E1.1, the offense level is the higher of 19, or the

offense level applicable to the underlying racketeering activity. To determine the offense level for the racketeering activity, the Probation Office applied the grouping analysis set forth in Chapter Three of the Guidelines, and identified four groups of conduct: one group related to the murder of Adolfo Bruno (Count One, Racketeering Act One of Count Two, and Count Three); extortion and conspiracy to commit extortion (Count One, Racketeering Acts Two and Six of Count Two, and Counts Four through Six); loansharking (Count One, Racketeering Act Three of Count Two, and Counts Seven and Eight); and the operation of illegal gambling businesses (Count One, Racketeering Acts Four and Five of Count Two).[5]

For Group One, relating to the murder of Adolfo Bruno, the Probation Office applied Section 2A1.1(a), which provides for a base offense level of 43, which is also the total offense level because no enhancements applied.[6]

For Group Two, relating to extortion and extortion conspiracy, the Probation Office applied Section 2B3.2(a), which provides for a base offense level of 18; a two-level enhancement, pursuant to U.S.S.G. § 2B3.2(b)(1), because the conduct involved express or implied threats of bodily injury; a three-level enhancement, pursuant to U.S.S.G. § 2B3.2(b)(2) and § 2B3.1(b)(7)(D), because the extortionate conduct exceeded $250,000; and a further five-level enhancement, pursuant to U.S.S.G. § 2B3.2(b)(3)(A)(iii), because co-conspirators Fotios and Ty Geas possessed firearms in connection with extortion attempts. The resulting total offense level for Group Two is 28.

---

[5]    The PSR did not include Count Nine (operation of illegal gambling business) in this group, although it should be included.

[6]    Pursuant to Section 2A1.5(c)(1), which applies to conspiracy to commit murder, Section 2A1.1 applies if the offense results in the death of a victim.

For Group Three, relating to loansharking, the Probation Office applied a base offense level of 18, pursuant to U.S.S.G. § 2B3.2(a). The Probation Office further determined that a two-level enhancement applied, pursuant to U.S.S.G. § 2B3.2(b)(1), because the conduct involved express or implied threats of bodily injury, and an additional two-level enhancement, pursuant to U.S.S.G. § 2B3.2(b)(2) and § 2B3.1(b)(7)(C), because the extortionate conduct exceeded $100,000. The resulting total offense level for Group Three, as calculated by the Probation Office, is 22.

For Group Four, relating to the operation fo illegal gambling businesses, the Probation Office applied a base offense level of 12, pursuant to Section 2E3.1. Because no additional enhancements applied, the Probation Office determined the total offense level for Group Four to be 12.

Applying the grouping analysis set forth in Section 3D1.4, Group One constituted one Unit, but the other groups did not constitute a unit because they were more than nine levels less than Group One. As a result, the combined adjusted offense level in the PSR is 43. Because Bologna accepted responsibility pursuant to Section 3E1.1(a) and (b), which warranted a three-level reduction, the total offense level, according to the Probation Office, is 40.

The Probation Office calculates that Bologna has no criminal points, placing him in Criminal History Category I. At offense level 40 and Criminal History Category I, the Probation Office determined the Sentencing Guidelines range to be 292 to 365 months' imprisonment. The Probation Office recommends a sentence at the bottom of that range.

## 2.     The Government's Guidelines Calculation

The Government agrees with the Probation Office's Guidelines calculation for Groups

One, Two, and Four, but believes the Probation Office applied the incorrect Guidelines section for Group Three, which relates to loansharking.  Loansharking, or extortionate extensions of credit, is governed by Section 2E2.1, not Section 2B3.2.  Section 2E2.1 has a base offense level of 20.  In the loansharking conduct related to James Downey charged here, no enhancements apply.  As a result, the total offense level for Group Three is 20.  This change to the Probation Office's calculation does not alter the ultimate determination of the Guidelines range because Group Three still does not count as a Unit in the grouping analysis under Section 3D1.4.  Accordingly, the Government agrees with the Probation Office's calculation of a Guidelines range of 292 to 365 months' imprisonment.

**C.     A Substantial Sentence is Warranted**

The Government recognizes that, while imposing any sentence is a challenging task for a District Court, deciding what sentence is sufficient but not greater than necessary for John Bologna will be particularly challenging because of the competing interests at stake.  While all of the statutory factors are of course important considerations for the Court, from the Government's perspective, there are three primary factors at issue: (1) the nature of Bologna's crimes, which are of close to the highest order; (2) the value of his cooperation, which is significant; and (3) the nature of his duplicity, both before and after he commenced his cooperation, which is also immensely troubling.  On balance, the Government respectfully submits that these factors counsel in favor of a substantial sentence, but, because of Bologna's substantial assistance, the Government does not oppose a sentence somewhere below the advisory Guidelines range of 292 to 365 months' imprisonment.

1.      The Nature and Circumstances of Bologna's Crimes

25

Bologna chose to engage in a life of crime.  While he never became an official, made member of La Cosa Nostra, he was a committed associate – committing crimes with and for multiple Organized Crime families for years.  He has not had a real job in decades; instead, he chose to make money the mob way, through shakedowns and rackets.  Not only that, Bologna pushed his way into a position of significant power within the mob.  He became Arthur Nigro's right-hand-man.  That meant that whenever Bologna went to Springfield, Massachusetts, he spoke for Nigro.

Prior to Bologna beginning to travel to Springfield, Massachusetts, there was a long history of Genovese Family control in that city.  But it was relatively benign, at least in mob terms.  When Bologna began traveling to Springfield at Nigro's request, he pushed the local mobsters to step up their extortions, and send more money to him and Nigro in New York.  He also began instigating personality conflicts, and, in essence, laying the groundwork for the problems that would ultimately lead to Bruno's murder.

In addition, as noted above, Bologna was personally involved in two murder plots – the plan to kill Frank Dadabo, which was ultimately unsuccessful, and the plan to kill Adolfo Bruno, which was successful. While Bologna neither pulled the trigger nor gave the order on either of these murder plans, he unquestionably knew about the plans, and encouraged the killings to take place. Indeed, from Bologna's perspective, he stood to gain by both murders, as they would boost Nigro's standing in the mob and, in turn, give Bologna more clout.  Thus, he is in many ways just as culpable for these murder plans as those -- lower down the Genovese Family chain of command -- who actually carried them out.

Bologna was also involved in shakedown after shakedown.  In essence, he was a bully --

threatening people on the streets if they refused to give him money.  While seemingly minor in comparison to the murders, these extortions of which Bologna played a part are in and of themselves serious crimes that must be punished.

       2.      <u>The Nature of Bologna's Cooperation</u>

On the other hand, this Court should strongly consider the substantial value of Bologna's cooperation. At the outset, it must be remembered that all of Bologna's cooperation was undertaken at considerable personal risk to Bologna.  Giving information about mobsters -- men who have proven their willingness to kill people they suspect of being informants -- is no easy task.  Making consensual recordings and wearing recording devices against such people is still harder. Without individuals willing to undertake the risk of cooperating, it would often be impossible for the Government to prosecute those responsible for crimes, particularly within well-insulated organizations like the mafia.

       a.      *United States v. Nigro, et al.*

When Bologna agreed to cooperate in October 2007, the Government's investigation into the Bruno murder was largely inactive. While the Government had leads, and had some evidence of Bologna's involvement, it was unclear when, or if, it was going to be able to charge him or anyone else.  Indeed, it appeared that although Frankie Roche had cooperated already, the Government might be unable to expand the investigation beyond Fred Geas.  Bologna's cooperation made that possible.  Because of his cooperation, the Government was able to charge Anthony Arillotta and Arthur Nigro with the Bruno murder and other crimes, and to strengthen its proof against Fred Geas.  Then, with Arillotta's cooperation building upon information Bologna had provided, the Government was able to charge Felix Tranghese, Ty Geas, and Emilio

Fusco.  As this Court is aware, all have now pled guilty or been convicted of numerous crimes, including the Bruno murder.[7]

Bologna's cooperation was unquestionably one of the key factors in obtaining these results.  Not only was the Government able to charge Arillotta because of Bologna's cooperation -- Arillotta's decision to cooperate was itself driven almost entirely by his assumption that, with Bologna cooperating, he stood no chance at any trial. Thus, even though the Government did not call Bologna as a witness at the *Nigro* and *Fusco* trials, the Government respectfully submits that, without his cooperation, the trials might never have taken place, and Anthony Arillotta, Arthur Nigro, Ty Geas, Felix Tranghese, and Emilio Fusco all could have escaped punishment for their crimes.

        b.    *United States v. Steve Alfisi, et al.*

Bologna's cooperation led directly to the arrest and guilty pleas of Nigro's early co-defendants, Steve Alfisi, Mark Caio, James Coumoutsos, and George Coumoutsos.  In particular, Bologna's cooperation (and, particularly, his proactive cooperation) is what permitted the Government to charge Alfisi with RICO, including the extortion of James Downey, and to charge all four with operating an illegal gambling business. As this Court is aware, each of these four defendants ultimately pled guilty to operating an illegal gambling business, and each was sentenced to between three and ten months' imprisonment. Because these defendants appeared before this Court, the Government will not rehash the value of securing these pleas.

At the same time, it is worth noting that part of why the Government ultimately accepted

---

[7]    As discussed above, the jury acquitted Emilio Fusco of the Bruno murder, but this Court found by a preponderance of the evidence that Fusco participated in that murder.

a plea from Alfisi to a lesser charge of operating an illegal gambling business (as opposed to the Downey extortion or RICO) is because the Government's proof was so heavily reliant on Bologna's credibility.  The Government ultimately became concerned about its ability to prove the more significant charges against Alfisi to the extent that it would require Bologna's testimony and, ultimately, accepted a lesser plea deal than it may have accepted if Bologna had not breached his cooperation agreement with the Government.

        c.     *United States v. Louis Cherico*

Bologna's cooperation also played a significant role in the prosecution of attorney Louis Cherico for Cherico's participation in a mortgage fraud scheme.  *See United States* v. *Cherico*, 08 Cr. 786 (CM).  At the time that Bologna began cooperating, the Government was actively investigating two related fraud schemes that had been conducted by a group of individuals led by Domenick DeVito, a Genovese Crime Family associate.  One scheme involved the filing of inflated insurance claims connected to property damage on multi-million dollar residential properties in Westchester County.  The second scheme was a mortgage fraud scheme that involved making false statements to banks in order to secure mortgages on multi-million dollar properties in Westchester County, including some of the same properties involved in the insurance fraud scheme.  Cherico participated in the mortgage fraud scheme by representing participants in the conspiracy on several of the real estate transactions in connection with which fraudulent mortages were obtained.  Despite strong evidence of Cherico's involvement in transactions at the heart of the mortgage fraud scheme, the prosecution of Cherico was challenging.  While Cherico had plainly been involved in making false statements to the banks, it was not clear whether Cherico was aware that the statements were false at the time (or whether

29

he was simply communicating information provided to him by others that he believed to be true).

Over the course of their in-person meetings, Cherico and Bologna repeatedly discussed both the insurance fraud and mortgage fraud schemes.  During those conversations, Cherico made a series of critical admissions that were devastating proof of Cherico's knowing participation in the mortgage fraud.  First, Cherico discussed in detail the mechanics of the mortgage fraud, explaining details of the scheme to Bologna that would have only been known to a participant.  Second, Cherico, in discussing the scheme, posed the question of whether he had known what DeVito and others had been up to, and then answered his own question with a definitive: "I did."  Finally, Cherico offered an explanation for why he participated in the scheme, suggesting to Bologna that, at the time, other lawyers were doing the same thing (i.e. lying to banks in the process of securing mortgages).

The impact of Cherico's recorded admissions to Bologna on the prosecution of Cherico cannot be overstated.  The evidence had a significant impact on the decision to charge Cherico — Bologna's recordings, along with the decision of an accountant involved in the schemes to cooperate with law enforcement, were the tipping points that resulted in Cherico being charged.  The Bologna recordings were also the most important piece of evidence at Cherico's trial, which commenced on October 12, 2011 and concluded on November 1, 2011, when Cherico was convicted on five counts, all of which stemmed from his involvement in the mortgage fraud scheme.

Cherico was eventually sentenced by the Honorable Colleen McMahon to one year and

one day imprisonment.[8]  Without Bologna's timely and effective proactive cooperation, it is far

from certain that Cherico would ever have been punished for his criminality.

### 3. The Nature of Bologna's Duplicity

Finally, this Court must consider the nature of Bologna's duplicity, which the

Government respectfully submits tempers the weight that this Court should give to Bologna's

cooperation.

As explained above, notwithstanding having been told time and again the importance of

being "fully on board" after deciding to cooperate, it remains unclear whether John Bologna has

ever truly made the necessary leap of faith.  For approximately ten years, beginning in 1996,

Bologna led a double life, as a mobster committing crimes with the Genovese Family on the one

hand, and providing the FBI confidential source information about certain Gambino Family

members and associates on the other.  After being confronted by the FBI and agreeing to

cooperate, Bologna failed to successfully make the transition from confidential informant (who

was not required to admit to all of his crimes) to cooperating witness (who was required to do

so).  Even after being warned time and again, Bologna continued to withhold information about

crimes he had committed, and crimes he knew about by others.

It is impossible for the Government to ascertain what drove Bologna's continued

withholding and piecemeal disclosures, but one anecdote may prove revealing.  In the month

leading up to the *Nigro* trial, former AUSA Mark Lanpher and FBI Special Agent Joy Adam met

with Bologna and his counsel to discuss the fact that he may be called by a witness for the

---

[8]       Moreover, as a result of being convicted of a felony, Cherico lost his license to
practice law.

defense in the *Nigro* trial.[9]  Among other things, Bologna was asked what he had thought when he first heard that Anthony Arillotta was cooperating, and, more specifically, whether Bologna was concerned that Arillotta would tell the Government about Bologna's role in the Dadabo shooting.  Bologna said he had not been concerned.  When asked why, Bologna said: "Because I thought more of the kid."  In other words, Bologna was saying that, even though Arillotta was cooperating, Bologna thought Arillotta would lie to the Government -- and that by doing so, he would be "more" of a man.  Even though Bologna had been through the cooperation process, he still somehow did not accept that he and others were truly obligated to tell the whole truth.

---

[9]      Counsel for Emilio Fusco also considered calling Bologna as a defense witness, even requiring Bologna to be transported to the District in order to be ready to testify. Ultimately, at the last minute, Fusco's counsel decided against calling Bologna as a defense witness.

**Conclusion**

For the foregoing reasons, and to appropriately balance the statutory factors set forth in Title 18, United States Code, Section 3553(a), the Government respectfully requests that the Court to sentence John Bologna to a substantial incarceratory sentence,, although we do not oppose a sentence below the Guidelines sentence of life imprisonment.

Respectfully submitted,

PREET BHARARA
United States Attorney

By:____/s/_____
    Miriam E. Rocah
    Daniel S. Goldman
    Assistant United States Attorneys
    (914) 993-1907
    (212) 637-2289

cc:    Andrew Patel, Esq.
       Christopher Ferrall, U.S. Probation